Michael F. Barrett (42305)
David J. Cohen (74070)
SALTZ MONGELUZZI BARRETT & BENDESKY, P.C.
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
(215) 496-8282

*Additional counsel listed on signature page*

---

| | |
|---|---|
| **PAMELA MYERS,**<br>**1522 B Marcy Place**<br>**Philadelphia, PA 19115,** : | **PHILADELPHIA COUNTY** |
| : | **COURT OF COMMON PLEAS** |
| **DARRYL WILLIAMS,**<br>**128 N. 7th Street**<br>**Darby, PA 19023, and** : | **TRIAL DIVISION** |
| : | |
| **WYATT SEALS,**<br>**3326 Fox Street**<br>**Philadelphia, PA 19129,**<br>**Individually and on behalf of**<br>**all others similarly situated,** : | **CLASS ACTION** |
| : | |
|             **Plaintiffs,** :<br>  **vs.** : | **MARCH TERM, 2009** |
| **JANI-KING OF PHILADELPHIA, INC.,** :<br>**2500 Eisenhower Avenue**<br>**Norristown, PA 19403,** : | **CASE NO. _____** |
| : | |
| **JANI-KING, INC.,**<br>**16885 Dallas Parkway**<br>**Addison, TX 75001, and** : | |
| : | |
| **JANI-KING INTERNATIONAL, INC.,** :<br>**16885 Dallas Parkway**<br>**Addison, TX 75001,** : | |
| : | |
|             **Defendants.** : | |

---

**COMPLAINT -- CLASS ACTION**
1O — Contract: Other

Case ID: 090303550

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

| For Prothonotary Use Only (Docket Number) |
|---|

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| Pamela Myers | Jani-King of Philadelphia, Inc. |

*Filed and Attested by PROTHONOTARY*
*20 MAR 2009 04:03 pm*
*S. GARRETT*

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 1522 B Marcy Place | 2500 Eisenhower Avenue |
| Philadelphia       PA       19115-4285 | Norristown       PA       19403-3322 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| Darryl Williams | Jani-King, Inc |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 128 N. 7th Street | 16885 Dallas Parkway |
| Darby       PA       19023-2310 | Addison       TX       75001-5215 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| Wyatt Seals | Jani-King International, Inc. |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 3326 Fox Street | 16885 Dallas Parkway |
| Philadelphia       PA       19129-1323 | Addison       TX       75001-5215 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NO OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| N/A | 3 | ☑ Complaint   ☐ Petition Action   ☐ Notice of Appeal |
| | | ☐ Writ of Summons   ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | | |
|---|---|---|---|---|---|
| ☐ $50,000.00 or less | ☐ Arbitration | ☐ Mass Tort | ☐ Commerce | ☐ Settlement |
| ☑ More than $50,000.00 | ☐ Jury | ☐ Savings Action | ☐ Minor Court Appeal | ☐ Minors |
| | ☐ Non-Jury | ☐ Petition | ☐ Statutory Appeals | ☐ W/D/Survival |
| | ☑ Other: Class Action | | | |

CASE TYPE AND CODE (SEE INSTRUCTIONS)

1O       Contract: Other

STATUTORY BASIS FOR CAUSE OF ACTION (SEE INSTRUCTIONS)

43 P S  §§ 333.101, et seq. ; 43 P.S. §260.1 et seq.

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | IS CASE SUBJECT TO COORDINATION ORDER? |
|---|---|
| | Yes       No |
| | ☐          ☐ |
| | ☐          ☐ |
| | ☐          ☐ |

### TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant:

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS (SEE INSTRUCTIONS) |
|---|---|
| Michael F  Barrett / David J  Cohen (74070) | 1650 Market Street, 52nd Floor |

| PHONE NUMBER | FAX NUMBER | |
|---|---|---|
| (215) 496-8282 | (215) 496-0999 | Philadelphia       PA       19103-7236 |

| SUPREME COURT IDENTIFICATION NO | E-MAIL ADDRESS |
|---|---|
| 42305 | mbarrett@smbb.com; dcohen@smbb.com |

| SIGNATURE | DATE |
|---|---|
| | March 20, 2009 |

Case ID: 090303550

| NOTICE | AVISO |
|---|---|

**NOTICE**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after the complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

PHILADELPHIA BAR ASSOCIATION
Lawyer Referral and Information Service
1101 Market Street, 11th Floor
Philadelphia, Pennsylvania 19107
(215) 238-1701

**AVISO**

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notification. Hace falta asentar una comparencia escrita o con un abogado y entregar a la corte en forma escrita sus defenses o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demandaen contra suya sin previo aviso o notificacion. Ademas, la corte puede decidira favor del demandante y require que usted cumplacon todas las provisiones de esta demanda. Usted puede perder dinero o sus propriedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A AN UN ABOGADO INMEDIATA-MENTE SI NO TIENEABOGADO O SI NO TIENE EL DINERO SUFFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONOA LA OFFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASSOCIACION DE LICENCIADOS DE FILADELFIA
Servicio De Referencia E Informacion Legal
1101 Market Street, 11th Floor
Filadelfia, Pennsylvania 19107
(215) 238-1701

Plaintiffs Pamela Myers, Darryl Williams, and Wyatt Seals ("Plaintiffs"), by and through their undersigned attorneys, hereby make the following allegations concerning their acts and status upon actual knowledge, and concerning all other matters upon information, belief, and the investigation of their counsel:

## NATURE OF ACTION

1.      Jani-King of Philadelphia, Inc., Jani-King, Inc., and Jani-King International, Inc. ("Defendants") have engaged in a many-headed, but uniform and systematic, course of conduct with respect to Plaintiffs and the Class members. Defendants took large sums of money from Plaintiffs and the Class members in return for purported cleaning "franchises" that Defendants represented to be profitable businesses. In reality, for their money, Plaintiffs and the Class

Case ID: 090303550

members received a low-paying (even sub-minimum wage) job, and the right to be subjected to additional, excessive finder's fees, royalty fees, business plan protection fees, accounting fees, advertising fees, and administration fees. Further, Defendants systematically underbid the cleaning accounts Plaintiffs and the Class members worked, causing them to receive far less than fair market value for their services. Defendants also actively pursued the termination of Plaintiffs and the Class members from accounts to which they were assigned so that Defendants could churn those accounts from franchisee to franchisee, ostensibly satisfying their obligation to provide Plaintiffs and the Class members with cleaning work, all while collecting more franchise fees.

2.      As set forth in detail below, Defendants' actions violated the Pennsylvania Minimum Wage Act of 1968, 43 P.S. §§ 333.101, et seq. ("MWA") and the Pennsylvania Wage Payment and Collection Law, 43 P.S. §260.1 et seq. ("WPCL"), and give rise to related claims for breach of contract, breach of the duty of good faith, and unjust enrichment. Plaintiffs bring these claims on their own behalf, and on behalf of a Class defined to include: "All persons who performed cleaning services for Defendants in Pennsylvania at any time from March 20, 2006 to the present" ("the Class members").

## PARTIES

3.      Plaintiff Pamela Myers is a resident of the Commonwealth of Pennsylvania who resides in Philadelphia County and performed cleaning services for Defendants in Philadelphia throughout the relevant period.

4.      Plaintiff Darryl Williams is a resident of the Commonwealth of Pennsylvania who resides in Philadelphia County and performed cleaning services for Defendants in Philadelphia throughout the relevant period.

3

5.      Plaintiff Wyatt Seals is a resident of the Commonwealth of Pennsylvania who has resides in Philadelphia County and performed cleaning services for Defendants in Philadelphia throughout the relevant period.

6.      Defendant Jani-King of Philadelphia, Inc. is a Texas corporation with its primary business office at 2500 Eisenhower Avenue, Norristown, PA 19403.  Jani-King of Philadelphia is a wholly-owned subsidiary of Jani-King, Inc.

7.      Defendant Jani-King, Inc. is a Texas corporation with its primary business office at 16885 Dallas Parkway, Addison, TX 75001.  Jani-King is a wholly-owned subsidiary of Jani-King International, Inc.

8.      Defendant Jani-King International, Inc. is a Texas corporation with its primary business office at 16885 Dallas Parkway, Addison, TX 75001.

9.      During the relevant period, Defendants have been an integrated enterprise with common owners, inter-related operations, common management, and centralized control of labor relations and personnel management.  Defendants have operated one of the largest commercial cleaning companies in the world, with roughly 12,000 franchisees and 100 regional support centers.  Throughout the relevant period, Defendants served as each others' agents and worked in concert to accomplish the improper actions pled here.  Defendants jointly formulated, approved, and controlled the improper practices described in this Complaint, and are jointly responsible for the improper practices described herein.

## JURISDICTION AND VENUE

10.     This Court has personal jurisdiction over this lawsuit as a result of Defendants' significant contacts with Philadelphia County, which include its employment of scores of Philadelphia residents, and its provision of services to many customers in Philadelphia County.

4

Case ID: 090303550

11.     This Court has subject matter jurisdiction over this lawsuit because Plaintiff asserts claims under the WPCL, 43 P.S. §260.1 *et seq.*, and the MWA, 43 P.S. §§ 333.101, *et seq.*

12.     Venue is proper in this Court because the transactions and occurrences giving rise to Plaintiff's cause of action took place in Philadelphia County.

13.     Original jurisdiction over this matter does not lie in the federal courts pursuant to the jurisdictional exception provided at 28 U.S.C. § 1332(d)(4)(A).

14.     Under the totality of the circumstances, the forum selection clause in Defendants' Franchise Agreement (which ostensibly requires claims against Defendants to be filed in Texas) is invalid.  All of the relevant considerations weigh heavily in favor of allowing Plaintiffs' claims to be litigated in Pennsylvania, including: the parties' relative bargaining power, the circumstances of their negotiations, the location of the subject transactions and events, the presence of fraud and undue influence, the location of the parties, the place where Plaintiffs and the Class members suffered the claimed injuries, the convenience of witnesses, and the accessibility of evidence.  Further, throughout the relevant period, Plaintiffs and the Class members did not stand in an equal bargaining position with Defendants, did not understand the terms or consequences of Defendants' forum selection clause, much less that performing cleaning services for Defendants would require them to waive their right to bring suit in Pennsylvania or receive the protections of Pennsylvania law.

## PENNSYLVANIA CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action pursuant to Pa. R. Civ. P. 1701-16 on behalf of a Class defined to include: "All persons who performed cleaning services for Defendants in Pennsylvania at any time from March 20, 2006 to the present" (the "Class").

Case ID: 090303550

16.   Plaintiffs are members of the Class they seek to represent. The Class members can be identified using records in Defendants' control and kept by Defendants in the usual course of their business. Class members will be able to receive notice related to this class action through direct mailings to addresses maintained in the usual course of Defendants' business.

17.   The Class members are so numerous that their joinder would be impracticable. During the relevant period, Defendants employed more than 200 people to perform cleaning services in Pennsylvania.

18.   Defendants engaged in a common course of conduct that violated the legal rights of Plaintiffs and the Class members. Individual questions, if any, pale by comparison to the numerous material questions of law or fact common to the Class that will necessarily dominate the Court's analysis of Plaintiffs' claims, including:

a.   Whether Defendants violated the MWA by treating Plaintiffs and the Class members as independent contractors rather than as employees and, among other things, at or above the legally-mandated minimum wage;

b.   Whether Defendants violated the WPCL by treating Plaintiffs and the Class members as independent contractors rather than employees and, among other things, improperly deducting excessive and improper fees from their wages;

c.   Whether Defendants committed a breach of contract by violating or undermining the promises made in their Franchise Agreement;

d.   Whether Defendants breached their duty of good faith and fair dealing to Plaintiffs and the Class members;

e.   Whether Defendants engaged in acts with respect to Plaintiffs and the Class that would substantiate a claim common law deceit; and

6

Case ID: 090303550

f.       Whether Defendants should be required to pay compensatory damages, liquidated damages, and/or attorneys' fees for violating the WPCL and/or MWA.

19.      Plaintiffs' claims are typical of the claims belonging to absent Class members. Plaintiffs and the absent Class members are all similarly-situated employees who suffered the same type of harm as a result of Defendants' common course of wrongful conduct. Plaintiffs and the Class members all worked for Jani-King under the circumstances alleged in this Complaint, and all suffered economic damages as a result of Defendants' common course of wrongful conduct.

20.      Plaintiff will fairly and adequately assert and protect the interests of absent Class members under the criteria set out in Pa. R. Civ. P. 1709 as follows:

a.       Plaintiffs are familiar with the facts that form the bases of the Class members' claims;

b.       There is no apparent conflict of interest between Plaintiff and the absent Class members;

c.       Plaintiffs have retained counsel who are competent and experienced in Class action litigation, and intend to prosecute this action vigorously. Plaintiffs' counsel have successfully prosecuted many complex Class actions, including wage and hour and breach of contract class actions, and will fairly and adequately protect the interests of the absent Class members; and

d.       Plaintiff has or can acquire adequate financial resources to assure that the interests of the Class will not be harmed. Consistent with Pa. R. Prof. Conduct 1.8(e)(1), counsel for Plaintiff have agreed to advance the costs and expenses of litigation on the Class' behalf, contingent upon the outcome of this litigation.

7

Case ID: 090303550

21.    Allowing this action to proceed as a class action will provide a fair and efficient method for adjudication of the issues presented by this controversy under the criteria in Pa. R. Civ. P. 1708 as follows:

 a.    Common questions of law or fact predominate over any questions affecting only individual members, as Plaintiff seeks to remedy common legal grievances on behalf of all similarly-situated employees;

 b.    No difficulties are likely to be encountered in the management of this litigation as a class action, given that Defendants' records will assist, both in identifying the Class members and verifying the fact and precise amount of their claims;

 c.    No class action litigation has been commenced that addresses the issues raised here;

 d.    This forum is particularly appropriate for adjudicating these claims as this Court has significant experience with class action litigation, transactions and occurrences giving rise to Plaintiff's claims took place in Philadelphia, and many members of the Class live in Philadelphia.

 e.    The claims addressed in this Complaint are not too small to justify the expenses of class-wide litigation, nor are they likely to be so substantial as to require the litigation of individual claims.

22.    The class action device is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims. The relief sought by individual Class members is small given the burden and expense of individual prosecution of the potentially extensive litigation necessitated by Defendants' conduct.

Case ID: 090303550

23.     Given the material similarity of the Class members' claims, even if each Class

member could afford to litigate a separate claim, this Court should not countenance or require the

filing of at least two hundred identical actions.  Individual litigation of the legal and factual

issues raised by Defendants' conduct would cause unavoidable delay, a significant duplication of

efforts, and an extreme waste of resources.  Alternatively, proceeding by way of a Class action

would permit the efficient supervision of the Class' claims, give rise to numerous economies of

scale for the Court and for the parties, and result in a binding and uniform adjudication on each

issue for every party.

## EMPLOYMENT STATUS ALLEGATIONS

24.     Throughout the relevant period, Defendants operated a business that provided

cleaning services to commercial clients like offices, schools, restaurants, and warehouses.

25.     Throughout the relevant period, Defendants provided these cleaning services

through a complex scheme by which Plaintiffs and the Class members were seemingly offered an

opportunity to buy a Jani-King franchise and run it as an independent business.  In reality,

Plaintiffs and the Class members were not sold a franchise.  Instead, they were made to enter an

illegal employment agreement that: allowed Defendants to maintain control over Jani-King's

cleaning clients in such a way that prevented Plaintiffs and the Class members from conducting

independent business activities; imposed a broad range of requirements and fees that prevented

Plaintiff and the Class members from deriving a fair profit from their efforts; and withheld

numerous benefits owed to employees under Pennsylvania law.

26.     Throughout the relevant period, the degree of control Defendants exercised over

Plaintiffs and the Class members was indicative of an employer-employee relationship (and not

of an independent contractor status) because, among other things, Defendants:

9

a.      had sole discretion to determine whether Plaintiffs and the Class members would be offered work;

b.      had sole discretion to determine the nature, scope, frequency, and value of the work Plaintiffs and the Class members performed for each client;

c.      had sole discretion to negotiate with clients, determine the cleaning work to be done, set the number of hours and amount of manpower allotted and, as a result, controlled the economic parameters of every job;

d.      had sole discretion to determine what cleaning methods and procedures Plaintiffs and the Class members would use;

e.      had sole discretion to determine what training Plaintiffs and the Class members would receive, created and disseminated the training materials, set the time-frame in which the required training had to be completed, had sole authority to require Plaintiffs and the Class members to attend (and pay for) supplemental training sessions under certain circumstances, and fixed the costs associated with training;

f.      routinely withheld work from (or offered inferior work to) Plaintiffs and the Class members for, among other things, complaining about Defendants' practices or rejecting inconvenient or undesirable work;

g.      required Plaintiffs and the Class members to participate in Defendants' advertising program, set the financial contribution from Plaintiffs and the Class members for the advertising program, and retained sole discretion over the nature, content, and frequency of advertisements Jani-King published or broadcast;

h.      had sole discretion over how Plaintiffs and the Class members used Defendants' trademarks in providing cleaning services, and promulgated instructions

10

related to the filing and maintenance of trade/fictitious name registrations by Plaintiffs and the Class members;

        i.      required Plaintiffs and the Class members to agree that they would not communicate or disclose information about Defendants' business to any person or entity, or compete with Defendants' business for a period of two years;

        j.      performed "quality control" visits to clients serviced by Plaintiffs and the Class members to inspect and evaluate their cleaning services, make recommendations on how to correct deficiencies, improve techniques, and enhance the efficiency of the services provided;

        k.      set penalties in the event Plaintiffs and the Class members failed to provide the contracted level or amount of cleaning services, and collected these penalties;

        l.      required Plaintiffs and the Class members to accept non-competition covenants that, among other things, barred them from performing cleaning services for any related business while they worked for Defendants, prevented them from engaging in any competing business for one year after leaving Jani-King, and prohibited them from doing any work for Jani-King clients for two years after leaving Jani-King.

        m.      on termination required Plaintiffs and the Class members to surrender all property belonging to Defendants or pay a $1,000/day fine for failing to do so.

27.      Throughout the relevant period, the degree of financial control Defendants exercised over Plaintiffs and the Class members was indicative of an employer-employee relationship (and not of an independent contractor status) because, among other things, Defendants:

Case ID: 090303550

a.      maintained sole ownership and control of every Jani-King client's cleaning contract;

b.      had sole discretion to set the economic parameters of the work performed by Plaintiffs and the Class members, and determined how much Defendants' clients would pay for the cleaning services performed by Plaintiffs and the Class members;

c.      had sole discretion to determine when, how frequently, and under what circumstances, Plaintiffs and the Class members would be assigned clients, as well as which clients would be offered to Plaintiffs and the Class members;

d.      had sole discretion to withhold clients and fees from Plaintiffs and the Class members if they were determined to be causing problems or violating Defendants' policies or procedures;

e.      had sole discretion to withhold clients and fees from Plaintiffs and the Class members if they complained about Defendants' practices, or rejected inconvenient or undesirable work;

f.      uniformly denied Plaintiffs and the Class members the opportunity to conduct site inspections before deciding whether to accept new clients, so that Plaintiffs and the Class members could not assess, or have any input into, the criteria used to determine the parameters or value of any cleaning contract;

g.      billed all clients for cleaning services performed by Plaintiffs and the Class members, received all payments for cleaning services performed by Plaintiffs and the Class members, and had complete control over the money Plaintiffs and the Class members received for the cleaning services they performed;

Case ID: 090303550

h.    required Plaintiffs and the Class members to waive and relinquish their right to collect any fees due for services performed by clients who terminated them;

i.    deducted any fees and costs Defendants assessed from monies owed to Plaintiffs and the Class members;

j.    retained sole discretion to provide accounting services related to the money collected on behalf of Plaintiffs and the Class members, set the rate charged for these services, and collect this fee;

k.    reserved the right to inspect and examine the accounts, books, records and tax returns kept by Plaintiffs and the Class members, and to call for an independent audit of these records;

l.    required Plaintiffs and the Class members to purchase certain types and amounts of liability insurance that were not commonly available, set the rate for these coverages, and provided this coverages (through an entity called the Guardian Risk Purchasing Group) to Plaintiffs and the Class members;

m.    had sole discretion to determine the procedures for requiring corrective action following any mistakes committed by Plaintiffs and the Class members, including whether economic penalties would be assessed and the size of those penalties; and

n.    had sole discretion to determine whether Plaintiffs and the Class members would be allowed to transfer clients to another Jani-King employee and, if such transfers were allowed, to assess transfer fees.

28.    Throughout the relevant period, Defendants' relationship with Plaintiffs and the Class members bore additional hallmarks of an employer-employee relationship (and not of an independent contractor status) because:

Case ID: 090303550

a.      the work performed by Plaintiffs and the Class members was a key aspect of, and integral to, Defendants' business;

b.      Defendants exercised significant direction and control over the activities of Plaintiffs and the Class members;

c.      Defendants controlled the geographic territory in which Plaintiffs and the Class members were offered, and performed, work;

d.      Plaintiffs and the Class members were not a party to Defendants' client contracts, and had no input into any term in these contracts.

e.      Defendants conducted both routine and surprise inspections of the work performed by Plaintiffs and the Class members, prepared reports describing any problems or deviations they found, and used these reports to control the flow of clients, work, and income to and from them;

f.      Defendants were solely responsible for receiving client complaints, communicating those complaints to Plaintiffs and the Class members, and ensuring that Plaintiffs and the Class members complied with the requirements of its cleaning contracts;

g.      Defendants had sole discretion to determine, issue, and modify the quality standards Plaintiffs and the Class members were required to meet in performing their assigned cleaning tasks;

h.      Defendants had sole discretion to determine, issue, and modify the cleaning production standards Plaintiffs and the Class members were required to meet in performing their assigned cleaning tasks;

14

Case ID: 090303550

i.      Defendants had sole discretion to establish, amend, and revise policies and procedures pertaining to the work performed by Plaintiffs and the Class members;

j.      Defendants had sole discretion to suspend or terminate the authority of Plaintiffs and the Class members to service any or all of their accounts;

k.      Plaintiffs and the Class members had no recourse when a client sought to reduce the amount of cleaning services it was receiving, despite the fact that Defendants represented the account as having a certain value when the job was offered;

l.      Defendants reserved a unilateral right to terminate Plaintiffs and the Class members for engaging in a wide range of behavior deemed to constitute a "default" of their employment (e.g., failing to promptly pay money owed to Defendants, or failing to maintain the standards required by Defendants) without any opportunity to cure; and

m.      Defendants had sole discretion to transfer accounts between Plaintiffs and the Class members.

29.   Throughout the relevant period, Plaintiffs and the Class members should have been classified and treated as employees (rather than as independent contractors) because, among other things, they:

a.      did not operate a business that was independent of Defendants' business, and relied heavily on Defendants in every aspect of their work;

b.      only provided cleaning services for clients determined and provided by Defendants, and had no clients other than Defendants' clients;

c.      did not determine what cleaning services would be performed for Defendants' clients;

15

d.     did not negotiate cleaning contracts, determine the price of the work to be performed, bill clients, or collect money from clients for their services;

e.     were heavily managed by Defendants' supervisors who, among other things, received client complaints and were responsible for communicating those complaints to Plaintiffs and the Class members; and

f.     lacked independence in the provision of cleaning services to Defendants' clients.

## CAUSES OF ACTION

### COUNT I
### Violation of the Pennsylvania Minimum Wage Act

30.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

31.     Defendants are "Employers" as defined in MWA § 3(g). Plaintiffs and the Class members are "Employees" as defined in MWA § 3(h). The MWA definition of "Wages" in MWA § 3(d) includes the wages at issue in this litigation.

32.     At no time did Defendants, Plaintiffs, or the Class members fall under any exemption contained in MWA § 5.

33.     Throughout the relevant period, Defendants were covered employers obligated to comply with the MWA's minimum wage and overtime requirements, and Plaintiffs and the Class members were covered employees entitled to the MWA's protections.

34.     From March 9, 2006 to December 31, 2006, MWA § 4(a) required Defendants to pay Plaintiffs and the Class members wages for all hours worked at a rate of not less than $5.15 per hour.

Case ID: 090303550

35.     From January 1, 2007 to June 30, 2007, MWA § 4(a) required Defendants to pay Plaintiffs and the Class members wages for all hours worked at a rate of not less than $6.25 per hour.

36.     From July 1, 2007 to the present, MWA § 4(a) required Defendants to pay Plaintiffs and the Class members wages for all hours worked at a rate of not less than $7.15 per hour.

37.     Throughout the relevant period, Defendants violated MWA § 4(a) by, among other things, willfully and uniformly underbidding the value of cleaning service contracts, obligating Plaintiffs and the Class members to perform more services than could be reasonably completed in the time allotted, and requiring Plaintiffs and the Class members to complete additional work not described in their cleaning contracts – all of which caused Plaintiffs and the Class members to receive an hourly rate of pay below the legally-mandated minimum wage.

38.     Throughout the relevant period, MWA § 4(c) required Defendants to pay Plaintiffs and the Class members overtime compensation of "not less than one and one-half times the employe's regular rate" for all hours worked over 40 in a given workweek.  Under the MWA, overtime is calculated based on the number of hours worked in a "workweek", defined in controlling regulations as "a period of 7 consecutive days".  *See* 34 Pa. Code § 231.42.

39.     Throughout the relevant period, Defendants violated MWA § 4(c) by, among other things, willfully and uniformly causing and requiring Plaintiffs and the Class members to work overtime hours to complete their assigned cleaning work, and failing to pay the legally-mandated "time-and-a-half" overtime wage when Plaintiffs and the Class members worked more than forty hours in a given workweek.

17

40.    Throughout the relevant period, MWA § 8 required Defendants to "keep a true and accurate record of the hours worked by each employee and the wages paid to each."

41.    Throughout the relevant period, Defendants violated MWA § 8 by, among other things, willfully and consistently failing to keep a true and accurate record of the hours worked by – and the wages paid to – Plaintiffs and the Class members.

42.    In violating the MWA, Defendants acted willfully and with reckless disregard of clearly applicable MWA provisions.

43.    Defendants have no good faith justification or defense for engaging in these violations of the MWA.

44.    MWA § 13 expressly allows private plaintiffs to bring civil actions to enforce an employers' failure to comply with the Act's requirements.

WHEREFORE, Plaintiffs respectfully pray for the following relief:

   a.    Entry of a judgment in favor of Plaintiffs and the Class on Count I;

   b.    Entry of an order awarding Plaintiffs and the Class all available compensatory damages, including, inter alia, all unpaid wages and prejudgment interest owed by Defendants under the MWA;

   c.    Entry of an order requiring Defendants to reimburse Plaintiffs and the Class for their attorneys' fees and litigation costs under the MWA;

   d.    Entry of an order awarding Plaintiffs and the Class the maximum amount of liquidated damages permitted by the MWA;

   e.    Entry of an injunction prohibiting Defendants from engaging in future violations of the MWA;

Case ID: 090303550

f.     Entry of an order awarding Plaintiffs and the Class pre-judgment interest on all unpaid overtime wages owed by Defendants;

g.     Entry of an order awarding Plaintiffs and the Class any further relief the Court deems necessary, just, and proper; and

h.     Entry of an order maintaining jurisdiction over this action after judgment or verdict to ensure Defendants' compliance with the foregoing.

## COUNT II
### Violation of the Pennsylvania Wage Payment and Collection Law

45.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

46.     Defendants are "Employers" as defined by WPCL § 2.1.

47.     Throughout the relevant period, Defendants were covered employers obligated to comply with the WPCL's wage payment requirements, and Plaintiffs and the Class members were employees entitled to the WPCL's protections.

48.     Throughout the relevant period, WPCL § 3(a) required Defendants to pay Plaintiffs and the Class members all wages due to their employees on regular paydays designated in advance.

49.     Throughout the relevant period, Defendants violated WPCL § 3(a) by willfully and consistently failing to pay Plaintiffs and the Class members all regular wages due on regular paydays designated in advance.

50.     Throughout the relevant period, Defendants violated WPCL § 3(a) by willfully and consistently failing to pay Plaintiffs and the Class members all overtime wages due on regular paydays designated in advance.

19

51.    Throughout the relevant period, Defendants violated WPCL § 3(a) by willfully and consistently failing to pay Plaintiffs and the Class members on regular paydays designated in advance for time spent on required training sessions, compensable travel, meal breaks, other rest periods, and completing required reports.

52.    Throughout the relevant period, Defendants violated WPCL § 3(a) by willfully and consistently failing to make required workers compensation insurance contributions on behalf of Plaintiffs and the Class members.

53.    Throughout the relevant period, Defendants violated WPCL § 3(a) by willfully and consistently failing to make required unemployment insurance contributions on behalf of Plaintiffs and the Class members.

54.    Throughout the relevant period, Defendants violated WPCL § 3(a) by willfully and consistently taking improper deductions from the wages owed to Plaintiffs and the Class members, including: finders fees, royalty fees, business plan protection fees, accounting fees, advertising fees and administration fees that commonly amounted to more than 20% of Plaintiff's and the Class members' gross monthly earnings.

55.    Through these unlawful deductions, Defendants required Plaintiffs and the Class members to pay administrative, business, and operating expenses that should have been Defendants' legal responsibility.

56.    Throughout the relevant period, WPCL § 8 required Defendants to maintain true and accurate records relative to the enforcement of the Act.

57.    Throughout the relevant period, Defendants violated WPCL § 8 by willfully and consistently failing to maintain true and accurate records of the hours worked by, and the wages paid to, Plaintiffs and the Class members.

20

58.     In violating the WPCL, Defendants acted willfully and with reckless disregard of clearly applicable WPCL provisions.

59.     Defendants have no good faith justification or defense for engaging in these violations of the WPCL.

60.     WPCL §§ 9.1 and 10 expressly allow a private plaintiff to institute a civil action to enforce an employers' failure to comply with the Act's requirements, and to recover any unpaid overtime wages, attorneys' fees and litigation costs, liquidated damages, and pre-judgment interest.

61.     WPCL § 9.1(a) provides that "Any employee or group of employees... may institute actions provided under this act", and thus permits private plaintiffs to pursue class action status for their WPCL claims.

WHEREFORE, Plaintiffs respectfully pray for the following relief:

    a.      Entry of a judgment in favor of Plaintiffs and the Class members on Count II;

    b.      Entry of an order awarding Plaintiffs and the Class members compensatory damages for all unpaid overtime wages owed by Defendants under WPCL § 9.1;

    c.      Entry of an order requiring Defendants to reimburse Plaintiffs and the Class members for their attorneys' fees and litigation costs under WPCL § 9.1;

    d.      Entry of an order awarding Plaintiffs and the Class members the maximum amount of liquidated damages permitted by WPCL § 10;

    e.      Entry of an injunction prohibiting Defendants from engaging in future violations of the WPCL;

21

f.      Entry of an order awarding Plaintiffs and the Class members pre-judgment interest on all unpaid overtime wages owed by Defendants;

g.      Entry of an order awarding Plaintiffs and the Class members any further relief the Court deems necessary, just, and proper; and

h.      Entry of an order maintaining jurisdiction over this action after judgment or verdict to ensure Defendants' compliance with the foregoing.

## COUNT III
## Breach of Contract

62.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

63.     A claim for breach of contract lies where the Plaintiffs allege: the existence of a contract containing essential terms, a breach of those essential terms, and damages resulting from the breach.

64.     Defendants' Franchise Agreement, Franchise Offering Circular, and Policies and Procedures Manual ("the documents") all contain material terms relating to Plaintiffs' and the Class' provision of cleaning services for Jani-King.

65.     The documents contain substantially similar language relating to each of the essential terms discussed below.

66.     Defendants expressly intended for the documents to define their obligations to Plaintiffs and the Class members.

67.     The documents obligated Defendants to offer Plaintiffs and the Class members commercial cleaning work with a certain, agreed-upon value:

> Franchisor will secure commercial cleaning and maintenance
> contracts and offer to Franchisee the opportunity to perform
> services in accordance with those commercial cleaning and
> maintenance contracts which contracts will have cumulative initial

22

gross monthly billings in the amount equal to the amount stated as the "INITIAL FINDER'S FEE BUSINESS" in the Franchise Summary.

*See* Franchise Agreement, p.4 (Exhibit A).

68.   The documents obligated Defendants to replace commercial cleaning accounts

lost for reasons not attributable to Plaintiffs and the Class members for a period of one year:

> (1) If an account cancels or is transferred to a new franchisee due to non-performance, theft, your failure to service the account properly, your failure to maintain good customer relations, or your failure to comply with the Policies and Procedures, we will not replace the account.
>
> (2) If an account cancels at no fault of yours before you service the account for 12 full months, the full gross monthly billing value of that account will be replaced within a reasonable period of time by another account or a combination of accounts, at no additional cost to you.  This provision applies until the cumulative time Franchisee has provided service to the original account and all replacement account(s) equals 12 months.

*See* Franchise Agreement at p.13.

69.   The documents obligated Defendants to periodically inspect the work done by

Plaintiffs and the Class members, monitor their compliance with Jani-King's performance

standards, and provide suggestions for improving their services:

> A representative of Franchisor will inspect the accounts from time to time in order to insure that the service is performed in accordance with the cleaning schedule or instructions associated with the contract between Franchisor and the client and to the performance standards of Jani-King.  If at any time, whether through complaint or inspection, a deficiency in performance is discovered, Franchisor can elect to dispatch its own staff to the account and correct all deficiencies in performance.

*See* Franchise Agreement at p.14.

70.   Plaintiffs and the Class members accepted the terms set out in the documents by,

among other things, acknowledging their receipt of the documents, paying fees required by the

documents, and/or performing cleaning services for Defendants during the relevant period.

23

Case ID: 090303550

71.     Plaintiffs and the Class members were not able to negotiate any terms or conditions different from those appearing in the documents.

72.     Throughout the relevant period, Defendants breached their agreement to offer Plaintiffs and the Class members commercial cleaning contracts with a certain value by engaging in a uniform course of conduct that included:

       a.     underbidding the amount of time required to perform a given cleaning job, such that Plaintiffs and the Class members routinely had to work additional hours to complete their assigned cleaning tasks;

       b.     underbidding the amount of staffing required to perform a given cleaning job, such that Plaintiffs and the Class members routinely had to work additional hours and/or pay other employees to help complete the required work;

       c.     underbidding the value of cleaning jobs to win the right to service those jobs without regard for whether the contract price set for the job would permit Plaintiffs and the Class members to profitably perform the required work;

       d.     refusing to allow Plaintiffs and the Class members to inspect cleaning jobs, bid sheets, or account analyses before requiring them to accept or reject the work, thereby depriving them of the ability to avoid problems associated with Defendants' underbidding practices – or the related consequences of failing to provide cleaning services to Defendants' standards;

       e.     counting rejected jobs – even those rejected for reasons such as geographic inconvenience or scheduling conflicts – against the revenue levels promised to Plaintiffs and the Class members;

Case ID: 090303550

   f.  offering cleaning jobs to more than one person and, after it is assigned, counting that job against the promised revenue levels for all persons to whom it was offered rather than just the person who accepted it;

   g.  offering Plaintiffs and the Class members geographically inconvenient jobs that were more costly to perform and less economically viable than the jobs Defendants had promised; and

   h.  charging Plaintiffs and the Class members a series of excessive, unconscionable, and improper fees.

73.  Throughout the relevant period, Defendants breached their agreement to replace commercial cleaning accounts lost for reasons not attributable to Plaintiffs and the Class members free of charge for one year by engaging in a uniform course of conduct that included:

   a.  underbidding the value of clients' cleaning jobs so that Plaintiffs and the Class members could not properly perform the required work;

   b.  refusing to allow Plaintiffs and the Class members an opportunity to inspect cleaning jobs, bid sheets, or account analyses before requiring them to accept or reject the work, thereby depriving them of the ability to avoid problems associated with Defendants' underbidding practices – or the related consequences of failing to provide cleaning services to Defendants' standards;

   c.  intentionally failing to provide Plaintiffs and the Class members with reasonable notice about problems or complaints related to their cleaning services;

   d.  intentionally failing to provide Plaintiffs and the Class members with a reasonable opportunity to address or correct problems or complaints related to their cleaning services;

Case ID: 090303550

  e.  actively petitioning and/or encouraging clients to terminate Plaintiffs and the Class members for performance-related problems; and

  f.  offering Plaintiffs and the Class members geographically inconvenient jobs and, if they refused the work, refusing to replace the value of those jobs without additional charges and fees.

74.  Throughout the relevant period, Defendants breached their agreement to inspect the work done by Plaintiffs and the Class members, monitor their compliance with Jani-King's performance standards, and provide suggestions for improving their services by engaging in a uniform course of conduct that included:

  a.  omitting to tell Plaintiffs and the Class members that inspection results would be used to seek their termination from cleaning jobs;

  b.  failing to use inspection results for agreed-upon purposes such as evaluating the quality of cleaning services or making recommendations to improve cleaning techniques;

  c.  intentionally failing to provide Plaintiffs and the Class members with reasonable notice about problems or complaints related to their cleaning services;

  d.  intentionally failing to provide Plaintiffs and the Class members with a reasonable opportunity to address or correct problems or complaints related to their cleaning services; and

  e.  using inspection results to actively seek the termination of Plaintiffs and the Class members from cleaning accounts.

Case ID: 090303550

75.    Throughout the relevant period, Defendants intentionally breached the agreements set out above, reaping significant economic benefits for themselves while denying any material benefit to Plaintiffs and the Class members, by:

a.    circumventing their contractual agreement to replace clients assigned to Plaintiffs and the Class members for a period of one year without cost;

b.    enabling the "churning" of a limited number of available clients to more easily satisfy obligations to provide Plaintiffs and the Class members with commercial cleaning work of a specified value;

c.    triggering clauses in the documents that gave Defendants the option to void material contractual obligations to Plaintiffs and the Class members – including the promise to provide Plaintiffs and the Class members with access to commercial cleaning clients;

d.    triggering clauses in the documents that made Plaintiffs and the Class members liable to pay excessive fines;

e.    triggering clauses in the documents that required Plaintiffs and the Class members to pay excessive finders fees (from 5% - 20% of monthly earnings) for access to new clients; and

f.    triggering clauses in the documents that allowed Defendants to direct more profitable business (e.g., floor stripping and waxing) to other entities it controlled, and from which it derived greater profit.

76.    As a direct result of Defendants' breaches, Plaintiffs and the Class members have suffered economic damages in an amount to be ascertained at trial.

Case ID: 090303550

77.     Rescission is a particularly suitable remedy where, as here, Defendants' breach of contract rendered the contract practically worthless to Plaintiffs and the Class members, and minimized the value they received from Defendants.

WHEREFORE, Plaintiffs respectfully pray for the following relief:

      a.     Entry of a judgment in favor of Plaintiffs and the Class members on Count III;

      b.     Entry of an order granting rescission of the agreement between Defendants and Plaintiffs and the Class members;

      c.     Entry of an order awarding Plaintiffs and the Class members compensatory damages in an amount to be determined at trial;

      d.     Entry of an order awarding Plaintiffs and the Class members the costs of suit; and

      e.     Entry of an order awarding Plaintiffs and the Class members such other relief as the Court deems just and proper under the circumstances.

### COUNT IV
### Breach Of The Duty Of Good Faith And Fair Dealing

78.     Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

79.     Pennsylvania law imposes a duty of good faith and fair dealing on franchisors in the performance and termination of a franchise agreement.

80.     Throughout the relevant period, Defendants breached their duty of good faith and fair dealing to Plaintiffs and the Class members by engaging in bad faith actions including:

      a.     securing Plaintiffs and the Class members as franchisees with false promises of independent business ownership and financial independence;

28

Case ID: 090303550

      b.      failing to provide Plaintiffs and the Class members with commercial cleaning work of an agreed-upon value as promised;

      c.      failing to provide promised training and support to Plaintiffs and the Class members;

      d.      failing to replace commercial cleaning accounts lost by Plaintiffs and the Class members for reasons not attributable to them for a period of one year as promised:

      e.      failing to use the results of periodic inspections to the benefit of Plaintiffs and the Class members as promised and, instead, using those results to seek their termination from accounts; and

      f.      engaging in a scheme to churn cleaning accounts among franchisees in such a way as to deprive Plaintiffs and the Class members of promised business opportunities;

81.     These actions breached the duty of good faith and fair dealing owed to Plaintiffs and the Class members, had a material impact on their business operations, caused them significant economic losses, deprived them of promised economic benefits, and ultimately caused them to abandon or lose their franchises.

WHEREFORE, Plaintiffs respectfully pray for the following relief:

      a.      Entry of a judgment in favor of Plaintiffs and the Class members on Count IV;

      b.      Entry of an order granting rescission of the agreement between Defendants and Plaintiffs and the Class members;

      c.      Entry of an order awarding Plaintiffs and the Class members compensatory damages in an amount to be determined at trial;

      d.     Entry of an order awarding Plaintiffs and the Class members the costs of suit; and

      e.     Entry of an order awarding Plaintiffs and the Class members such other relief as the Court deems just and proper under the circumstances.

### COUNT V
### Unjust Enrichment

82.    Each of the preceding paragraphs is incorporated by reference as though fully set forth herein.

83.    Throughout the relevant period, Plaintiffs and the Class members conferred non-gratuitous benefits upon Defendants by paying a multitude of fees to Defendants, including: franchise fees, finder's fees, royalty fees, business plan protection fees, accounting fees, advertising fees, and administration fees that commonly amounted to more than 20% of their gross monthly earnings.

84.    Throughout the relevant period, Defendants appreciated, and had knowledge of, the non-gratuitous benefits that Plaintiffs and the Class members conferred upon it in the form of these fees.

85.    Throughout the relevant period, Defendants accepted and retained the non-gratuitous benefits conferred by Plaintiffs and the Class members with full knowledge that Plaintiffs and the Class members would not receive anything of similar or fair value or substance in return.

86.    The fees Defendants received from Plaintiffs and the Class members were out of all proportion to the value or substance they returned to Plaintiffs and the Class members.  For example, Plaintiffs and the Class members paid thousands of dollars to Defendants for the right

30

Case ID: 090303550

to provide cleaning services to their clients, but Defendants had the right to suspend or terminate Plaintiffs and the Class members from those clients at any time.

87.   Defendants' underbidding of accounts and excessive fee deductions caused Plaintiffs and the Class members to be denied fair value for the services they performed.

88.   Allowing Defendants to retain the non-gratuitous benefits conferred on them by Plaintiffs and the Class members would be unjust and inequitable under these circumstances.

WHEREFORE, Plaintiffs respectfully pray for the following relief:

a.   Entry of a judgment in favor of Plaintiffs and the Class on Count V; and

b.   Entry of an order awarding Plaintiffs and the Class compensatory damages in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

Plaintiffs, by and through their undersigned counsel, hereby demand a trial by jury in the above-captioned matter.

DATED: March 20, 2009          By:   _____

Michael F. Barrett (42305)
mbarrett@smbb.com
David J. Cohen (74070)
dcohen@smbb.com
SALTZ MONGELUZZI BARRETT &
   BENDESKY, P.C,
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
(215) 575-3985 (phone)
(215) 496-0999 (fax)

Shannon Liss-Riordan
sliss@prle.com
Hillary Schwab
hschwab@prle.com
PYLE, ROME, LICHTEN, EHRENBERG &
   LISS-RIORDAN, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 367-7200 (phone)
(617) 367-4820 (fax)

31

Case ID: 090303550

# EXHIBIT A

Case ID: 090303550

# JANI-KING OF PHILADELPHIA, INC.

## FRANCHISE AGREEMENT

AN AGREEMENT made and entered into in Addison, Dallas County, Texas by and between JANI-KING OF PHILADELPHIA , INC., a Texas Corporation, hereinafter referred as either "JANI-KING" or "Franchisor", and

_____

hereinafter referred to, singularly or collectively, as "Franchisee", doing business as a:

[   ] Corporation,          [   ] Partnership          [   ] Sole Proprietorship
incorporated under the
laws of _____.

for the purposes of allowing Franchisee to operate a business as a Franchisee of JANI-KING.

### FRANCHISE SUMMARY

EFFECTIVE DATE: _____, 2_____.     PLAN: _____

INITIAL FRANCHISE FEE DOWN PAYMENT AND INITIAL FINDER'S FEE DOWN PAYMENT:

   ($_____) _____ Dollars

PROJECTED INITIAL FRANCHISE FEE AND INITIAL FINDER'S FEE MONTHLY PAYMENT:

   $_____ PER MONTH FOR _____ MONTHS

INITIAL FINDER'S FEE BUSINESS:

   ($_____) _____ (Thousand)

INITIAL OFFERING PERIOD: _____ (_____) Days

TERRITORY:  Counties: Kent and New Castle in the State of Delaware.

          Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Mercer and
          Salem in the State of New Jersey.

          Berks, Bucks, Chester, Dauphin, Delaware, Lancaster, Lebanon, Lehigh, Montgomery,
          Northampton, Philadelphia and York in the State of Pennsylvania.

FRANCHISEE ADDRESS:

_____

CITY: _____   STATE: _____   ZIP CODE: _____

COUNTY: _____   TELEPHONE NUMBER: (____)_____

JANI-KING OF PHILADELPHIA , INC.          INT ____ INT ____
FRANCHISE AGREEMENT: 4/07                 PAGE 1 OF 33

Case ID: 090303550

# RECITALS

## SECTION 1

1.1.  WHEREAS, Franchisor owns a system (the "System") consisting of the Proprietary Marks (as defined herein), and certain proprietary know-how and other Confidential Information (as defined herein) for:

(a)  the operation and franchising of comprehensive cleaning and maintenance businesses using the System and the Confidential Information, and the supply and distribution of complete cleaning and/or maintenance related services, including, but not limited to, commercial, industrial, institutional and residential cleaning (the "Services"); and

(b)  the supply and distribution of maintenance products using the System and the Confidential Information, and the promotion, sale and delivery of the same (the "Products").

1.2.  WHEREAS, Franchisor is authorized to grant a license to use the System, the Proprietary Marks and/or the Confidential Information.

1.3.  WHEREAS, Franchisee desires to use the System in Franchisee's business as a Jani-King Franchisee.

1.4.  WHEREAS, the parties to this Agreement desire that the Franchisor grant to the Franchisee a license to use the System developed by Jani-King in the Territory for the business, and agree that such business shall be governed by the terms, covenants, and conditions contained in this Agreement.

1.5.  NOW, THEREFORE, in consideration of the full and faithful performance of each and every one of the covenants, terms and conditions contained herein, the parties agree as follows:

## SECTION 2

2.1.  Franchisor grants to the Franchisee, upon the terms and conditions herein contained, the right to establish and operate a Jani-King business and a license to use the System developed by Jani-King in connection therewith for its business in the territory described in the Franchise Summary (the "Territory"). The Franchise Summary is defined as all information contained on the first page of this Agreement appearing below the words "Franchise Summary."

## SECTION 3

## GRANT OF FRANCHISE

3.1.  For and in consideration of the full and faithful performance of each and every one of the covenants, terms and conditions herein contained and agreed to by Franchisee, Franchisor grants to the Franchisee the right to establish and operate a Jani-King franchise within the Territory.

3.2.  Franchisee shall operate the business at or from a location of its choosing within the Territory subject to the approval of Franchisor and Franchisee's continued compliance with the terms and conditions set forth herein.

## SECTION 4

## FRANCHISEE PLEDGES

4.1.  To operate a Jani-King Franchise cleaning and maintenance services company in the Territory described herein, using the trade name "Jani-King" in conjunction with its business name, as "John Doe, d/b/a Jani-King", or "ABC Inc., d/b/a Jani-King". Franchisee agrees not to use as part of a corporate name or other legal name, (i) the name "Jani-King of (any city, state, or other region)", (ii) any other janitorial, maintenance or cleaning service name in conjunction with their formal name, i.e.   such as "ABC Custodials", "ABC Maintenance", "ABC Cleaning Services" etc., (iii) a name prefix of "Jani-", or any other similarly spelled or sounding prefix, (iv) the words "Services", "Cleaning", and "Maintenance" or (v) any other trademarks, trade names or service marks or any name that has not been granted prior written approval by Jani-King's Corporate Office. All names of the entity operating as Franchisee, including corporate names, business names, trade or assumed names, or other legal names shall be approved in writing by Franchisor prior to adoption for use by Franchisee. All directory listings, advertising, letterhead, or any other visual or printed matter used by Franchisee to communicate to anyone shall conform to Franchisor's established Jani-King policies and shall be subject to review and approval by Franchisor prior to use by Franchisee.

4.1.1.  Franchisor has developed and used and continues to develop, use and control in connection with its System certain Proprietary Marks that have become associated with its System so as to impart to the public superior standards of quality and service.  The "Proprietary Marks" as used in this Agreement shall mean all trademarks, trade names, trade dress, service marks, slogans and logos, including, but not limited to, the mark Jani-King, or any other trademark or service mark which may be authorized in writing by an officer of Franchisor now or at any time in the future.

4.1.2.  Franchisor has developed and used, and continues to develop, use and control in connection with its System, certain confidential information, programs, devices, methods, techniques and processes which are not generally known to the public pertaining to franchising, promotion, marketing, operation and management of a business, including, but not limited to, the System, as defined herein, which includes but is not limited to information regarding the operational, sales, promotional methods and techniques, and marketing methods and techniques of Franchisor and the Jani-King program.  Such information includes but is not limited to  (a) Jani-King's manuals and forms, the information contained and compiled therein, and the updates and memoranda thereto; (b) names of Jani-King's agents, suppliers, and customers, and their requirements, specifications, and preferences; (c) the contractual arrangements between Jani-King and its agents, suppliers, and customers; (d) the financial details (including but not limited to credit and discount terms) of Jani-King's relationship with its agents, suppliers, or customers; (e) the names of prospective Jani-King customers and their requirements, specifications, and preferences; (f) information concerning the remuneration paid by Jani-King to its employees; (g) Jani-King's accounting software and forms; (h) information concerning and presented at Jani-King meetings; (i) security and access information; (j) information provided through initial and ongoing specialized training; and (k) Jani-King's business plans and strategies (collectively, the "Confidential Information").

4.1.3.  All use of the Proprietary Marks and Confidential Information by Franchisee shall be in accordance with the terms of this Agreement and shall inure to the benefit of Franchisor and all such Proprietary Marks and Confidential Information shall remain the sole property of Franchisor.

4.1.4.  Franchisee agrees to submit to Franchisor, prior to use by Franchisee, samples of any and all advertising and promotional plans and materials of any type which contain in any manner any of the Proprietary Marks, including without limitation the trade names, trademarks, service marks, slogans and logos as are now or which in the future may be approved for use by Franchisee.

4.2.1. Franchisee agrees to devote sufficient time and effort to its business pursuant to this Agreement and that all work and services performed under this Agreement will be performed and/or supervised by Franchisee or authorized agents/employees of Franchisee that comply with all terms of this Agreement.

4.2.2. Franchisee, its agents, and employees will follow current established Jani-King policies, practices and procedures, and as they may be amended from time to time, and agrees not to deviate therefrom without prior written consent of Franchisor.

4.2.3. Franchisee and officers and directors (if Franchisee is a corporation) who will actively participate in the operations of the franchise business agree to successfully complete the initial training program within six (6) months of the signing of this Agreement.

4.3. In consideration of the franchise herein granted under the plan identified in the Franchise Summary (the "Plan"), and the initial services to be performed by Franchisor in connection with Franchisee's use in the Territory of the System, Proprietary Marks and Confidential Information as pledged herein, Franchisee shall pay to the Franchisor, upon execution of this instrument, the INITIAL FRANCHISE FEE DOWN PAYMENT AND INITIAL FINDER'S FEE DOWN PAYMENT, as stated in the Franchise Summary herein ("the Initial Franchise Fee Down Payment and Initial Finder's Fee Down Payment" or the "Initial Franchise Fee and Initial Finder's Fee Down Payment"). Franchisee authorizes Franchisor's deduction of Initial Franchise Fee Monthly Payments and Initial Finder's Fee Monthly Payments, as stated in the Franchise Summary herein, (the "Initial Franchise Fee Monthly Payments and Initial Finder's Fee Monthly Payments" or the "Initial Franchise Fee and Initial Finder's Fee Monthly Payments) from the Gross Revenue, as defined herein, in the amount and number of payments stated in the Franchise Summary, provided Franchisee's franchise produces Gross Revenue in an amount equal to or greater than the Initial Franchise Fee Monthly Payments and Initial Finder's Fee Monthly Payments.

4.3.1. Payment of this sum shall entitle Franchisee to the non-exclusive right to operate a Jani-King franchised business in the Territory described herein. Franchisor will secure commercial cleaning and maintenance contracts and offer to Franchisee the opportunity to perform services in accordance with those commercial cleaning and maintenance contracts which contracts will have cumulative initial gross monthly billings in the amount equal to the amount stated as the "INITIAL FINDER'S FEE BUSINESS" in the Franchise Summary (the "Initial Finder's Fee Business"). The Initial Finder's Fee Business may also be referred to as the "Initial Business." All commercial cleaning and maintenance contracts will remain the sole property of Jani-King.

4.3.2. Except as otherwise noted herein, the Initial Franchise Fee Down Payment and the Initial Finder's Fee Down Payment is non-refundable and is in addition to royalties and other payments set out herein.

4.3.3. In the event that Franchisor is unable to secure and offer to the Franchisee the right to provide services to commercial cleaning and maintenance contracts with a cumulative total of initial gross monthly billings equal to or greater than the Initial Finder's Fee Business within the time period stated as the Initial Offering Period in the Franchise Summary (the "Initial Offering Period"), a portion of the Initial Franchisee Fee Down Payment and the Initial Finder's Fee Down Payment may be refundable. If the Franchisor fails to offer the full amount of Initial Finder's Fee Business, an amount equal to the lesser of (i) three (3) times the amount of Initial Finder's Fee Business not offered to the Franchisee or (ii) the total Initial Franchise Fee Down Payment and the Initial Finder's Fee Down Payment paid by Franchisee to Franchisor may be refunded. Any refund will be first applied to any money owed to Franchisor, Jani-King Leasing Corporation, or an affiliate of Franchisor, any unpaid fees or charges that would result in a negative due Franchisee Report. Any remaining portion of the refund will be credited to the Franchisee, unless agreed to otherwise, in writing, by Franchisor and Franchisee. A refund, or other written agreement between the parties, under this provision will fulfill Franchisor's obligation to offer any remaining portion of the Initial Finder's Fee Business used to calculate the refund.

4.4. In addition to the Office Supply and Advertising Package provided to Franchisee by Franchisor as described in Schedule One of this Agreement, Franchisee is required to purchase the Professional Products and Equipment listed in Schedule One as the "Supply and Equipment Package", and also purchase, lease or provide proof of ownership to Franchisor of the following:

A commercial vacuum cleaner, a commercial floor polisher, a commercial wet/dry vacuum and a compact portable vacuum cleaner (canister type) w/shoulder strap and cloth bag, identified as "Additional Electric Equipment" in Schedule One. These items are not included in the Office Supply and Advertising Package furnished by Franchisor.

The Supply and Equipment Package and the Additional Electric Equipment must be obtained by the Franchisee before any Initial Finder's Fee Business will be offered.

4.5.1 Franchisee agrees to pay to Franchisor or its designee, by the fifth (5th) day of each month a royalty fee equal to ten percent (10%) of the monthly Gross Revenue. Gross Revenue is defined as all revenue invoiced by anyone for any contract services, one time cleans, extra work, sales of supplies, equipment or goods and any other revenue related to or derived from the provision of any cleaning and maintenance services including, but not limited to, commercial, industrial, institutional and residential, as well as the sale, leasing or distribution of related supplies and equipment in connection with the conduct and operation of Franchisee's business or otherwise directly or indirectly, in whole or in part, performed or sold by, or for the benefit of Franchisee, Franchisee's principals, guarantors, spouse(s), officers, directors, shareholders, agents, or employees, regardless of the entity or business name used. The minimum royalty shall be Fifty Dollars ($50.00) monthly during the first twelve (12) months of operation and One Hundred Dollars ($100.00) per month thereafter. Such minimum royalty is subject to annual adjustment for increases in the Consumer Price Index.

A fee of $25 per day (the "Non-Reported Business Fee") will be charged to Franchisee for each day Franchisee fails to report all Gross Revenue, in addition to any and all fees, payments, charges, chargebacks, or other amounts due and owing Franchisor under the terms of this agreement as a result of such Gross Revenue, whether or not collected by Franchisee. Such amounts shall be immediately due and payable. The payment of the Non-Reported Business Fee shall constitute liquidated damages and not a penalty, and shall be in addition to any other remedies available to Franchisor at law or in equity.

4.5.2. Franchisee agrees to pay Franchisor an advertising fee (the "Fee") equal to one percent (1%) of Franchisee's Gross Revenue as defined above. Franchisee agrees to pay the Fee, in addition to the royalty payment, commencing on the fifth (5th) day of the month and continuing on the fifth (5th) day of every month thereafter for the remainder of the term. Franchisee agrees that the Fee shall be maintained and administered by Franchisor or its designee as follows:

The Fee will be used by us or our designee as follows:

1. We will direct all advertising programs and will have sole discretion to approve or disapprove the creative concepts, materials and media used in the programs. The Fee is intended to be used to maximize general public recognition and acceptance of the registered trademarks and enhance the collective success of all franchises operating under the Jani-King system. None of the Fee is specifically or principally used for advertising that is principally a solicitation for the sale of franchises. In using the Fee, we and our designees are not required to make expenditures for you which are equivalent or proportionate to your payment or to ensure that any particular franchisee benefits directly or pro rata from the placement of advertising. We or our designees are also not required to advertise in the area where you are located.

2. The Fee may be used to satisfy any and all costs of maintaining, administering, directing and preparing advertising (including, without limitation, the cost of preparing and conducting television, radio,

magazine and newspaper advertising campaigns; direct mail and outdoor billboard advertising; vehicle decaling, public relations activities; employing advertising agencies to assist therein; travel and associated expenses of personnel dispatched to assist in account start ups and account bidding; and costs of our personnel and other departmental costs for advertising that is internally administered or prepared by us). Sums paid by you relating to the Fee will also be used to defray any of our administrative costs incurred in activities reasonably related to advertising programs. This Fee is a payment to us for advertising and related costs and we do not have any duty to you related to the use of the Fee.

3. The Fee may also be used in our National Vehicle Program ("NVP") which is a voluntary program through which you can purchase a select number of vehicles from a national vehicle manufacturer. If you participate in the NVP, you are required to have a decal installed on the vehicle you purchase. The cost and installation of the vehicle decal will be paid out of the Fee.

4.6. Franchisee further agrees to pay to Franchisor a Finder's Fee on any additional business in excess of the Initial Finder's Fee Business of which Franchisee accepts the designation, from Franchisor, as authorized franchisee to provide service to such business, whether or not that additional business or contract resulted from an increase in the contract price for an existing business being serviced by Franchisee, an expansion of service for existing business being serviced by Franchisee at the same or other locations, or completely new business. Finder's Fees are in addition to royalties, Initial Franchise Fee and Initial Finder's Fee Monthly Payments, and other payments set out in this Agreement, and are calculated on the gross monthly billing for an account according to the formulas listed below. Franchisor has no obligation to offer Franchisee for the right to provide service to additional business or contracts beyond the Initial Finder's Fee Business. Should Franchisor, in its sole opinion, decide to offer Franchisee the right to service any additional business or contracts, Franchisee may either decline or accept the offer at the time it is made.

Following Franchisor's offer and Franchisee's acceptance of the right to provide service to any additional business or contract, the Franchisee agrees to pay an amount as a Finder's Fee according to the guidelines established by the Franchisor. Franchisor will, from time to time, establish such guidelines, policies and procedures as necessary to calculate the applicable Finder's Fee, taking into consideration industry standards and increases in costs and expenses of soliciting new accounts, and Franchisor reserves the right to increase or decrease the Finder's Fee in all categories. Currently, the following guidelines will apply, but any guideline or policy regarding the calculation of a Finder's Fee or the payment thereof, for any account, may be changed by the Franchisor at any time prior to the offering of the account:

(1) Upon acceptance of the right to perform services on any additional business, the Franchisee will sign an Account Acceptance/Finder's Fee Agreement, that will include the Finder's Fee payment calculations, if any, according to the provisions set out in the Finder's Fee Schedules below.

(2) For each of the Finder's Fee Schedules set out below, the following terms apply to calculate the Finder's Fee for the additional business:

"OVER" / "UP TO": To determine the proper formula for a Finder's Fee payment structure within the appropriate Schedule, the Monthly Billing categories are listed by ranges, where the monthly billing will exceed the amount listed as "OVER", but less than the amount listed as "UP TO". If the monthly billing may fluctuate, the proper category of Monthly Billing will be determined by the maximum gross monthly billing allowed by the account contract.

DOWN PAYMENT: The initial payment due at the time of acceptance of the right to provide services to the account, or as otherwise established under these guidelines, calculated by multiplying the percentage stated in the appropriate category of Monthly Billing under Down Payment, times the appropriate gross monthly billing. All Down Payments will be calculated using the gross billing for the First Full Month of Service. "First Full

Month of Service", for purposes of calculating the Down Payment, is defined as the first month in which the service is performed on or before the 15th day of the month. If a partial month is the First Full Month of Service, the gross monthly billing, for purposes of calculating the Down Payment, is determined as though the account had been serviced for the entire month. If the account begins service after the 15th, the following month will be used for purposes of the Down Payment, and no payment is due for the initial period. The Down Payment is due along with the monthly franchisee report for the First Full Month of Service (and second month as required) and may be payable as a deduction from the account billing on the franchisee report.

MONTHLY PAYMENT: The payment made each month for the designated number of months, calculated by multiplying the percentage stated in the appropriate schedule under Monthly Payment, times the gross monthly billing for the current accounting month. However, the total of the amounts paid as Monthly Payments (exclusive of the Down Payment) shall not exceed a sum greater than 300% of: (a) for Variable Rate Accounts, the maximum gross monthly billing that would be generated in a month in which the building was at a one hundred percent (100%) occupancy factor, exclusive of any down payment; or (b) for Public Event or Seasonal Accounts, the average gross monthly billing for the first twelve months service is performed under the account contract, exclusive of any down payment. Monthly Payments will begin the month following any scheduled Down Payment.

MONTHS: The number of months a Monthly Payment must be made under the terms of the Account Acceptance/Finder's Fee Agreement, subject to the maximum sum described in the definition of Monthly Payment.

(3) Accounts will be identified according to the following definitions and the Finder's Fee will be calculated using the formula set out in the appropriate Finder's Fee Schedule for the type of account:

1. FIXED RATE ACCOUNT: An account that has a constant monthly billing established by the account contract, and has a term of one year or longer. The Finder's Fee may be paid in full at the time of acceptance of the account, in which event, Franchisee will pay three (3) times the amount of the maximum gross monthly billing allowed under the contract, or the fee and payment will be structured according to the Schedule.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | | DOWN | MONTHLY | |
|---|---|---|---|---|
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
| 50 | 1,500 | 60% | 20% | 13 |
| 1,500 | 3,000 | 40% | 15% | 20 |
| 3,000 | 6,000 | 30% | 10% | 30 |
| 6,000 | 10,000 | 15% | 10% | 32 |
| 10,000 | unlimited | 5% | 5% | 65 |

2. VARIABLE RATE ACCOUNT: An account with a monthly billing that may fluctuate, depending on the occupancy of the property, where the billing is based on a set price per square foot of service area, and has a term of one year or longer. Any city, State or Federal account or Public School will be bid as a Multi-Tenant account. The Finder's Fee may be paid in full at the time of acceptance of the account, in which event, Franchisee will pay three (3) times the amount of the maximum gross monthly billing that would be generated in a month in which the building was at a one hundred percent (100%) occupancy factor, or the fee and payment will be structured according to the Schedule.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | | DOWN | MONTHLY | |
|---|---|---|---|---|
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
| 50 | 3,000 | 30% | 5% | 72 |
| 3,000 | 6,000 | 15% | 5% | 72 |
| 6,000 | unlimited | 5% | 5% | 72 |

3.  SEASONAL ACCOUNT: An account that will be serviced for a limited period of time but may recur on a seasonal basis. This account may have a constant or fluctuating monthly billing amount. A Down Payment is due only for the initial season. Monthly Payments are due each month until the total paid as Monthly Payments is equal to 300% of the average gross monthly billing for the first twelve months service is performed under the account contract, which may occur over several seasons.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | DOWN PAYMENT | MONTHLY PAYMENT | MONTHS |
|---|---|---|---|
| Any Amount | 20% | 10% | Varies* |

*Until Payments equal 300% of Average Gross Monthly Billing for first twelve months.

4.  PUBLIC EVENT FACILITIES: An account involving a public facility that houses special events for a limited duration, but similar events recur on a regularly scheduled basis. The monthly billing will fluctuate, depending on the type of event or use of the facility, where the billing is based on the labor-hours required to service the property, and has a term of one year or longer. Monthly Payments are due each month until the total paid as Monthly Payments is equal to 300% of the average gross monthly billing for the first twelve months service is performed under the account contract.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | DOWN PAYMENT | MONTHLY PAYMENT | MONTHS |
|---|---|---|---|
| Any Amount | 20% | 10% | Varies* |

*Until Payments equal 300% of Average Gross Monthly Billing for first twelve months.

5.  APARTMENT TURNAROUND: An account where one or more apartments or other facilities are serviced on a recurring basis as a make ready between occupancies or other uses. The monthly billing will fluctuate depending on the number of units serviced, but the account contract has a term of one year or more.

THIS SPACE INTENTIONALLY LEFT BLANK

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | DOWN PAYMENT | MONTHLY PAYMENT | MONTHS |
|---|---|---|---|
| Any Amount | 20% | 10% | All* |

*Each month service is performed.

6.  OTHER NON-STANDARD ACCOUNTS:  The Franchisor will establish the Finder's Fee on any other account that does not fall within one of the above definitions, prior to the account being offered to the Franchisee for designation of service.  The Finder's Fee on nonrecurring contracts, initial cleaning or one time cleaning contracts will vary but do not currently exceed twenty-five percent (25%) of the total invoiced amount.

(4)    Policies and Procedures will be established by Franchisor from time to time which regulate the amount and calculation, terms of payment, credits on termination or transfers of accounts, and other issues concerning Finder's Fees.

4.7.  Franchisee agrees that Franchisor shall have the exclusive right to perform all billing and accounting functions for the services provided by Franchisee.  Each month, Franchisee agrees to pay Franchisor five percent (5%) of Franchisee's Gross Revenues, as defined herein, as an Accounting Fee, to cover Franchisor's administrative costs and expenses for this service (see Section Five).  Depending on Franchisee's monthly Gross Revenue, Franchisee may be eligible for a rebate on the accounting fees paid by the Franchise.  This rebate will be a percentage reduction of the accounting fee for the month(s) in which Franchisee is eligible and will be calculated each month using the following table.  Franchisee's eligibility for the rebate shall be determined solely by Franchisor, and the calculation of the rebate shall be performed solely by Franchisor.  Any rebate Franchisor determines Franchisee is eligible for will be issued to Franchisee twice per year at a time determined solely by Franchisor.

| Monthly Gross Revenue (Dollars) | Accounting Rebate (Percent) |
|---|---|
| 0-25,000 | 0 |
| 25,001-45,000 | 0.5 |
| 45.001-65,000 | 1.0 |
| 65,001-85,000 | 1.5 |
| 85,001-Over | 2.0 |

4.7.1.  Franchisor each month will invoice clients serviced by Franchisee for the services rendered and supplies provided.  All monies received from clients are the property of Franchisor.  Each month, after deduction of all appropriate fees and charges including, but not limited to, all royalty fee, accounting fees, any note payments, the Initial Franchise Fee and Initial Finder's Fee Monthly Payments, Finder's Fees, advertising fees, transfer fees, chargebacks on past due invoices, any advances made to the franchisee by Franchisor, Non-Reported Business Fees, as defined hereinafter, or attorneys fees and court costs incurred by Franchisor in enforcing payment of accounts by clients, Franchisor will disburse money to Franchisee.  On the fifth (5th) day of each month, Franchisor will disburse to Franchisee the amount of money appearing in the Due Franchisee Column of the Franchisee Report for the preceding month.  In the event the fifth (5th) day of the month falls on a Saturday, Sunday or recognized holiday, then all such amounts due to Franchisee will be disbursed before the end of the next business day.

JANI-KING OF PHILADELPHIA , INC.
FRANCHISE AGREEMENT: 4/07

INT ____  INT ____
PAGE 9 OF 33

Case ID: 090303550

4.8.  Franchisee agrees to make all payments due Franchisor promptly in accordance with the terms of this Agreement, and recognizes that any failure on the part of the Franchisee to do so shall be deemed a substantial breach of this Agreement, and shall give Franchisor the right to terminate this Agreement immediately and retain all sums previously paid to Franchisor by Franchisee.

4.9.1.  During the term of this Agreement, Franchisee shall maintain and preserve full, complete and accurate books, records and accounts regarding the Franchise business.

4.9.2.  Upon request by Franchisor, Franchisee shall, at its sole cost and expense, prepare and submit to Franchisor within thirty (30) days after said request, a complete financial statement for the preceding twelve month period or any other calendar year, or a financial statement compiled and reviewed by a certified accountant or public accounting firm, together with such other information as Franchisor may reasonably require in order for Franchisor to determine that Franchisee is properly reporting and accounting for all Gross Revenue.

4.9.3.  Franchisor reserves the right to inspect or examine the accounts, books, records and tax returns of Franchisee, at any reasonable time, so far as the same pertain to determination of Franchisee's Gross Revenue or the business of operating a Jani-King Franchise.  Franchisor shall also have the right, at any time, to have an independent audit made of the books or financial records of Franchisee.  Any such inspection, examination or independent audit shall be performed at the cost or expense of Franchisor unless the same is necessitated by the failure of Franchisee to provide the reports requested or to preserve records as provided herein, or unless the inspection, examination or independent audit discloses that any statement or report made by Franchisee is in error to an extent of five percent (5%) or more, in which case Franchisee shall immediately pay to Franchisor the amount in error and shall reimburse Franchisor for any and all costs and expenses connected with the inspection or audit (including, without limitation, reasonable accounting and attorneys' fees).

4.10.  Franchisee agrees to be solely responsible for the services and results of services performed at locations where cleaning and maintenance services are performed by Franchisee, and to hold harmless and indemnify Franchisor from any and all claims arising from actions by Franchisee or its employees.

4.11.  Franchisee agrees to maintain a clean and safe place of business in compliance with OSHA and other governmental and industry standards and to conduct its business in a manner that would bring goodwill and public approval to itself and Jani-King.

4.11.1.  Franchisee is solely responsible for any leases of real or personal property in connection with the operation of its business, but agrees that Franchisor must approve office location, furniture and decor thereof to protect the image and reputation of Jani-King.  Franchisee must at all times during the term of this Agreement maintain such office and all fixtures, furnishings, signs and equipment located thereon in good order and condition, and in a manner which will portray the goodwill and a positive image of the Jani-King name and reputation as such may be prescribed by Franchisor from time to time.  Franchisee must, within a reasonable time specified by Franchisor, make all necessary additions, alterations, repairs and replacements to the office as required by Franchisor, but no others without Franchisor's prior written consent, including, but not limited to, periodic repainting or replacement of signs, furnishings, equipment or decor.  No other business venture shall operate out of the premises utilized by Franchisee for its office without the prior written consent of Franchisor.

4.12.1.  Franchisee agrees to be solely responsible for and indemnify and hold harmless Franchisor, Jani-King International, Inc., and their officers, directors, and employees for all loss or damage originating from, in connection with, or relating to the operation of Franchisee's business and for all claims or demands for damages to property or for injury or death of persons directly or indirectly resulting from or related to the operation of Franchisee's business.  Franchisee also agrees that before Franchisee will be authorized to begin operating its franchise, Franchisee is required to obtain and carry the insurance listed below with the limits listed, naming Franchisor, Jani-King International, Inc., and their officers and directors as Additional Insureds from an insurer

JANI-KING OF PHILADELPHIA , INC.
FRANCHISE AGREEMENT: 4/07

Case ID: 090303550

carrying an A.M. Bests' Rating of A or better.  Franchisee shall provide Franchisor with proof of such required coverage.

| TYPE | LIMITS |
|---|---|
| Comprehensive General Liability | $1,000,000 (per occurrence) $ 2,000,000 (Aggregate) |
| Hired and Non-Owned Automobile Insurance | $1,000,000 (combined single limit) |
| Excess or Umbrella Insurance | $20,000,000 (Aggregate) |
| Workers' Compensation | Statutory Limits |

4.12.2. The various limits of the required insurance may be increased or have new types of coverage added as circumstances dictate.  Franchisee shall provide Franchisor with proof of the required insurance coverage and is required to notify their insurance carrier that the insurance carrier will provide any cancellation notice directly to Franchisor no less than thirty (30) days prior to cancellation.

4.12.3.  If Franchisee fails to secure the above listed insurance to the satisfaction of Franchisor, Franchisor may, in addition to other remedies, purchase such insurance for the benefit of Franchisee and seek prompt reimbursement from Franchisee for all premiums and other costs incurred.  Franchisee shall be responsible for all premiums and other costs incurred by Franchisor up to and including the date Franchisor grants Franchisee written approval of Franchisee's insurance.  Franchisee agrees to indemnify and hold Franchisor harmless from any claims, loss or damage.

4.12.4. As an alternative to the requirement of purchasing the above insurance, Franchisor may offer to Franchisee, and Franchisee may participate in Franchisor's Business Protection Plan ("BPP") to the extent offered.  Participation in the BPP is voluntary, and Franchisee is not obligated or required to participate.  If Franchisee does not participate in the BPP, Franchisee must provide Franchisor with a certificate of insurance showing that Franchisee has obtained the equivalent amount of insurance coverage with limits as shown above or as established in the Jani-King Policies and Procedures Manual.

4.12.5. Participation in the BPP includes an initial membership in the Guardian Risk Purchasing Group ("GRPG"), a Texas non-profit corporation organized for the purpose of purchasing liability insurance on a group basis for persons or entities engaged in the janitorial industry.  Membership in the GRPG is restricted to individuals and entities who are engaged in the janitorial industry.  Members in the GRPG participate in GRPG's group insurance policies.  GRPG's group insurance policies are not individual insurance policies and the policy limits are shared between all GRPG members. If Franchisee does participate in the BPP, Franchisee is not required to purchase the required liability insurance listed above.  Insurance provided by GRPG does not include coverage any personal or business use automobile(s) or Franchisee's equipment, supplies, or building if Franchisee's building is different from Franchisor's.  Franchisee is required to purchase this insurance and supply proof of insurance to Franchisor before Franchisee will be authorized to begin operations of the franchise.  You are also required to keep accurate payroll records.  In the event Franchisee does not purchase this insurance, Franchisor reserves the right to purchase the insurance for Franchisee and charge Franchisee for the cost of the insurance.

The BPP also includes risk management, claims management assistance, periodic safety training, and regulatory compliance assistance.  For these services, you will be required to pay an administration fee which may include a profit to us. We will be solely responsible for administering the BPP.

4.12.6. Franchisee's membership in GRPG can be terminated if Franchisee: (1) fails to pay any amount owed for Franchisee's participation in the BPP or (2) if Franchisee fails to report all revenue generated by Franchisee's participation in the janitorial industry or (3) if Franchisee files a fraudulent insurance claim under any of the insurance coverage obtained by Franchisee from GRPG, (4) if Franchisee has excessive losses or (5) if Franchisee does not participate in the janitorial industry for 12 consecutive months.

4.13.   In connection with its agreement to indemnify and hold harmless Franchisor, Jani-King International, Inc., their officers, directors, and employees (the "Jani-King Parties") for all loss or damage as set forth in Section 4.12.1 of this Agreement, Franchisee agrees to defend the Jani-King Parties and any of their subsidiaries named in any lawsuit based on such loss or damage and to pay all costs and reasonable attorneys' fees associated with such defense. If any of the Jani-King parties wishes to retain their own counsel to defend any such action, Franchisee agrees to reimburse the Jani-King parties for all reasonable costs and legal fees incurred by the Jani-King parties for such defense. Said reimbursement shall be made to Franchisor in a timely manner as such fees are incurred by Franchisor and billed to Franchisee.

4.14.1  Franchisee, including officers and directors of Franchisee (where Franchisee is a corporation), agrees during the term of this Agreement not to engage in or have any financial interest in, either as an officer, agent, stockholder, employee, director, owner or partner, any other business which performs cleaning, cleaning management services, franchising or contracting cleaning management sales or any related business, except as otherwise approved in writing by Franchisor.

4.14.2  In the event this Agreement is sold, assigned, terminated or transferred, for any reason whatsoever, Franchisee, including officers  and directors of Franchisee (where Franchisee is a corporation), agrees not to engage in or have any financial interest in, either as an officer, agent, stockholder, employee, director, owner or partner, any other business which performs cleaning, cleaning management services, franchising or contract cleaning management sales or any related business: (a) within the Territory covered by this Agreement for a period of two (2) years from the effective date of such sale, assignment, termination, or transfer; and (b) in any other territory covered by a Jani-King Franchise Agreement for a period of one (1) year from the effective date of such sale, assignment, termination or transfer.  Franchisee, including officers and directors of Franchisee (where Franchisee is a corporation), during the periods referred to in this subsection, further agrees not to divert or attempt to divert from Jani-King or its Franchisees, by soliciting clients previously serviced by Franchisee or other Jani-King franchisees to perform any business in which Jani-King or its franchisees were engaged in at any time during the twelve (12) months preceding such sale, assignment, termination or transfer.

4.15.  Franchisee agrees to pay all personal property, sales, excise, use and other taxes, regardless of type or nature, which may be imposed, levied, assessed or charged, on, against or in connection with any services sold or furnished hereunder, whether from any state, municipality, county or parish, or other governmental unit or agency, which may have jurisdiction over such products, service and equipment.

4.16.  Franchisee agrees to timely pay all debts, obligations, and encumbrances that might arise as a result of its operation of a Jani-King Franchise.  Franchisee understands that in the event it be adjudicated bankrupt, or becomes insolvent, or a receiver (whether permanent or temporary) of Franchisee's property, or any part thereof, shall be appointed by a court of competent jurisdiction, or if Franchisee shall make a general assignment for the benefit of creditors, or if any judgment against Franchisee remains unsatisfied for thirty (30) days or longer, or if Franchisee defaults on any payments or obligations due Franchisor or its suppliers or others arising out of the purchase of supplies or the purchase or lease of equipment for use in the operation of a Jani-King Franchise, or if Franchisee infringes, abuses or misuses any of the Jani-King trademarks or trade names, or if the Franchisee fails to comply with any of the provisions of this Agreement except as to performance on customer accounts as set forth below, and has failed to take appropriate corrective action to the satisfaction of Franchisor within thirty (30) days after written notice by Franchisor of such failure or default, then Franchisor may terminate this Agreement

and all rights of Franchisee hereunder shall cease at the end of said thirty (30) day period or such longer period as required by law.

4.17. Franchisee agrees to be solely responsible for the services, and results of such services, performed at locations where cleaning and/or maintenance services are performed by Franchisee and Franchisee's representatives and agrees to provide all labor, materials, tools and supplies necessary to service such premises. All of such services will be performed in a good and workmanlike manner, to the satisfaction of the customer for whom such services are performed and in accordance with the cleaning schedule or instructions associated with the contract between Franchisor and the client and to the performance standards of Jani-King. Franchisee understands and agrees that Franchisee is required to maintain a good relationship with each customer serviced by Franchisee, and that Franchisor may inspect any premises serviced by Franchisee at any time to ensure that the quality of service being rendered is in accordance with Jani-King standards.

The following procedures apply if any account we previously offered the right to you to provide services as part of the Initial Finder's Fee Business requests a transfer to another franchisee or cancels the cleaning contract:

(1) If an account cancels or is transferred to a new franchisee due to non-performance, theft, your failure to service the account properly, your failure to maintain good customer relations, or your failure to comply with the Policies and Procedures, we will not replace the account.

(2) If an account cancels at no fault of yours before you service the account for 12 full months, the full gross monthly billing value of that account will be replaced within a reasonable period of time by another account or a combination of accounts, at no additional cost to you. This provision applies until the cumulative time Franchisee has provided service to the original account and all replacement account(s) equals 12 months. If any replacement account or combination of accounts has a greater billing rate than the original account, the billing rate in excess of the original account will be applied to the obligation of other Initial Finder's Fee Business, or if the Initial Finder's Fee Business obligation has been fulfilled, Finder's Fees will be charged. Franchisor is not otherwise obligated to replace the accounts that are serviced by Franchisee if the account(s) cancel before the full term of the account.

EXAMPLE: An account with a monthly gross billing of $1,000 per month cancels after 7 months through no fault of yours. We will replace the account with one or more accounts having cumulative gross monthly billing of at least $1,000 per month. If any of the replacement accounts also happen to cancel at no fault of yours at any time during the next 5 months you service the account(s), we will replace the replacement account(s) with other account(s). If the cumulative gross monthly billings of the replacement accounts exceed $1,000, the monthly billing in excess of $1,000 would apply against other Initial Finder's Fee Business obligation, or Finder's Fees will be charged.

4.17.1. Franchisee and each of its employees must be in an approved, neat and clean uniform at any time they are performing services at a client's facility. A personal identifying name tag shall be considered a part of the uniform and is required for all personnel while on the premises of an account.

4.17.2. Failure of the Franchisee to comply with any provisions of this Agreement or established Jani-King Policies and Procedures within seventy-two (72) hours after Franchisor has given notice to the Franchisee of non-compliance will be sufficient cause for Franchisor to suspend the authority of Franchisee to perform services for any or all accounts serviced by Franchisee, until such time as Franchisor is satisfied that Franchisee has complied with the provisions, or, at the option of Franchisor, to transfer the right to provide service to the account to another Franchisee, without notice or delay.

JANI-KING OF PHILADELPHIA , INC.
FRANCHISE AGREEMENT: 4/07

INT ____ INT ____
PAGE 13 OF 33

Case ID: 090303550

4.17.3.  A representative of Franchisor will inspect the accounts from time to time in order to insure that the service is performed in accordance with the cleaning schedule or instructions associated with the contract between Franchisor and the client and to the performance standards of Jani-King. If at any time, whether through complaint or inspection, a deficiency in performance is discovered, Franchisor can elect to dispatch its own staff to the account and correct all deficiencies in performance. Franchisor has sole discretion in determining urgency and the time frame when dispatching its staff to an account.

4.17.4.  Franchisee must cooperate fully with Franchisor's staff, and pay a hourly rate ("Service Fee"), plus expenses and travel time, on each occasion Franchisor dispatches its staff to an account in order to correct a deficiency in performance. The Service Fee will be established exclusively by Franchisor from time to time, but will not exceed the rate of $50.00 per "labor hour". In order to promote full compliance with all Jani-King performance standards and policies, a Complaint Fee may also be charged to Franchisee as provided in Section 4.23.

4.17.5.  If the deficiency in performance requires immediate action to meet the client's demand for a visit or performance of services at the client's premises in less than four (4) hours, and Franchisor is not able to reach the Franchisee, or the Franchisee is not available for an immediate visit or performance of services, the Franchisee will be assessed the Service Fee, plus expenses, for the operations representative's time and effort to satisfy the needs of the customer.

4.17.6.  In the event Franchisee fails to perform the cleaning services as required by this Section, pursuant to the spirit and intent of this Agreement, and such deficiency shall continue for five (5) days cumulative within a ninety (90) day period, Franchisor may suspend the authority of Franchisee to perform services for any or all accounts serviced by Franchisee, until such time as Franchisor is satisfied that Franchisee will comply with all performance standards and policies, or, at the option of Franchisor, to transfer the account. In the event Franchisee's right to perform services is suspended, any reinstatement of the right to perform services may not include the right to perform services to the same Jani-King accounts to which Franchisee provided services prior to suspension.

4.17.7.  Franchisor may also exercise the option to transfer Franchisee's right to provide service to an account immediately upon receiving a request for transfer or cancellation from the customer or if Franchisee provides any services to any customer and does not report and include such services in their Gross Revenue.

4.17.8.  Franchisee shall waive any and all payments for services which may become due and payable after Franchisor has exercised the option to transfer an account under any of the Sections 4.17.1 through 4.17.7, and shall not be entitled to any refund, rebate or reduction of any fees previously paid or pledged in connection with that customer's contract. If Franchisor does not exercise any option hereunder, either in part or in full, with regard to any deficiency or default, the election not to exercise any option shall not constitute a waiver of such rights with regard to any subsequent deficiency or default.

4.18.  At Franchisor's request, Franchisee will provide to Franchisor a list of all clients to which Franchisee is providing service and copies of the contracts under which service is being performed. Franchisee is prohibited, without Franchisor's prior written approval, from disclosing to anyone other than Franchisee's employees the names of the clients or any list of clients to whom Franchisee is providing service.

4.18.1.  Neither Franchisee nor any officer, director or controlling principal of Franchisee shall communicate, divulge or use for the benefit of any other person, persons, partnership, association or corporation during the term of this Agreement and following the expiration or termination of this Agreement, any Confidential Information, as defined herein, knowledge or know-how concerning the methods of operation of the franchised business which may be communicated to them or of which they may be apprised in connection with the operation of the Franchise under the terms of this Agreement. Franchisee and Controlling Principals shall

divulge such Confidential Information only to such of Franchisee's employees as must have access to it in order to operate the Franchise. Any and all information, knowledge, know-how, techniques and any materials used in or related to the Jani-King System which Franchisor provides to Franchisee in connection with this Agreement, whether or not expressly marked or labeled confidential, shall be deemed confidential for purposes of this Agreement. Neither Franchisee nor the Controlling Principals shall at any time, without Franchisor's prior written consent, copy, duplicate, record or otherwise make the same available to any unauthorized person. The covenant in this Section shall survive the expiration, termination or transfer of this Agreement or any interest herein and shall be perpetually binding upon Franchisee and each of the Controlling Principals.

4.19.1. In the event Franchisee voluntarily wishes to discontinue providing service to an account, Franchisee must notify Franchisor, in writing. If the account's monthly billing amount is less than $10,000, the written request must be made at least ten (10) days prior to the desired date of transfer. If the account's monthly billing is $10,000 or more, the written request must be made at least thirty (30) days prior to the desired date of transfer. Upon Franchisor's receipt of Franchisee's request to discontinue providing service or in the event Franchisee fails to provide service to an account for a period of two (2) days, for any reason, Franchisor reserves the right to service the account or to offer the right to provide service to another franchisee. In either event, Franchisee agrees that any and all payments (regardless of when services were rendered) which paid after Franchisee no longer services the account will be waived by Franchisee, and Franchisee shall not be entitled to any refund or rebate of any fees paid or pledged previously to Franchisor for such business.

4.19.2. All contracts under which terms services are provided by any Jani-King franchisee are the sole property of Jani-King. The Franchisee may solicit potential clients to provide cleaning and maintenance services through their franchise. However, all contracts for the provision of services by Franchisee must be drafted by Jani-King and must name Jani-King as the sole party to the contract (other than the client). Jani-King reserves the right, at its sole discretion, to suspend or cancel service of any contract serviced by Franchisee in the event the contract becomes delinquent in payment for services.

4.20. Upon termination or non-renewal of this Agreement for any reason, Franchisee shall immediately and permanently cease all use of the Proprietary Marks, Confidential Information, and all aspects of the System, and shall cease indicating verbally or in writing to clients and any other franchisee that it is still a Jani-King franchisee. Franchisee shall immediately return to Jani-King all advertising matter, products or writings that contain Jani-King's trade name, logo or copyright, as well as any Confidential Information. All such lists, files and the information contained therein shall remain the exclusive property of Franchisor. Any keys to buildings, security passes, and codes shall be delivered by Franchisee to Franchisor at the time the Franchisee ceases providing service. In the event Franchisee fails to deliver all keys, security passes, and codes to Franchisor, Franchisee hereby agrees to pay all costs and expenses incurred by Franchisor resulting from Franchisees failure to return these items.

4.21. If this Agreement is terminated or not renewed for any reason, such termination or non-renewal shall not be effective until Franchisee surrenders to Franchisor all property belonging to Franchisor including, but not limited to, keys to all clients' buildings and all contracts between Franchisor and Client. Franchisee agrees that the above-named items are the property of Franchisor. Franchisee must also pay, in full, all amounts owed to Franchisor at the date of termination or non-renewal and surrender any and all equipment belonging to Jani-King. Until Franchisee complies with each obligation hereunder, this Agreement shall be deemed effective and not terminated. Once Franchisee has, in Franchisor's sole opinion, complied with this paragraph, this Agreement shall be deemed terminated.

4.22. If Franchisee has proclaimed to have terminated or not renewed the Agreement and refused to surrender the items described herein, Franchisee agrees to pay Franchisor One Thousand dollars ($1,000.00) per day for each day that it has not complied with the foregoing paragraph. The parties acknowledge that damages

for Franchisee's failure to adhere to the foregoing paragraph are difficult to ascertain and therefore agree that this amount shall be payable as liquidated damages and not as a penalty.

4.23. In order to promote full compliance with all Jani-King performance standards and policies, a Fifty dollar ($50.00) complaint fee ("Complaint Fee") will be charged to any Franchisee who does not respond to or who has not serviced a customer complaint within the time frames allotted for initial response or corrective action and which require Franchisor's representatives to respond to the complaint. "Serviced" or "respond to" the complaint in this case means communicating with the client to determine the nature of the complaint and what needs to be done to resolve the situation, and to provide the customer relations necessary to try to protect the account from cancellation or damages to Jani-King's goodwill and does not mean providing cleaning or maintenance services to the customer to resolve a complaint. An additional Service Fee, as stated in Section 4.17.4 above, will be assessed, plus expenses (i.e., labor, materials, supplies, equipment, etc.), for all Franchisor's representatives' time required to resolve a complaint. A Complaint Fee will be charged under the following circumstances:

If at any time, whether through complaint or inspection, a deficiency in performance is discovered concerning the services provided by Franchisee, Franchisor will attempt to contact Franchisee during the four (4) hour period immediately following the discovery of the deficiency (attempting a contact a minimum of once each hour) and report the complaint to Franchisee.

The Complaint Fee, plus the Service Fee and expenses, will be charged under either of the following conditions:

(a) Franchisor cannot locate the Franchisee during the above described four (4) hour period and Franchisor must respond to the complaint; or,

(b) if the complaint was made known to Franchisee, and after two (2) hours following the opening of the client's business the following morning, the deficiency in performance has not been corrected to the satisfaction of the client and Franchisor resulting in Franchisor responding to the complaint.

4.23.1. The Fifty Dollar ($50.00) Complaint Fee, plus the Service Fee and expenses, will be charged to the Franchisee responsible for the complaint even if the account must be transferred to save it or if the account terminates for non-performance. The fees will be payable in the month they are incurred.

4.24. Franchisor reserves the right to establish company policies and/or procedures pertaining to the operation of Franchisee's franchised business or this Agreement. Franchisee agrees to be bound by the policies and/or procedures upon receipt of same by Franchisee. Franchisor shall keep a current, updated manual of all such policies and procedures at Franchisor's corporate office. In the event that policies and procedures kept by Franchisor differ from those kept by Franchisee, the policies and procedures maintained in Franchisor's corporate office manual shall be controlling.

4.25. Franchisee acknowledges that the System must continue to evolve in order to reflect the changing market and to meet new and changing customer demands, and that accordingly, variations and additions to the System may be required from time to time in order to preserve and enhance the public image of the System and to ensure the continuing operational efficiency of franchisees operating within the System. Accordingly, Franchisee agrees that Franchisor may, from time to time, hereafter or otherwise change the System, including, without limitation, the adoption and use of new or modified Proprietary Marks, Confidential Information, Products, Services, equipment and furnishings and new techniques and methodologies relating to the preparation, sale, promotion and marketing of service and supplies.

Franchisee agrees to promptly accept, implement, use, and display in the operation of the business all such additions, modifications and changes at its sole cost and expense.

4.26.   Franchisee agrees that if it or any of its employees develop any new concept, process or improvement in the System or the Confidential Information, it will promptly notify Franchisor and provide Franchisor with all necessary information concerning same, without compensation. Franchisee acknowledges that any such concept, process or improvement shall become the property of Franchisor, and Franchisor may utilize or disclose such information to other franchisees as it determines to be appropriate.

## SECTION 5

## NONCOMPETITION

5.1.     Franchisor agrees to provide Franchisee with valuable initial and ongoing specialized training, the Confidential Information, and the Proprietary Marks. The initial specialized training provides training in Jani-King methods and practices of professional cleaning services, management, sales and promotional techniques, and includes information about production procedures and rates, marketing, and management matters. The ongoing specialized training includes updated information of the type provided in the initial training, as well as additional training and information compiled and developed over time as the System evolves. Franchisee acknowledges that, whether or not the initial and ongoing specialized training or Confidential Information is denoted, labeled or marked as confidential, Franchisor considers such training and Confidential Information to be, and treats it as, confidential.

5.2.     In consideration for the valuable initial and ongoing specialized training and Confidential Information described above, Franchisee (including officers and directors of Franchisee, if Franchisee is a corporation) agrees as follows:

5.2.1. Franchisee (including officers and directors of Franchisee, if Franchisee is a corporation) agrees that Franchisee, the officers or directors of Franchisee (if any), and Franchisee's employees shall not at any time, both during and after, the term of this Agreement, communicate or disclose to any person or entity (other than Franchisor or a person or entity expressly designated by Franchisor in writing), or use outside the scope of the business governed by this Agreement, any of the initial or ongoing specialized training or Confidential Information acquired by Franchisee (including the officers and directors of Franchisee, if Franchisee is a corporation) or Franchisee's employees during the term of this Agreement.

5.2.2    Franchisee (including officers and directors of Franchisee, if Franchisee is a corporation) agrees to use all reasonable efforts to maintain as confidential the initial and ongoing specialized training and Confidential Information. Accordingly, Franchisee (including officers and director of Franchisee, if Franchisee is a corporation) agrees that Franchisee, the officers or directors of Franchisee (if any), and Franchisee's employees shall not at any time duplicate, copy, record, or otherwise reproduce, in whole or in part, materials containing Confidential Information and/or information imparted through initial and/or ongoing specialized training, except as expressly authorized in writing by Franchisor.

5.2.3. Franchisee (including officers and directors of Franchisee, if Franchisee is a corporation) agrees that, during the term of this Agreement and for a continuous uninterrupted period of (2) years thereafter (unless otherwise specified in this Section 5) commencing upon expiration or termination of this Agreement, regardless of the cause for termination, except as otherwise approved in writing by Franchisor, Franchisee, the officers or directors of Franchisee (if any), and Franchisee's employees shall not, directly or indirectly, for itself/themselves or through, on behalf of, or in conjunction with any person, persons, partnership or corporation:

JANI-KING OF PHILADELPHIA , INC.                    INT ____  INT ____
FRANCHISE AGREEMENT: 4/07                           PAGE 17 OF 33

Case ID: 090303550

(a)  Divert or attempt to divert to any competitor, by direct or indirect inducement or otherwise, any business or customer of the business franchised hereunder or any Jani-King franchisee anywhere;

(b)  Do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's trademarks or trade names or the Jani-King franchise program;

(c)  Employ, seek to employ, or otherwise directly or indirectly induce to leave his/her employment any person who is employed by or has been employed within the previous twelve (12) months by Franchisor or by any of Franchisor's affiliated companies or by any other franchisee of Franchisor;

(d)  Own, maintain, operate, engage in or have any interest in any business (hereinafter referred to as "Competing Business") which is the same as or similar to the business franchised under the terms of this Agreement, which Competing Business operates, solicits business, or is intended to operate or solicit business: (i) within the  Territory of this Agreement; and (ii) for a period of one (1) year commencing upon expiration or termination of this Agreement (regardless of the cause for termination), in any other territory in which a Jani-King franchise operates.

5.3.  The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this section is held unreasonable or unenforceable by a court or agency having valid jurisdiction in any unappealed final decision to which Franchisor is a party, Franchisee (including Franchisee's officers and directors, if Franchisee is a corporation) expressly agrees that Franchisee, Franchisee's officers and directors (if any), and Franchisee's employees  will be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section.

5.4  Franchisee understands and acknowledges that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section, or any portion thereof, without its consent, effective immediately upon written notice to Franchisee; and Franchisee agrees that it shall comply forthwith with any covenant as so modified, which modified covenant shall be fully enforceable notwithstanding the provisions of any other Sections hereof.

5.5.  Franchisee acknowledges that any materials and information provided to Franchisee (including Franchisee's officers and directors, if Franchisee is a corporation) and/or to Franchisee's employees by Franchisor will at all times be and remain the property of Franchisor.  Franchisee also acknowledges that any materials, concept, process, or improvement developed in the operation or promotion of the business governed by this Agreement by Franchisee (including its officers and directors, if Franchisee is a corporation) and/or Franchisee's employees will at all times be and remain the property of Franchisor.  Franchisee agrees to give Franchisor notice of and all necessary information related to such development(s).  Upon sale, assignment, termination, expiration, or transfer of this Agreement, Franchisee shall deliver to Franchisor all property belonging to Franchisor (including but not limited to the materials described above) and/or relating to Franchisor's business.  In addition, upon sale, assignment, termination, expiration, or transfer to this Agreement, Franchisee agrees to provide Franchisor, upon Franchisor's request, with a list of all customers that Franchisee is servicing or has serviced on or at any time during the twelve (12) months preceding the date of such sale, assignment, termination, expiration, or transfer, and a copy of any contracts under which the service is or was provided.

5.6.  Franchisee expressly agrees that the existence of any claims that Franchisee, Franchisee's officers and directors (if any), or Franchisee's employees may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section. Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees and all costs of court) incurred by Franchisor in connection with the enforcement of this  Section of this Agreement.

5.7.    Franchisee acknowledges that a violation of any of the terms of this Section would result in irreparable injury to Franchisor for which no adequate remedy at law may be available. Franchisee acknowledges that the initial and ongoing specialized training and Confidential Information described herein have been developed and compiled through Jani-King's time and effort in the industry and provide a blueprint for Jani-King's business.  Accordingly, Franchisee acknowledges that, in addition to Franchisor's remedies at law, Franchisor may seek and obtain preliminary and permanent injunctive relief restraining the breach or threatened breach by Franchisee; and Franchisee consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of this Section.

5.8.    Franchisee shall require and obtain execution of covenants similar to those set forth in this Section (including covenants applicable upon and after the termination of a person's relationship with Franchisee) from any or all officers, directors, managers and other  employees of Franchisee who have received or will receive initial and/or ongoing specialized training or Confidential Information directly or indirectly from Franchisor. Every covenant required by this Paragraph shall be in a form satisfactory to Franchisor, including, without limitation, specific and express identification of Franchisor as a third party beneficiary of such covenants with the independent right to enforce them.  Failure by Franchisee to obtain execution of a covenant required herein shall constitute a material event of default under the terms of this Agreement.

## SECTION 6

### FRANCHISOR PLEDGES

6.1.1.  To offer Franchisee the opportunity to provide service to Franchisor's contracts located within the Territory, as defined herein, which have minimum cumulative gross monthly billings in an amount at least equal to the amount defined as the "Initial Finder's Fee Business" in the Franchise Summary.  The contracts under which Franchisee will provide service are and will remain the property of Franchisor.  The right to provide service to the Initial Finder's Fee Business will be offered within the number of days identified in the Franchise Summary as the "Initial Offering Period." The Initial Offering Period will begin on the date after (i) all required equipment and supplies have been obtained by Franchisee, (ii) Franchisee has successfully completed training as indicated by Franchisee's signing and returning to Franchisor the Acknowledgment of Completion of Training and (iii) Franchisee's delivery to Franchisor of written proof that Franchisee has obtain the insurance required under this Agreement.  Notwithstanding, the Initial Offering Period may begin at a later date if requested by Franchisee and agreed to by Franchisor, or as provided below.  As a condition to Franchisee being eligible to provide service to certain Jani-King clients, Franchisee and Franchisee's employees may be required to undergo background checks.

6.1.2.  The actual time to secure and offer, as described above, the Initial Finder's Fee Business to the Franchisee may, at Franchisor's sole discretion, be automatically extended under the following conditions: (1) if Franchisee requests a delay in the offering of the Initial Finder's Fee Business; (2) if Franchisee is in default under the terms and conditions of the Franchise Agreement or any other agreements between Franchisee and Franchisor; or (3) if any of the Initial Finder's Fee Business previously provided to Franchisee requests a transfer to another Franchisee or requests to be cancelled due to non-performance in which case Franchisee is required to repeat and complete to Franchisor's satisfaction all training classes required by Franchisor.  In the event of the occurrence of any of the above conditions, Franchisor will have the remainder of the Initial Offering Period or a minimum of 120 days, which ever is longer, from the date: (1) Franchisee notifies Franchisor that they are ready to accept the right to service other business and has provided any documentation required under the Policies and Procedures; (2) Franchisee has cured any default; or (3) the acknowledgment of retraining is signed, to offer the balance of Initial Finder's Fee Business to Franchisee.  Franchisor does not guaranty that the Initial Finder's Fee

Business will reach or remain at the level stated on the Franchise Summary throughout the term of the Franchise Agreement.

6.2. To provide Franchisee with the Office Supply and Advertising Package outlined in Schedule One of this Agreement.

6.3. To make available to Franchisee applicable confidential manuals, training aids and other pertinent information concerning Jani-King methods and practices.

6.4. To provide an initial local training program to include Jani-King cleaning methods, systems and programs using established Jani-King procedures and forms. Franchisee agrees to successfully complete the training within six (6) months after the date of this Agreement.

6.5. To offer Franchisee the right to provide service to Jani-King clients until Franchisee has been offered the right to provide service to Jani-King clients with cumulative gross monthly billings in an amount equal to or greater than the Initial Finder's Fee Business.

6.6. To provide additional training and support for Franchisee at reasonable rates as established by Jani-King policies and procedures, currently at a rate of Fifty Dollars ($50.00) per hour, plus expenses.

6.7. To allow Franchisee the non-exclusive right to use the Jani-King marks, insignia, logo, design and color scheme in the Territory subject to limitations and restrictions herein, and to allow Franchisee to utilize the processes, methods, materials, equipment and promotional plans developed by Jani-King.

6.8. To permit Franchisee the right to profit from its efforts, commensurate with its status as owner of its business, and correspondingly, to bear the risk of loss or failure that is characteristic of this status.

6.9. To make available to Franchisee the System and to provide Franchisee with new developments in the cleaning services industry at the discretion of and as determined by Franchisor.

6.10. To make available for Franchisee, at Franchisor's discretion and at a reasonable cost, promotional materials, sales and service manuals, equipment and other materials relevant to the operation of a Jani-King franchise.

## SECTION 7

## ADDITIONAL SERVICES

7.1. There are no additional services provided by Franchisor to Franchisee except as explicitly set out in this Agreement.

## SECTION 8

## DEFAULT AND TERMINATION

8.1. Franchisee shall be deemed to be in default, and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon the provision of notice to Franchisee, either by mailing or hand delivery, upon the occurrence of any of the following events:

(a)  If Franchisee or any of its Principals is convicted of, pleads guilty or no contest to, or receives deferred adjudication for a felony, a crime involving theft, a crime involving moral turpitude, or any other crime or offense that is reasonably likely, in the sole opinion of Franchisor, to adversely affect the Jani-King franchise program, any Jani-King trademarks, trade names or the goodwill associated therewith or Franchisor's interest therein.

(b)  If Franchisee or any of its Principals discloses or divulges the contents of any Confidential Information, or any other trade secrets or confidential information provided to Franchisee by Franchisor in violation of the terms and conditions of this Agreement.

(c)  If Franchisee abandons the Jani-King Franchise business or otherwise forfeits the right to do or transact business in the Territory where the licensed business is located.

(d)  If Franchisee or any of its Principals purport to transfer any rights or obligations under this Agreement to any third party without the Franchisor's prior written consent.

(e)  If Franchisee makes any material misrepresentations or untrue or false statements on the franchise application or in other correspondence relating to the acquisition of the franchise business.

(f)  If the Franchisee repeatedly fails to comply with one or more requirements of the Agreement, any operations procedure, or Jani-King Policies and Procedures, whether or not corrected after notice;

(g)  If Franchisee fails to comply with any provision of this Agreement, any other agreement between Franchisor and Franchisee, and thereafter fails to cure such default to the satisfaction of the Franchisor within thirty (30) days after written notice has been given thereof.  Defaults by the Franchisee shall include, without limitation, the occurrence of any of the following events:

(i)  If Franchisee fails, refuses, or neglects promptly to pay any monies owing to Franchisor or its subsidiaries or affiliates when due, or to submit the financial information required by Franchisor under this Agreement, or makes any false statements in connection therewith.

(ii)  If Franchisee fails to maintain the standards that Franchisor requires in this Agreement or any other standards contained in Jani-King manuals, including the Jani-King Policies and Procedures manual.

(iii)  If Franchisee engages in conduct which reflects unfavorably upon the operation or reputation of the Jani-King franchise business or System.

(iv)  If Franchisee fails, refuses, or neglects to obtain the Franchisor's prior written approval or consent as required by this Agreement, other than as provided in Section 8.1(d).

(v)  If Franchisee or any of its Principals misuses or makes any unauthorized use of the Jani-King proprietary trademarks, trade names, service marks or other materials, including any forms of advertising, or otherwise materially impairs the goodwill associated with the Jani-King name or Franchisor's rights.

(vi)  If Franchisee is declared insolvent or bankrupt, or makes any assignment or trust mortgage for the benefit of creditors, or if a receiver, guardian, conservator, trustee in bankruptcy or similar officer shall be appointed to take charge of all or a part of Franchisee's property by a court of competent jurisdiction.  This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A., Sec. 101 et seq.)

8.2.  The termination of this Agreement shall be without prejudice to any remedy or cause of action which Jani-King may have against Franchisee for the recovery of any monies due Jani-King or any equipment or property of Jani-King, or to any other right of Jani-King to recover damages for any breach hereof.

8.3.  If the provisions of this Agreement provide for periods of notice less than those required by applicable state law, or provide for termination, cancellation, non-renewal or the like other than in accordance with applicable state law, Section 11.2.2. of this Franchise Agreement shall apply.

## SECTION 9

## TERM AND EXTENSION

9.1.  Subject to Section 9.2 herein, this Agreement and the franchise and license granted hereunder, unless sooner terminated, shall be and remain in full force and effect for a period of twenty (20) years from and after the Effective Date of this Agreement which is the date identified in the Franchise Summary.  This Agreement shall expire 20 years after the Effective Date unless extended pursuant to the terms contained herein.

9.2.  Provided Franchisee is not in default of this Agreement and provided Franchisee has delivered to Franchisor the required notice, Franchisee shall have the option to renew this Agreement for an additional period of twenty (20) years and for three (3) subsequent, additional twenty (20) year periods following the first extension (a total of one hundred (100) years when initial periods and renewal terms are combined).  Prior to the expiration of each 20 year term, Franchisee must notify Franchisor, in writing, of its intention to renew the Agreement not less than seven (7) months nor more than twelve (12) months prior to the end of the then current term.

9.3. As a condition to and at the time of any renewal, Franchisee is required to execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its subsidiaries, and their respective officers, directors, agents and employees in their corporate and individual capacities, including without limitation, claims arising under this Agreement and any federal, state and local laws, rules and ordinances.

9.4.  As a further condition to and at the time of any renewal, Franchisee agrees to execute Franchisor's most recent standard franchise agreement being used by Franchisor which may differ substantially from the agreement under which the Franchisee has operated and any other ancillary agreements and documents as Franchisor may require.  Franchisee understands that the most current, executed agreement between Franchisee and Franchisor will govern relations between Franchisor and Franchisee for the following Twenty (20) years.  However, no additional Initial Franchise Fee or renewal fee shall be paid by Franchisee at the time of renewal, nor shall Franchisor be obligated to provide any additional Initial Finder's Fee Business or training.

## SECTION 10

## TRANSFER

10.1. This Agreement shall inure to the benefit of the successors and assigns of Franchisee.  The interests of Franchisee in this Agreement are personal and may not be sold, assigned, transferred, shared or divided in any manner by Franchisee without the written consent of Franchisor, which consent shall not be unreasonably withheld.  Franchisee shall provide to Franchisor prior to the sale or transfer, a copy of any written agreements relating to the proposed sale or transfer, or any additional information which Franchisor may require in order to determine if it will grant its consent to the proposed sale or transfer.  For purposes of this Agreement, any change in stock ownership, voting or other control whatsoever of a corporation or partnership which acts as a Franchisee under this Agreement constitutes a transfer.  For all purposes herein, a beneficiary of a trust which owns a

beneficial interest in a Franchisee which is an entity shall be deemed to have an interest in the Franchise Agreement. Provided further, for all purposes herein, in the event that a trust owns a beneficial interest in Franchisee which is an entity, any change in the beneficial interest of a beneficiary shall constitute a "transfer" hereunder. Any transaction or series of transactions which would have such an effect must be approved by Franchisor on the same basis as any other sale or transfer as set forth herein. Franchisee hereby covenants and warrants (i) that its certificate or articles of incorporation, corporate charter, by-laws and/or partnership agreement limit transfers as described in this Section 11, and (ii) if Franchisee is a corporation, that each security shall bear a legend (in a form to which Franchisor consents) indicating that any transfer is subject to this Section 11, or if Franchisee is a partnership, that its partnership agreement shall provide (in a form to which Franchisor consents) that all transfers are subject to this Section 10.

10.2. Franchisee agrees to pay to Franchisor the greater of Two Thousand Dollars ($2,000.00) or ten percent (10%) of the sales price or exchanged value as a transfer fee (the "Transfer Fee").   This Transfer Fee must be paid before Franchisor will grant consent to the sale or transfer. If no monetary consideration or other exchange of value is made for the transfer of a franchise, no Transfer Fee will be charged for a transfer to: (1) any party currently holding an interest in the franchise at the time of the transfer; (2) a controlled corporation in which the current owners of the Franchise retain ninety (90%) percent or greater of the outstanding shares of stock; or (3) if the transfer is to an immediate family member of the current owner (for the purposes of this Section 10.2, family members include Franchisee's mother, father, brother, sister, and children only), whether a life time transfer or upon death. An administrative fee will be charged to cover necessary and reasonable costs and preparation of the documents associated with the transfer if no Transfer Fee is assessed.   The current administrative fee is $250.00, but may be increased by Franchisor in the future.

10.3. Prior to the sale or transfer of the franchise, Franchisee will provide to Franchisor a copy of any written agreements relating to the proposed sale or transfer or any additional information which Franchisor may require in order to determine if it will grant consent to the proposed sale or transfer. It is agreed that consent for sale, transfer or assignment will be granted only when: (a) all obligations under the terms of this Agreement have been fulfilled, (b) all money owed by Franchisee to Franchisor and Franchisor's affiliates have been paid in full, (c) the purchaser of the franchise agrees to undergo the training required of a new Jani-King franchisee and (d) the purchaser of the franchise agrees to execute Franchisor's most current franchise agreement which may differ substantially from this Agreement.

10.4. Franchisee also agrees to provide, as a condition of Franchisor's consent to the sale, transfer, or assignment, a personal covenant to the purchaser not to compete in the cleaning and/or maintenance services industry, nor to seek to divert business from Franchisor or its franchisees for a period of two (2) years after transfer or sale. This covenant is in addition to the non-compete covenants contained in this Agreement. The transferor must also execute a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor, Franchisor's parent corporation and affiliated corporations, and the officers, directors, shareholders and employees of Franchisor and each parent and affiliate corporation in their corporate and individual capacities including, without limitation, claims arising under this Agreement and federal, state and local laws, rules and ordinances.

10.5. This Agreement is fully assignable by Franchisor and shall inure to the benefit of any assignee or other legal successor to the interest of Franchisor.

## SECTION 11

## RIGHT OF FIRST REFUSAL

11.1. In the event Franchisee receives a bona fide arms-length offer to purchase Franchisee's interest in this Agreement (or in the business conducted hereunder) from any third party, or in the event Franchisee proposes to convert, assign, or otherwise transfer Franchisee's interest in this Agreement (or in the business conducted hereunder), in whole or in part, to any third party, Franchisee hereby agrees to offer to Franchisor a first right to purchase or otherwise receive Franchisee's interest under the same terms and conditions offered to or accepted from the third party (the "Right of First Refusal"). Franchisee's failure to offer to Franchisor the Right of First Refusal will be an act of default of the terms of this Agreement. Notwithstanding anything contained herein to the contrary, Franchisee shall not be obligated to offer Franchisor the Right of First Refusal sale, assignment, or transfer is solely between Franchisee and either (a) a corporation whose original sole shareholders are individuals who comprise the original Franchisee and/or (b) the immediate family of Franchisee or the immediate family of the individuals described in (a) herein. For the purpose of this section, immediate family shall mean the spouse, children, siblings, or parents of Franchisee only.

11.2. Franchisee shall make available to Franchisor in a written statement verified by Franchisee the terms of the offer received or made by Franchisee, and Franchisor shall have thirty (30) days from the receipt of said statement to either accept or refuse such offer. Written notice of Franchisor's decision to accept or refuse said offer shall be delivered to Franchisee. Acceptance by Franchisor shall be at the same price and on the same terms set forth in the written statement submitted by Franchisee.

11.3. In the event Franchisor fails to accept the offer within the thirty-day (30) period, Franchisee shall be free to effect the disposition described in the statement upon the exact terms set forth in the statement delivered to Franchisor, provided that nothing in this paragraph shall be interpreted as limiting the requirements of Section 10 hereof relating to transfer of the Agreement.

11.4. Furthermore, in the event Franchisee is insolvent, or upon the filing of any petition by or against Franchisee under any provisions of any bankruptcy law, Franchisor shall have the first right to purchase the business conducted by Franchisee, for an amount and pursuant to terms established by an independent appraiser selected by Franchisor.

## SECTION 12

## GENERAL

12.1. Nothing in this Agreement shall be construed to prevent Franchisee from freely setting its own prices and discounts for services and products which it may render or sell provided such actions do not affect the business of Franchisor.

12.2.1. Should any part of this Agreement for any reason be declared invalid or unenforceable, such decision shall not affect the validity of the remaining portion, which remaining portion shall remain in full force and effect as if this Agreement had been executed with the invalid or unenforceable portion eliminated, and the parties to this Agreement agree that they would have executed the remaining portion of this Agreement without including any such part, parts, or portion which may, for any reason, hereafter be declared invalid or unenforceable.

12.2.2. If any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the termination of or refusal to renew this Agreement than is required hereunder, or the taking of some other action

JANI-KING OF PHILADELPHIA , INC.
FRANCHISE AGREEMENT: 4/07

INT ____   INT ____
PAGE 24 OF 33

Case ID: 090303550

not required hereunder, or if under any applicable and binding law or rule of any jurisdiction, any provision of the Agreement or any specification, standard or operating procedure prescribed by Franchisor is invalid or unenforceable, the prior notice and/or other action required by such law or rule shall be substituted for the comparable provisions hereof, and Franchisor shall have the right, in its sole discretion, to modify such invalid or unenforceable provision, specification, standard or operating procedure to the extent required to be valid and enforceable. Franchisee agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is comprehended within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof, or any specification, standard or operating procedure prescribed by Franchisor, any portion or portions which a court may hold to be unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order. Such modifications to this Agreement shall be effective only in such jurisdiction, unless Franchisor elects to give them greater applicability, and shall be enforced as originally made and entered into in all the jurisdictions.

12.3.  This Agreement, the Policies and Procedures manual, and the applicable information disclosed in the Uniform Franchise Offering Circular provided to Franchisee as part of this transaction constitutes the entire agreement between the parties and supersedes any and all agreements, verbal or written, including any other franchise agreement, previously made between the parties herein. All transactions between Franchisee and Franchisor regarding any operation of a Jani-King franchise business granted under any franchise agreement dated prior to this Agreement shall be controlled by this Agreement and the most current publication of the Jani-King Policies and Procedures Manual. Any amendment or modification to this Agreement is invalid unless made in writing and signed by all the parties.

12.4.  Franchisee acknowledges that neither Franchisor nor anyone on its behalf has made any representations, promises or agreements, orally or otherwise, respecting the subject matter of this Agreement which are not embodied herein.

12.4.1.  Franchisee acknowledges that it has carefully read this Agreement, that ample opportunity has been provided for Franchisee to obtain the services of an independent legal or financial advisor, and that Franchisee has had the opportunity to have this Agreement and all supporting disclosure documentation, as well as any other information gathered by the Franchisee, reviewed by an attorney or financial advisor of its own choice.

12.4.2.  Franchisee further acknowledges that Franchisor does not authorize any representative of Franchisor to make any oral, written, visual or other claim or representation that are not contained in the Uniform Franchise Offering Circular provided to Franchisee by Franchisor and does not permit any promises, agreements, contracts, commitments or representations to be made to Franchisee except those stated in this Agreement.

12.5. Franchisor may also conduct the type of business operated by the Franchisee.

12.6. Franchisee acknowledges that the franchised business and all documents and information Franchisee receives from Franchisor relating to the operation of the franchise, including the manuals and communication tools and the training will be presented to Franchisee in the English language. Franchisee acknowledges that Franchisee is required to have a representative that is fluent in the English language present during any training provided by Jani-King and available for any translating necessary during the operation of my franchise.

12.7. It is agreed and understood that Franchisee will act at all times as an independent contractor and will not, at any time, directly or indirectly, hold itself out as an agent, servant or employee of Franchisor.

12.8. No waiver by Franchisor of any default in performance on the part of Franchisee, time being of the essence, or like waiver by Franchisor of any breach or series of breaches, of any of the terms, covenants and

conditions of this Agreement shall constitute a waiver of any subsequent breach or waiver of said terms, conditions or covenants.

12.9.   Any notice required or permitted under this Agreement must be in writing and delivered by personal delivery service or by deposit in the U.S. mail, certified, return receipt requested or by a recognized express delivery service providing written receipt of delivery at the address listed for the Franchisee in the Franchise Summary or to Franchisor at the following address:

Jani-King of Philadelphia, Inc.
2500 Eisenhower Avenue
Norristown, Pennsylvania 19403

A party to this Agreement may change its notice information by providing written notice to the other parties pursuant to the notice requirements stated above, and such change shall be effective as to each other party on the tenth (10th) day after delivery to such other party.

12.10.   THE PARTIES AGREE AND INTEND THIS INSTRUMENT TO BE EXECUTED, INTERPRETED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REFERENCE TO CONFLICT OF LAWS PRINCIPLES. TEXAS LAW SHALL APPLY TO ALL CLAIMS, DISPUTES, AND DISAGREEMENTS BETWEEN THE PARTIES, WHETHER ARISING FROM ALLEGED BREACHES OF THE CONTRACT OR AGREEMENT OR OTHER CLAIMS ARISING IN ANY WAY FROM THE PARTIES' DEALINGS.   JURISDICTION AND VENUE IS DECLARED TO BE EXCLUSIVELY IN DALLAS COUNTY, IN THE STATE OF TEXAS.

12.11. The submission of this Agreement does not constitute an offer to license, and this Agreement shall become effective only upon execution thereof by Franchisor and Franchisee and the compliance with section 12.13.

12.12. THE PARTIES AGREE THAT ANY DAMAGES SOUGHT BY OR AWARDED TO FRANCHISEE SHALL BE LIMITED TO FRANCHISEE'S TOTAL INVESTMENT WITH FRANCHISOR, AND NO PUNITIVE OR EXEMPLARY DAMAGES WILL BE AWARDED TO FRANCHISEE.

12.13.   This Agreement shall not be binding on Franchisor unless and until it has been accepted and signed by an officer or director of Franchisor at Franchisor's home office in Addison, Dallas County, Texas.

12.14. The numbers and headings of paragraphs used herein are for convenience only and do not affect the substance of the paragraphs themselves.

12.15.   Franchisee certifies and warrants that all owners and spouses of owners or partners, if the franchise is a sole proprietorship or partnership; and all persons who are a shareholder, officer or director of any corporation who holds the franchise: (1) are listed in the attached SCHEDULE OF PRINCIPALS; and (2) that all such parties will execute all Guarantees or other documents required by Jani-King.

IN WITNESS WHEREOF, the parties hereto have set their hands this _____ day of _____, 2_____.

JANI-KING OF PHILADELPHIA , INC.                    FRANCHISEE

BY:_____

TITLE:_____             _____
                                                    (Signature of Owner, Partner or Authorized
                                                    Officer)

                                                    _____
                                                    (Print Name)
                                                    Social Security #_____

                                                    _____
                                                    By:  (Signature of Partner or Spouse)

                                                    _____
                                                    (Print Name)
                                                    Social Security #_____

                                                    _____
                                                    By:  (Signature of Partner or Spouse)

                                                    _____
                                                    (Print Name)
                                                    Social Security #_____

                                                    COMPLETE IF FOR CORPORATION:

                                                    _____
                                                    (Corporate Name)

                                                    _____
                                                    (Title of Authorized Officer)
                                                    Federal Tax ID#: _____

ACCEPTED by the Home Office of Franchisor on this _____ day of _____, _____.


BY:_____
        Authorized Representative


JANI-KING OF PHILADELPHIA , INC.         INT ____ INT ____
FRANCHISE AGREEMENT: 4/07                PAGE 27 OF 33

                                         Case ID: 090303550

## SCHEDULE OF PRINCIPALS

ANY OTHER PERSON NOT LISTED IN THIS AGREEMENT WHO IS A SPOUSE, PARTNER, OR AN OFFICER, DIRECTOR OR SHAREHOLDER OF FRANCHISEE:

Name: _____
Relationship: _____
Taxpayer ID: _____
Address: _____
_____
Telephone: _____

Name: _____
Relationship: _____
Taxpayer ID: _____
Address: _____
_____
Telephone: _____

Name: _____
Relationship: _____
Taxpayer ID: _____
Address: _____
_____
Telephone: _____

Name: _____
Relationship: _____
Taxpayer ID: _____
Address: _____
_____
Telephone: _____

## SCHEDULE ONE
## "OFFICE SUPPLY AND ADVERTISING PACKAGE"

LIST OF MATERIALS PROVIDED TO FRANCHISEE
PURSUANT TO THE FRANCHISE AGREEMENT

| ITEM | AMOUNT |
|---|---|
| Business Cards (imprinted logo) | 1,000 |
| JANI-KING Logo/Border Paper (matching envelopes) | 100 |
| Color Tri-Fold | 50 |
| JANI-KING Tunics | 3 |
| JANI-KING Golf Shirt | 1 |
| JANI-KING Polo Shirts | 4 |
| Inspection Pads | 5 |
| Memo Pads | 5 |
| Past Performance Pads | 5 |
| Account Bid Sheet Pad | 1 pad |
| Contact Evaluation Pad (replace as needed) | 1 pad |
| Discover JANI-KING Media | 1 |
| JANI-KING Logo Binders | 2 |
| JANI-KING Executive Pad Holder | 1 |
| JANI-KING Tri-fold Pad Holder | 1 |
| JANI-KING Training Videos | 1 set |
| JANI-KING Customer Relations Handbook | 1 |
| Account Follow-up Sheets (replace as needed) | 5 |
| New Account Start-Up (replace as needed) | 5 |
| Initial Clean Sign-Off Sheets (replace as needed) | 5 |
| Franchisee Request Cards (replace as needed) | 5 |
| Authorization for Extra Work Forms (replace as needed) | 5 |
| JANI-KING Business Card Order Forms | As Needed |

JANI-KING OF PHILADELPHIA , INC.
FRANCHISE AGREEMENT: 4/07

INT ____ INT ____
PAGE 29 OF 33

Case ID: 090303550

## "SUPPLY AND EQUIPMENT PACKAGE"

### THE FOLLOWING SUPPLIES AND EQUIPMENT MUST BE PURCHASED
### BY EACH FRANCHISEE PURSUANT TO THE FRANCHISE AGREEMENT AND
### PRIOR TO FRANCHISOR OFFERING ANY OF THE INITIAL FINDER'S FEE BUSINESS

The products listed may be purchased from Franchisor, subject to shipping restrictions, or any other source. Prices currently charged by Franchisor may be changed or modified in the future.

| ITEM | AMOUNT |
|---|---|
| All Purpose Cleaner (Biodegradable for use on walls, formica, etc. | 1 - one gallon container (or equivalent) |
| Glass Cleaner | 1 - one gallon container (or equivalent) |
| Restroom Disinfectant | 1 - one gallon container (or equivalent) |
| Cream Cleanser | 2 - one quart containers (or equivalent) |
| Neutral Floor Cleaner | 1 - one gallon container (or equivalent) |
| Carpet Cleaning Concentrate (Bonnet Method) | 1 gallon |
| Carpet Spot Remover | 1 can (or equivalent) |
| Floor Finish Stripper | 1 gallon |
| High Gloss Floor Finish | 1 gallon |
| Stainless Steel Cleaner | 1 can |
| Dust Mop Treatment | 1 can |
| Small Trash Liners (10-12 gallon capacity) | 1 case |
| Large Trash Liners (40-45 gallon capacity) | 1 case |

| ITEM | AMOUNT |
|---|---|
| Mop Bucket (26 quart minimum with wet floor caution inlayed) | 2 |
| Mop Wringer; Down Press | 2 |
| Wet Mop Handle | 2 |
| Wet Mop Head (24 oz.) | 4 |
| Dust Mop Head (24 inch) | 1 |
| Dust Mop Frame (24 inch) | 1 |
| Swivel Dust Mop Handle | 1 |
| Metal-Tipped Handle for Doodle Bug | 1 |
| Doodle Bug Holder and Pads (3) | 1 |
| Plastic Angler Broom | 1 |
| Corner Brush | 1 |
| Toy Broom | 1 |
| Janitor Dust Pan | 1 |

## "SUPPLY AND EQUIPMENT PACKAGE" – Continued

| ITEM | AMOUNT |
|---|---|
| 17" Black Stripping Pad | 5 |
| 17" Red Buffing Pad | 5 |
| 17" Bonnet Pad | 1 |
| Window Squeegee Handle | 1 |
| 14" Window Stripwasher with Sleeve | 1 |
| 12" Squeegee Channel | 1 |
| Commercial Sponge with Scrubber | 1 |
| Commercial Sponge | 1 |
| Roll-around Trash Container (32 gallon) | 1 |
| Brute Container Caddy | 1 |
| Lambswool Duster (Telescoping) | 1 |

| ITEM | AMOUNT |
|---|---|
| Disposal Wipes | 1 package |
| Disposal Gloves | 1 box |
| Putty Knife | 1 |
| Sanitary Bowl Swab | 2 |
| Rubber Door Stop | 1 |
| Wet Floor Caution Sign | 4 |
| One Quart Spray Bottle | 6 |
| Trigger Sprayer | 6 |
| 8 oz. Measuring Cup | 1 |
| Electronic Pager (not Available through Franchisor) | 1 |

Franchisor may adjust the items included in the Supply and Equipment Package as industry standards change.

—

## "ADDITIONAL ELECTRIC EQUIPMENT"

### THE FOLLOWING EQUIPMENT MUST BE PURCHASED BY EACH FRANCHISEE PURSUANT TO THE FRANCHISE AGREEMENT AND PRIOR TO FRANCHISOR OFFERING ANY OF THE INITIAL BUSINESS

The products listed may be purchased from Franchisor or any other source.
Prices currently charged by Franchisor may be changed or modified in the future.

| QUANTITY | DESCRIPTION | UNIT PRICE |
|---|---|---|
| 1 | 17" Heavy Duty Floor Machine with 1.5 HP electric motor, triple planetary gearing (includes pad driver), 175 rpm, with easy adjusting handle | $663.04 each |
| 1 | Or

17" Heavy Duty Floor Machine with 1.5 HP electric motor, triple planetary gearing (includes pad driver), 175 rpm | $670.00 each |
| 1 | Wet/Dry vacuum with 15 gallon tank, 95" of waterlift, including tool package | $448.57 each |
| 1 | Or

Wet/Dry vacuum with 15 gallon tank, 92" of waterlift, including tool package | $516.09 each |

In addition to the above equipment, Franchisee must purchase one of the following equipment packages:

Equipment Package #1

| QUANTITY | DESCRIPTION | UNIT PRICE |
|---|---|---|
| 1 | 12" Upright commercial 7 amp vacuum, 50' cord, with cloth bag | $187.29 each |
| 1 | Or

12" Upright commercial 7 amp vacuum, 50' cord, cloth bag with paper bag inserts | $248.34 each |
| 1 | Compact Portable Vacuum Cleaner (Canister Type) w/ shoulder strap and cloth bag | $126.00 each (CASH ONLY) |
| 1 | Or

Backpack Vacuum Cleaner, 10 qt. including tool package | $375.71 each |

or Equipment Package #2

| QUANTITY | DESCRIPTION | UNIT PRICE |
|---|---|---|
| 1 | 14"Upright commercial vacuum complete with the following:<br>• 750 watt vacuum motor<br>• 40 foot cord<br>• paper filter collection system<br>• crevice tool<br>• upholstery and drapery tool<br>• attachment hose | $374.29 each |