IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PAMELA MYERS ET AL. :
 :  CIVIL ACTION
  v. :
 :  NO. 09-1738
JANI-KING OF PHILADELPHIA, INC., :
ET AL. :

**SURRICK, J.**       **MARCH  10 , 2015**

<u>**MEMORANDUM**</u>

Presently before the Court is Plaintiffs' Motion for Class Certification.  (ECF No. 64.)

For the following reasons, Plaintiffs' Motion will be granted.

**I.**  **BACKGROUND**

  **A.**  **Procedural Background**

This case is about whether Defendants Jani-King of Philadelphia, Inc., Jani-King, Inc.,

and Jani-King International, Inc., (collectively "Jani-King") misclassified Plaintiff franchisees as

independent contractors as opposed to employees.  Jani-King is the world's largest commercial

cleaning franchisor.  (Figlioli Dep. 63, Pls.' Mot. Ex. D, ECF No. 64.)[1]  Plaintiffs Darryl

Williams and Howard Brooks seek class certification of their claim brought pursuant to

Pennsylvania's Wage Payment and Collection Law ("WPCL"), 43 Pa. Stat. Ann. § 260.1 *et seq.*[2]

Plaintiffs allege, on behalf of themselves and all others similarly situated, that Jani-King sold

them rights to its cleaning services franchise, and that the franchise agreements that secured

---

[1] Each named defendant plays a different role in the Jani-King franchise system.  The distinctions between the various Jani-King entities are not at issue for purposes of this Motion. (Def.'s Opp'n 2 n.1.)  Therefore, we will refer to the three entities collectively as Jani-King.

[2] Plaintiffs also requested class certification for claims brought under the Pennsylvania Minimum Wage Act, 43 Pa. Stat. Ann. § 333.101 *et seq.*  That request has been withdrawn. (Pls.' Resp. 3, ECF No. 86.)

those rights were, in reality, illegal employment agreements.  (Compl. ¶ 25, ECF No. 1 Ex. A.)

Plaintiffs specifically claim that they were misclassified as independent contractors under the

WPCL and that, as a result of this misclassification, Jani-King took improper deductions from

their wages.  (*Id.* at ¶ 54.)  The proposed class that Plaintiffs seek to represent consists of "all

individuals who signed contracts with [Jani-King] and performed cleaning services for them at

any time since March 20, 2006."  (Pls.' Mot. 2; *see id.* at ¶ 15.)  Plaintiffs calculate that the group

of potential class members consists of about 185 individuals with addresses in Pennsylvania and

about 61 individuals with addresses outside of Pennsylvania.  (Franchisee List, ECF No. 11, Ex.

A.)

On August 9, 2013, Plaintiffs filed this Motion for Class Certification.  (Pls.' Mot.)  On

October 11, 2013, Defendants filed an Opposition to the Motion for Class Certification.  (Defs.'

Opp'n, ECF No. 69.)  Plaintiffs filed a Response on November 1, 2013.  (ECF No. 79.)

Defendants filed their Surreply on November 27, 2013.  (Defs.' Reply, ECF No. 82.)[3]  On

December 17, 2013, Plaintiffs filed a corrected version of their Response.  (Pls.' Resp., ECF No.

86.)

### B.   Factual Background

#### 1.   *The Jani-King Franchise*

Jani-King offers franchises for commercial cleaning businesses to individuals who wish

to own and conduct such businesses under the Jani-King name.  (Pls.' Mot. Ex. B.)  Currently,

Jani-King has roughly 300 franchisees in the Philadelphia area.  (Figlioli Dep. 30-40.)  To

become a Jani-King franchisee, an individual is not required to have any experience in business,

---

[3] Defendants filed their Sur-Reply on ECF twice.  (*See* ECF Nos. 82, 83.)  We will refer
to the first filing.

cleaning, or sales.  (Figlioli Dep. 186.)  The only requirements are that the individual form a

corporation or a limited liability company, pass a background check, pay Jani-King an initial

investment amount ranging from $14,625 - $142,750, and sign the Jani-King Franchise

Agreement.  (Figlioli Dep. 110-11; Franchise Disclosure 13-15, Pls.' Mot. Ex C.)  In exchange

for becoming a franchisee, Jani-King guarantees that it will provide the franchisee with a certain

amount of gross sales in cleaning work, within an agreed-upon timeframe.  (Franchise Disclosure

13-15.)  Generally, a larger initial investment comes with more guaranteed cleaning work and a

longer timeframe in which Jani-King has to provide the guaranteed cleaning work.   (Franchise

Disclosure 13-15.)  In addition, Jani-King provides franchisees with licenses to Jani-King

trademarks, goodwill, and a proprietary commercial cleaning system, as well as administrative

support such as billing, collections, advertising, and sales support.  (Figlioli Decl. ¶ 2, ECF No.

70.)  The Franchise Agreement specifically states that the franchisee agrees that he or she:

> will be at all times an independent contractor . . . .  Nothing in this agreement may
> be construed to create a[n] . . . employment or fiduciary relationship of any kind.
> None of Franchisee's employees will be considered to be Franchisor's employees.
> Neither Franchisee nor any of Franchisee's employees whose compensation
> Franchisee pays may in any way, directly or indirectly, expressly or by
> implication, be construed to be Franchisor's employee for any purpose.

(Franchise Agreement 12.6, Pls.' Mot. Exs. C, I.)

Once an individual becomes a Jani-King franchisee, he or she must meet a number of

additional requirements.  First, the new franchisee must obtain the requisite equipment and

insurance, both of which can be obtained through Jani-King or through outside vendors.

(Franchise Agreement 4.4, 4.13.1; Figlioli Dep. 137; Gonzalez Decl. ¶ 18, ECF No. 72;

Memedoski Decl. ¶ 12, ECF No. 75; Sinanovski Decl. ¶ 13, ECF No. 77.)  Next, the franchisee

must attend training provided by Jani-King.  (Franchise Agreement 6.4.)  The training spans

thirteen days and covers Jani-King cleaning methods, systems, programs, procedures, and forms. (Franchise Agreement 6.4; Training Manual 2-5, Pls.' Mot. Ex. E.)  The training is conducted through video-presentations, written material, and hands-on demonstrations of specific cleaning methods.  (Figlioli Dep. 118.)  Following the training, the new franchisee is required to take a quiz and earn a score of eighty percent or higher.  (*Id.* at 191.)  At any time after the training, Jani-King can require a franchisee to repeat or complete additional training, if it feels that the training is reasonably necessary to ensure that the quality of the cleaning services provided meets Jani-King's standards.  (Procedures Manual 1.7.)

After a Jani-King franchise is up and running, Jani-King starts giving the new franchise cleaning contracts.  The contracts themselves are obtained by Jani-King and are entered into between the customer and Jani-King.  (Jani-King Policies & Procedures Manual ("Procedures Manual") 3.34, Pls.' Mot. Ex. F.)  Jani-King obtains the contract by having someone from the regional Jani-King sales office meet with a prospective customer.  (Figlioli Dep. 60-61.)  Then, Jani-King discusses the customer's cleaning needs and gives the customer a quote for the cleaning work, without input from any franchisee.  (*Id.* at 72-73.)  The quote is a monthly rate based on the square footage and density of the areas to be cleaned, floor types, number and size of bathrooms, and the like.  (*Id.* at 73.)  Jani-King does not generally set how many hours it will take for the work to be completed or how many individuals will complete the work.  (*Id.* at 74.)  Once Jani-King secures a cleaning contract with a customer, the Jani-King regional office approaches franchises about whether they would like to service the contract.  (*Id.* at 93.)  Jani-King determines what franchises will be approached for the contract.  When a franchisee is approached, he or she can either accept or reject the contract.  (Gonzalez Decl. ¶¶ 12, 16.)  After

a franchisee has accepted a contract, any increase or decrease in a customer's services must be approved by Jani-King.  (Procedures Manual 3.35.)

 If a franchisee decides to accept a contract, he or she is responsible for providing the cleaning services to that client.  (Franchise Agreement 4.19.)[4]  A franchisee is not required to personally perform the cleaning work.  (Gonzalez Decl. ¶¶ 5-6.)  The franchisee can choose to hire employees, and Jani-King is not involved in any hiring, firing, or oversight of a franchisee's employee.  (*Id.* at ¶¶ 7-8; Jones Decl. ¶¶ 6-7, ECF No. 73 (franchisee has 27 employees); Lanier Decl. ¶ 8, ECF No. 74 (franchisee has 16 employees); Sinanovski Decl. ¶ 3 (franchisee has 35 employees).)  Franchisees also set the schedules for their employees.  (Gonzalez Decl. ¶ 19.) Jani-King requires that franchisees establish an employment file for each employee that contains a completed employment application with references, a completed W-4, a completed I-9, and signed copies of certain Jani-King policies.  (Procedures Manual 2.19.)

---

[4] The relevant provision of the Franchise Agreement reads:

Franchisee agrees to be solely responsible for the services, and results of such services, performed at locations where cleaning and/or maintenance services are performed by Franchisee and Franchisee's representatives. Franchisee agrees to provide all labor, materials, tools and supplies necessary to provide the service to such premises. Franchisee is responsible for choosing the times and methods of providing the services in conjunction with the instructions of the customer and in accordance with the terms of the contract under which the services are provided. All of such services will be performed in a good and workmanlike manner, to the satisfaction of the customer for whom such services are performed and in accordance with the cleaning schedule or instructions associated with the contract between Franchisor and the customer and to the performance standards of Jani-King. Franchisee understands and agrees that Franchisee is required to maintain a good relationship with each customer serviced by Franchisee, and that Franchisor may inspect any premises serviced by Franchisee at any time to ensure that the quality of service being rendered is in accordance with Jani-King standards.

(Franchise Agreement 4.19.)

Jani-King also requires that franchisees follow other specific procedures.  (Procedures Manual 2.9.1.)  Jani-King has the right to change the mandatory procedures as it deems necessary to manage the franchise system, and any failure to follow the procedures is cause for Jani-King to suspend a franchisee's authority to service customer accounts.  (*Id.* at Introduction 2.9.1; Franchise Agreement 4.26.)  Franchisees must communicate with customers on a regular basis.  Jani-King specifies a minimum amount of weekly and monthly customer communications, (Procedures Manual 2.18, 4.5), as well as a minimum level of performance management on a daily, weekly, and monthly basis (*id.* at 4.20).  Jani-King also requires that certain forms be filled out and distributed on a monthly basis.  (Procedures Manual 4.5, 4.20.)  Similarly, Jani-King requires that franchisees inspect cleaned areas a specific number of times per week and month.  (*Id.*)  Franchisees must at all times be reachable within four hours and inform Jani-King in advance if they will be unavailable for an extended period of time, such as for vacation.  (Procedures Manual 2.18(15)-(16).)  If a franchisee is not available within a four-hour period, the franchisee must obtain a paging device at his expense.  (*Id.*)  Jani-King also mandates that all Jani-King representatives wear an approved Jani-King uniform with a name tag when they are on a client's premises.  (Franchise Agreement 4.19.1.)  In addition, franchisees must abide by a non-competition agreement (*id.* at 5.2.3), must maintain a minimum amount of capital (Procedures Manual 3.33), and must keep complete and accurate financial records, which Jani-King can inspect and audit (*id.* at 3.15-17).

Jani-King performs quality-control inspections of accounts serviced by a franchisee from time to time to ensure that the cleaning services are performed in accordance with the cleaning schedule and instructions specified in the contract between Jani-King and the customer, and to ensure performance standards are consistent with Jani-King's standards.  (Franchise Agreement

6

4.19.1-2.)  Performance checks can be announced or unannounced, and occur about once a month.  (Figlioli Dep. 146-47; *see* Glover Decl. ¶ 9, ECF No. 71.)  The actual performance check involves an individual from the Jani-King regional office operations staff inspecting a franchisee's cleaning.  (Figlioli Dep. 146.)  The individual looks to see whether areas are sufficiently cleaned according to the client's cleaning schedule and requirements, and grades the franchisee based on what he sees.  (Figlioli Dep. 146.)  If a customer has a complaint about the cleaning work, the customer may first contact the franchisee, or may reach out directly to Jani-King.  (Figlioli Dep. 141; Glover Decl. ¶ 10; Gonzalez Decl. ¶ 13.)  Jani-King keeps a record of any complaints that it receives and communicates all complaints to the franchisee who services the account.  (Figlioli Dep. 141-42.)  When a franchisee addresses a customer complaint, he or she must do so in a specific manner.  (Procedure Manual 4.9.2.)  If a franchisee does not adequately respond to a complaint, Jani-King will respond to the customer complaint and bill the franchisee for the time it spent responding.  (Procedure Manual 4.9.8.)  Jani-King may transfer a customer's account from one franchisee to another if there are repeated complaints, or if Jani-King independently identifies repeated performance issues on the account.  (*See* Fliglioli Dep. 142-45.)  It is against Jani-King policy to unilaterally transfer an account unrelated to a franchisee's performance.  (*Id.* at 143.)

After a Jani-King franchisee starts servicing a customer, Jani-King starts invoicing the client for the services, and the customer pays Jani-King.  (*Id.* at 181.)  In fact, Jani-King handles all billing and accounting function for franchisees.  (Procedures Manual 3.1.)[5]  Each month, Jani-King sends every franchisee a monthly franchisee report listing gross monthly revenues and all

_____

[5] Even though Jani-King handles all billing and accounting, franchisees are responsible for collecting any outstanding receivables owed by clients.  (Procedures Manual 3.10.)

fees charged by Jani-King.  (Procedures Manual 3.5.)  Jani-King subtracts the applicable fees from the franchisee's gross monthly revenue and disburses the remainder to the franchisee.  (Figlioli Dep. 182-83.)  Specific fees that Jani-King franchisees pay include an accounting fee of five percent of gross revenues, a franchise fee of ten percent of gross revenues, an advertising fee of one percent of gross revenue, and other miscellaneous fees.  (Franchise Agreement 4.5.1-2; Procedures Manual 3.1.)   In addition, franchisees pay a finder's fee on any contracts that Jani-King provides to franchisees after Jani-King has already satisfied its initial obligation to provide a minimum amount of business.  (Franchise Agreement 4.6.)  Franchisees are allowed to solicit their own business, within specific limitations (Procedures Manual 4.24), and any advertising or marketing, including business cards, must be approved by Jani-King.  (*Id*. at 4.26.)

### 2.    *The Named Plaintiffs*

#### a.    Darryl Williams

Darryl Williams purchased a Jani-King franchise on April 3, 2007.  (Williams Dep. 19, Defs.' Opp'n Ex. B.)  Williams was guaranteed $5,000 of initial monthly cleaning business pursuant to the franchise package that he purchased.  (*Id*. at 20.)  Williams was offered a number of cleaning accounts by Jani-King.  (*Id.* at 26-30.)  Currently, Williams is servicing one Jani-King account, for which he personally performs the cleaning.  (*Id.* at 63.)  Jani-King does not dictate when Williams performs the cleaning.  (*Id.* at 83-84.)  At one point, Williams had an individual working for him.  (*Id.* at 62.)

#### b.    Howard Brooks

On September 3, 2013, Howard Brooks was substituted as a named plaintiff in this action for previously named plaintiff Pamela Myers.  (ECF No. 67.)  Brooks purchased a Jani-King franchise on January 6, 2010.  (Brooks Dep. 18, Defs.' Opp'n Ex A.)  He incorporated his

8

franchise as a limited liability company.  (*Id.* at 36-37.)  Jani-King guaranteed Brooks $4,000 of initial monthly cleaning business.  (*Id.* at 28.)  Brooks never hired employees to perform cleaning for his franchise, but personally performed all the cleaning services with occasional help from his wife and two friends.  (*Id.* at 43-44.)  Brooks is not currently servicing any Jani-King contracts.  (*See id.* at 86-87.)  At one time, he serviced two Jani-King contracts for over a year.

## II.   LEGAL STANDARD

"[A] party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with [Federal] Rule [of Civil Procedure] 23.'"  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. __, 131 S. Ct. 2541, 2551-52 (2011)).  "[C]ertification is proper only if 'the trial court is satisfied, after rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'"  *Dukes*, 131 S. Ct. at 2251 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160-61 (1982)).  When deciding whether to certify a class, "the district court must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008).  "Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim."  *Comcast*, 133 S. Ct. at 1432 (internal quotation marks and citation omitted).  These findings must be made by a preponderance of the evidence.  *Hydrogen Peroxide*, 552 F.3d at 307.  In other words, "to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23."  *In re Imprelis Herbicide Mktg. Sales Practices and Prods. Liab. Litig.*, 296 F.R.D. 351, 360 (E.D. Pa. 2013) (citing *Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257-58 (3d Cir. 2009)).

### III.   DISCUSSION

Rule 23(a) dictates that a party seeking class certification must demonstrate that:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These prerequisites are known as numerosity, commonality, typicality, and adequacy.  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, __ U.S. __, 133 S. Ct. 1184, 1191 (2013).  In addition, the proposed class must satisfy at least one of the requirements set forth in Rule 23(b).  *See* Fed. R. Civ. P. 23(b).  Plaintiffs here rely on Rule 23(b)(3), which applies when: (1) questions of law or fact common to class members predominate over any questions affecting only individual members; and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  *Dukes*, 131 S. Ct. at 2558.  These requirements are known as predominance and superiority.  *See id.*

Jani-King contends that Plaintiffs cannot meet three of the requirements for class certification:  typicality, adequacy, and predominance.

### A.   Rule 23(a)

#### 1.   *Numerosity*

The numerosity requirement is satisfied when the proposed class contains so many members that joinder would be impracticable.  Fed. R. Civ. P. 23(a)(1).  While there is no minimum number of plaintiffs required to maintain a class action, the Third Circuit has indicated that a class of more than 40 plaintiffs will generally meet the numerosity requirement.  *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001).  Jani-King does not dispute that Plaintiffs satisfy

the numerosity requirement.  Plaintiffs have presented evidence that Jani-King had between 150-300 franchisees who signed contracts with Jani-King and provided cleaning services during the relevant period.  (*See* Franchise List; Figlioli Dep. 39-44.)  Therefore, the proposed class could consist of over 150 members.  Under these circumstances, the numerosity requirement is clearly established.

> 2.     *Commonality*

The second requirement to Rule 23(a) is that there are questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2).  "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Duke*, 131 S. Ct. at 2551 (internal quotation omitted).  This prerequisite "is not a high bar:  it does not require identical claims or facts among class members." *Chiang v. Veneman*, 385 F.3d 256, 265 (3d Cir. 2004), *abrog. on other grounds by Hydrogen Peroxide*, 552 F.3d at 318 n. 18.  Rather, it is satisfied when the claims depend upon a common contention that is capable of class wide resolution. *Duke*, 131 S. Ct. 2551.  An issue is capable of class wide resolution when "determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Id.*

The central issue in this case is whether Jani-King misclassified franchisees as independent contractors.  Plaintiffs contend that under Pennsylvania law, specifically the WPCL, Plaintiffs, and the proposed class members, should have been treated as employees of Jani-King—not independent contractors—because Jani-King's universal policies and procedures were so controlling that they created an employment relationship.  Plaintiffs further claim that, as a result of this alleged misclassification, Jani-King took improper deductions from franchisees' wages.  If Plaintiffs were in fact misclassified, then they and the proposed class members, all of whom were bound by the universal policies and procedures, would be entitled to relief.    On the

11

other hand, if Plaintiffs are incorrect and they were not misclassified because the universal

policies and procedures did not exert enough control over franchisees to create an employment

relationship, then no franchisee would be entitled to relief.  In essence, a determination of

whether Plaintiffs were misclassified based on Jani-King's universal policies will resolve

whether the proposed class members were misclassified based on the same policies.  Therefore,

determining the validity of Plaintiff's claim will resolve the claims of the putative class, and the

commonality requirement can be deemed satisfied. [6]

       3.    *Typicality*

The typicality requirement dictates that "the claims or defenses of the representative

parties [be] typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  This factor

is essentially asking "whether the named plaintiffs' claims are typical, in common-sense terms,

of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the

class."  *Beck v. Maximus, Inc.*, 457 F.3d 291, 295-96 (3d Cir. 2006) (citation omitted).  "Factual

differences will not render a claim atypical if the claim arises from the same event or practice or

course of conduct that gives rise to the claims of the class members, and if it is based on the

same legal theory."  *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994); *see

also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001)

---

[6] We note that several courts have dealt with similar challenges to an employer's
classification of its workers and have concluded that the commonality requirement is satisfied.
*See Sherman v. Amer. Eagle Exp., Inc.*, No. 09-575, 2012 WL 748400, at *4 (E.D. Pa. March 8,
2012) (finding commonality requirement satisfied when central issue was whether the plaintiffs
were misclassified as independent contractors); *Juarez v. Jani-King*, 273 F.R.D. 571, 578 (N.D.
Cal. 2011) (finding commonality satisfied when liability rested primarily on whether the
defendants had lawfully treated proposed class members as independent contractors rather than
employees); *In re FedEx Ground Package Sys., Inc., Emp't Practices Litig.*, 273 F.R.D. 424,
468-70, 494-98 (certifying class of plaintiffs who disputed their classification as independent
contractors).

("If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences.").

Plaintiffs' WPCL claims arise from the same conduct by Jani-King that gives rise to the claims of the proposed class members, and is based on the same legal theory. Plaintiffs allege that Jani-King violated the WPCL by misclassifying them, as well as all of the individuals who signed a Jani-King contract and performed cleaning for Jani-King, as independent contractors instead of employees. According to Plaintiffs, Jani-King, through the Franchise Agreement and its mandatory policies and procedures, exercised extensive control over the manner and means in which class members performed cleaning services such that they should have been classified as employees of Jani-King. Jani-King claims that Plaintiffs are not typical representatives of the class because factual differences exist between: (1) franchisees that personally performed the cleaning services and franchisees that hired employees to perform the cleaning services; and (2) franchisees who are corporate entities and those who are individuals. However, these factual differences do not make Plaintiffs' claims atypical. All the class members will be asserting the same legal claim as Plaintiffs (violation of the WPCL stemming from misclassification as independent contractors) based upon the same conduct by Jani-King (control over franchisees through the Franchise Agreement and universal policies and procedures). Class members will not have to pursue legal theories different from Plaintiffs for their claims to succeed because the alleged violations occurred as a result of the same agreements and policies propagated by Jani-King, which apply to all class members equally, regardless of whether they perform cleaning themselves or have chosen to incorporate their businesses. *See Clarke v. Lane*, 267 F.R.D. 180, 197 (E.D. Pa. 2010) (finding the named plaintiffs' claims were typical of the putative class

because the alleged constitutional violations occurred under the same uniform healthcare system).

Despite Jani-King's assertion, this is not a case like *Danvers Motor Company, Inc. v. Ford Motor Company*, 543 F.3d 141, 150 (3d Cir. 2008).  In *Danvers Motor*, the named plaintiffs and proposed class members' claims appeared to arise from the same program, but actually arose from a variety of different actions taken by the defendant pursuant to the program. *Id.*  Here, the claims of Plaintiffs and the proposed class members all stem from the same action by Jani-King—propagation and enforcement of Jani-King's universal policies and procedures. Jani-King does not allege that the policies were applied or enforced differently across the class, as was the case in *Danvers*.  Because all the claims arise from the same conduct by Jani-King, we are satisfied that Plaintiffs' claims are typical of the class.

### 4.    Adequacy of Representation

The typicality and adequacy requirements of Rule 23(a) "tend[ ] to merge because both look to potential conflicts and to whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Beck*, 457 F.3d at 296 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (internal quotation marks omitted)).  The adequacy requirement specifically ensures that class representatives fairly protect the interests of the class.  Fed. R. Civ. P. 23(a)(4).  This requirement has dual concerns:  (1) to ensure that class representatives do not have interests antagonistic to the class; and (2) to ensure that class counsel have the necessary skills and qualifications to adequately represent the class.  *In re Imprelis Herbicide Mktg.*, 296 F.R.D. at 361; *see also Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012) (noting that the adequacy of the representative parties requirement, "has two components:  (1)

14

concerning the experience and performance of class counsel; and (2) concerning the interests and incentives of the representative plaintiffs.").  "The adequacy inquiry serves to uncover conflicts of interest between named parties and the class they seek to represent."  *Beck*, 457 F.3d at 296 (internal quotation marks and citation omitted).  Jani-King does not take issue with the adequacy of Plaintiffs' counsel or allege that counsel has conflicts that would affect class representation. We also have no issues with Plaintiffs' counsel.  We find them to be adequate.  Jani-King does take issue with the adequacy of Plaintiffs as class representatives, putting forth two arguments.

First, Jani-King argues that Brooks is not qualified to represent the proposed class because he operates his franchise as a corporate entity, and under Pennsylvania law, a corporate entity cannot bring a claim under the WPCL.  (Defs.' Reply 7-8.)  Jani-King is correct that a corporate entity cannot bring claims under the WPCL.  *See Little v. USSC Grp., Inc.*, 404 F. Supp. 2d 849, 853 (E.D. Pa. 2005) ("Corporations such as [the plaintiff] are not 'employees' for WPCL purposes and are not entitled to the WPCL's protections."); *Frank Burns, Inc. v. Interdigital Commc'ns. Corp.*, 704 A.2d 678, 681 (Pa. Super. Ct. 1997) (holding that "corporations may not qualify as employees under the WPCL.").  However, that does not preclude Brooks and similarly-situated individuals in the proposed class from bringing their WPCL claims.  In the cases of both *Little* and *Frank Burns*, the corporate entities entered into contracts whereby the entity's sole employee would provide the defendant with services.  *Little*, 404 F. Supp. 2d at 853.  The only parties to the contract were the corporate entities and the defendants.  *Id.*  After the contract was terminated, the corporations claimed they were employees of the defendants, and the courts dismissed the claims because corporations cannot be considered employees under the WPCL.  *Id.*  The court in *Little* specifically noted that because

15

the plaintiff was not a party to the contract, he could not claim a violation of the WPCL.  *Id.* at 854.

The facts are different here.  Jani-King Franchise Agreements are entered into between Jani-King, the individual franchisee, and the individual's corporation or limited liability company.  (Franchise Agreement 1.)  Because every individual franchisee is a party to the Franchise Agreement, the issues that existed in *Little* and *Frank Burns* are not present here. Brooks can personally claim a violation of the WPCL as an individual because he was a party to the Franchise Agreement.  Brooks does not need his corporation to claim protections under the WPCL to establish that he was personally misclassified as an independent contractor.  He is a qualified class representative to the extent that he can properly bring a claim under the WPCL.  If Plaintiffs claim that a corporation formed by a Jani-King franchisee is an employee of Jani-King and that improper deductions were taken from the corporation, in violation of the WPCL, those claims will fail.  We do not read the word "individuals" in Plaintiffs' class definition to include corporations.

Jani-King's second argument is that the named Plaintiffs are not adequate representatives because there is an inherent conflict of interest among class members.  "Obviously, not all intra-class conflict will defeat the adequacy requirement."  *Dewey*, 681 F.3d at 184.  Indeed, "[a] conflict must be fundamental to violate Rule 23(a)(4)."  *Id.* (internal quotation omitted).  "A fundamental conflict exists where some class members claim to have been harmed by the same conduct that benefitted other members of the class," or where the conflict touches upon the specific issues in controversy.  *Id.* (citations omitted).  "It is not enough for objectors to point to differences in claims, allocation amounts, or state laws without identifying how such differences demonstrate a conflict of interest."  *Montgomery Cnty., Pa. ex rel. Becker v. MERSCORP, Inc.*,

16

298 F.R.D. 202, 212 (E.D. Pa. 2014). Moreover, a conflict that is unduly speculative will not generally be fundamental. *Dewey*, 681 F.3d at 184. We must determine whether the conflict Jani-King cites "causes a divergence of interests significant enough to undercut the representative plaintiffs' ability to adequately represent the class." *Id.* at 185.

According to Jani-King, a conflict exists here because Plaintiffs seek relief that some proposed class members do not wish to seek. Specifically, Jani-King claims that some franchisees who would fall into the proposed class may prefer to remain independent contractors rather than be treated as Jani-King employees. (Defs.' Opp'n 23; Defs.' Reply 8.) To support its argument, Jani-King generally cites to various declarations from current Jani-King employees who state that they like owning their own business. (Defs.' Opp'n 23; Glover Decl. ¶ 8 ("I like the freedom of being a small business owner."); Gonzalez Decl. ¶ 9 ("As a franchise owner, I tell my employees what to do and make all the decisions regarding how my business is run."); Memedoski Decl. ¶ 5 ("I still consider my franchise a business, and myself a business owner."); Sinanovski Decl. ¶ 3 ("My franchise has about 35 employees and I run it as a business and am the manager.").) In addition, Jani-King cites two cases from the Ninth Circuit that allegedly stand for the proposition that class representatives are inadequate if they seek relief that some class members do not wish to seek. (Defs.' Opp'n 23.) Jani-King's general citation to these cases, without more, is an oversimplification of the law in this area.

In any substantial class action, there is the possibility that some members of the class will take a position different from that of the class representatives. *Rosado v. Wyman*, 322 F. Supp. 1173, 1193-94 (E.D.N.Y. 1970) (citing *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 563 n.7 (2d Cir. 1968). It follows that a simple allegation of a difference of opinion among class members does not create a conflict of interest that automatically makes the class representatives

17

inadequate.  *Ruggles v. WellPoint, Inc.*, 272 F.R.D. 320, 338 (N.D.N.Y. 2011).  *Cf. In re TJX Cos. Retail Sec. Breach Litig.*, 246 F.R.D. 389, 395 (D. Mass. 2007).  Indeed, class certification is still appropriate where "some members of the class might prefer not to have violations of their rights remedied."  *Lanner v. Wimmer*, 662 F.2d 1349, 1357 (10th Cir. 1981) (quoting *U.S. Fidelity & Guaranty Co. v. Lord*, 585 F.2d 860, 873 (8th Cir. 1978)).

Nevertheless, there are circumstances in which a class representative will be deemed inadequate because of disagreements among class members.  *See Horton v. Goose Creek Independent Sch. Dist.*, 690 F.2d 470, 485 (5th Cir. 1982) (collecting cases); *Larry James Oldsmobile-Pontiac-GMC Truck Co., Inc. v. Gen. Motors. Corp.*, 164 F.R.D. 428, 436 (N.D. Miss. 1996) (collecting cases).  For example, courts have denied class certification where there is evidence of actual, substantial disagreement among the class.  *East Tx. Motor Freight Sys. v. Rodriguez*, 431 U.S. 395, 405 (1977) (denying class certification in part because the majority of the proposed class voted to reject a merger of the city-and line-driver collective-bargaining units when that merger was demanded by plaintiffs' complaint); *Peterson v. Okla. City Hous. Auth.*, 545 F.2d 1270, 1273 (10th Cir. 1976) (upholding denial of class certification where evidence established that many class members did not object to the provision that the named plaintiffs were challenging and actually believed the provision would benefit them); *Alston v. Va. High Sch. League, Inc.*, 184 F.R.D. 574, 579 (W.D. Va. 1999) (holding that class of high-school female athletes could not be certified when survey showed a majority of the athletes did not favor relief sought by named plaintiffs); *Pratt v. Chi. Hous. Auth.*, 155 F.R.D. 177, 180 (N.D. Ill. 1994).  Similarly, classes are not certified when some class members benefit from the same acts alleged to harm other members.  *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000).  Courts have also refused to certify classes when it is evident that "a realistic possibility of

antagonism" exists between class members and representatives.  *Horton*, 690 F.2d at 485-86; *see also Mayfield v. Dalton*, 109 F.3d 1423, 1427 (9th Cir. 1997) (approving the district court's finding that named plaintiffs could not adequately represent the class because there were undoubtedly people among the broad class who approved of the challenged policy); *Audio-Video World v. MHI Hotels Two, Inc.*, No. 09-39, 2010 WL 6239353, at *14-15 (E.D. N.C. Dec. 8, 2010) (finding the plaintiffs were not adequate class representatives where there was limited evidence that showed there was a "very real possibility that a significant portion of other potential class members do not support the remedial goals" of the lawsuit, and the plaintiffs did nothing to dispel that notion).  However, class certification will not be defeated when the alleged conflict among the class is too speculative.  *Allen v. Holiday Universal*, 249 F.R.D. 166, 181-82 (E.D. Pa. 2008) (rejecting argument that class representatives were inadequate where there was no evidence that supported the alleged conflict within the class); *Cullen v. Whitman Med. Corp.*, 188 F.R.D. 226, 231 (E.D. Pa. 1999).

We are satisfied that Plaintiffs in this case can adequately represent the proposed class. While the declarations provided by Jani-King support the possibility of a conflict between a handful of class members and the named Plaintiffs, such a speculative conflict will not defeat class certification.  None of the declarations actually state that individual franchisees oppose the litigation or the remedy that Plaintiffs are seeking.  Nor do the declarations state that franchisees will face harm if they are treated as employees instead of independent contractors.  The declarations merely state that a handful of individual franchisees like owning their own businesses.  From that, Jani-King would like us to infer that franchisees are opposed to being employees of Jani-King and that Plaintiffs possess economic or legal interests adverse to class members.  We will not draw such an inference, especially when there are declarations from only

19

six class members in a proposed class that could include as many as 300 members.  *See Ardrey v.*
*Fed. Kemper Ins. Co.*, 142 F.R.D. 105, 112-13, 112 n.12 (E.D. Pa. 1992) (stating unreliable
affidavit that alleged some class members did not wish to participate in litigation did not lead to
conclusion that class members had interests in conflict with the named plaintiffs).[7]  We cannot
conclude at this juncture that there is the real possibility of conflict within the class such that
Plaintiffs cannot adequately represent the interests of the entire class.

Furthermore, even if we believed that some class members disagreed with the remedy
Plaintiff was seeking, that would not necessarily undermine adequacy.  A number of courts have
hesitated to find class representatives inadequate based on some class members preferring that an
alleged illegal practice continues.  *See, e,g,*, *Ruggles*, 272 F.R.D. at 338 ("Adequacy is not
undermined where the opposed class members' position requires continuation of an allegedly
unlawful practice."); *Gen. Motors Corp.*, 164 F.R.D. at 437; *In re Potash Antitrust Litig.*, 159
F.R.D. 682, 692 (D. Minn. 1995).  The fact that some franchisees would prefer to continue to be
categorized as independent contractors, even if such a categorization violates the WPCL, will not
defeat the adequacy requirement.

**B.      Rule 23(b)(3)**

Having found that Plaintiffs have satisfied Rule 23(a), "[t]he party must also satisfy
through evidentiary proof at least one of the provisions of Rule 23(b)."  *Comcast Corp.*, 133 S.
Ct. at 1432.  Rule 23(b)(3) authorizes class certification if "the court finds that the questions of
law or fact common to class members predominate over any questions affecting only individual

---

[7] Plaintiffs argue that the declarations by Jani-King franchisees are unreliable and we
should view them with skepticism.  (Pls.' Resp. 17-18.)  We need not decide the proper weight to
accord the declarations because even if we accept everything in the declarations as true, no
conflict of interest is shown.

members, and that a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In resolving whether Rule 23(b) is

satisfied, we must undertake a "rigorous analysis" that may require us to "probe behind the

pleadings." *Comcast*, 133 S. Ct. at 1432.

       *1.    Predominance*

     "The Supreme Court has explained that 'the Rule 23(b)(3) predominance inquiry tests

whether proposed classes are sufficiently cohesive to warrant adjudication by representation,'

which imposes a standard 'far more demanding' than the Rule 23(a) commonality requirement."

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 266 (3d Cir. 2009) (quoting *Amchem Prods.,*

*Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)); *see also Comcast*, 133 S. Ct. at 1432 ("If

anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a).").

Common issues must predominate over issues affecting only individual class members. *Id.*

Whether an issue is common or individual depends on the nature of the evidence needed to

resolve it. *Hydrogen Peroxide*, 552 F.3d at 311. Therefore, to satisfy the predominance

requirement, Plaintiffs must demonstrate that the elements of their causes of action are "capable

of proof at trial through evidence that is common to the class rather than individual to its

members." *Id.*, at 311-12. Class certification is inappropriate where "proof of the essential

elements of the cause of action requires individual treatment." *Newton v. Merill Lynch, Pierce,*

*Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001). In analyzing whether common issues

predominate, the Court must "examine the elements of plaintiffs' claim through the prism of

Rule 23." *Hydrogen Peroxide*, 552 F.3d at 311. This requires "envision[ing] the form a

representative trial of Plaintiffs' claims will take, and conduct[ing] a 'rigorous assessment of the

available evidence and the method or methods by which plaintiffs propose to use the evidence'

to prove their claims." *Sherman*, 2012 WL 748400, at *8 (quoting *Hydrogen Peroxide*, 552 F.3d at 312).

The determinative issue for Plaintiffs' WPCL claim is whether the proposed class members were appropriately classified as independent contractors by Jani-King or should have been classified as employees.  If Plaintiffs can show that evidence common to the class is capable of resolving this issue, then Plaintiffs' claim can properly be certified.

Pennsylvania courts have used a multi-factor test to determine whether an individual is an employee or an independent contractor under the WPCL.[8]  *Morin*, 871 A.2d at 849-50; *Sherman*, 2012 WL 748400, at *8.  The factors are not controlling, but serve as general guidance to the Court.  *Morin*, 871 A.2d at 850 (citing *Lynch v. WCAB*, 554 A.2d 159, 160 (Pa. Cmwlth. Ct. 1989)).  The factors include:

> the control of the manner that work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; the skill required for performance; whether one employed is engaged in a distinct occupation or business; which party supplies the tools; whether payment is by the time or by the job; whether the work is part of the regular business of the employer, and the right to terminate the employment at any time.

*Id.* at 850.  The key factor is whether the alleged employer possessed the right to control the manner in which the alleged employee's work is performed.  *Id.*; *see also Sherman*, 2012 WL 748400, at *9 (citing collection of cases for proposition that "[c]hief among these factors, if not the object of the test, is whether the alleged employer possessed the *right to control* the alleged

_____

[8] The WPCL does not actually provide a statutory definition of the term "employee." However, Pennsylvania courts have found that the definition of "employee" provided in similar Pennsylvania statutes—the Workers' Compensation Act and the Unemployment Compensation Act—gives meaning to the term "employee" as used in the WPCL.  *See Morin v. Brassington*, 871 A.2d 844, 850 (Pa. Super. Ct. 2005).  Under the Workers Compensation Act, an independent contractor is not an "employee," and the above multi-factor test has been used to determine whether someone is an independent contractor or an employee.  *Id.* at 850.  The same test is used when making the determination under the WPCL.  *Id*. at 850-51.

employee" (emphasis in original)); *In re Fed Ex Ground Package System, Inc.*, 273 F.R.D. 424,

469 (N.D. Ind. 2008).  "[C]ontrol in an employment relationship exists where the alleged

employer: possesses the right to select the employee; the right and power to discharge the

employee; the power to direct the manner of performance; and, the power to control the

employee."  *Am. Rd. Lines v. Workers' Comp. Appeal Bd.*, 39 A.3d 603, 611 (Pa. Commw. Ct.

2012).  "[A] servant is the employee of the person who has the Right of controlling the manner

of his performance of the work, irrespective of whether he actually Exercises that control or not."

*Sherman*, 2012 WL 748400, at *9 (collecting Pennsylvania cases).

  Two cases that have sought class certification for misclassification claims under the

WPCL are *Sherman*, 2012 WL 748400, at *9 and *FedEx*, 273 F.R.D. at 469.  These cases

involved the alleged misclassification of delivery drivers as independent contractors.  In both

cases, the plaintiffs satisfied the predominance requirement because the plaintiffs established that

whether the defendants had a right to control the manner and means by which the class members

performed their work could be determined though evidence common to the class.  *Sherman*,

2012 WL 748400, at *8; *FedEx*, 273 F.R.D. at 469.  In *Sherman*, the plaintiffs established that

the defendant instituted policies that applied to all class members, and those policies resolved the

issue of right to control.  *Sherman*, 2012 WL 748400, at *9.  The policies dictated the delivery

route the driver must travel and the order in which packages must be delivered, as well as

requirements that drivers request days off in advance, prohibitions that passengers cannot

accompany the drivers, and obligations that drivers carry spare keys and a cell phone.  *Id.*

Likewise, in *FedEx*, the issue of whether and to what extent FedEx had the right to control could

be resolved by reference to FedEx's general policies.  *FedEx*, 273 F.R.D. at 469.

Plaintiffs contend that Jani-King's right to control workers can be proven through common evidence, including the Franchise Agreement, the Procedures Manual, and representative testimony from Jani-King managers and cleaning workers.  Jani-King, on the other hand, claims that litigating Plaintiffs' WPCL claims will require separate discovery and rulings for each franchisee.  Specifically, Jani-King claims that the common evidence that Plaintiffs plan to use to establish that Jani-King has control over franchisees falls short.  According to Jani-King, the Franchise Agreement and Procedures Manuals merely show Jani-King had common controls to guarantee the quality of its franchised product, which is insufficient to establish an employment relationship in Pennsylvania.  Jani-King contends that Plaintiffs must also present common evidence that Jani-King had control over the day-to-day operation of the franchise or controlled the manner in which the franchisees accomplished their work—something Plaintiffs allegedly have not done.

We are aware of no cases that have specifically addressed what it means for a franchisor to have control over the manner in which a franchisee performs, such that the franchisee should be considered an employee under the WPCL.  However, a number of cases have conducted a similar inquiry when determining whether a franchisor is vicariously liable for the acts of a franchisee.  In those cases, the analysis revolved around whether a franchise relationship was also an employment relationship because the franchisor controlled not only "the result of the work but ha[d] the right to direct the manner in which the work [was] accomplished."  Because both analyses are centered on the same issue—determining whether the franchisor sufficiently controls the manner in which the franchisee performs—we conclude that the cases addressing the vicarious liability of franchisors are illustrative of what Plaintiffs must prove to establish that a franchisee is an employee under the WPCL.

24

Understandably, "[s]ome degree of control by the franchisor over the franchisee would appear to be inherent in the franchise relationship." *Drexel v. Union Prescription Ctrs., Inc.*, 582 F.2d 781, 785 (3d Cir. 1978). However, "the mere existence of a franchise relationship does not necessarily trigger a master-servant relationship, nor does it automatically insulate the parties from such a relationship." *Id.* at 786. "Whether the control retained by the franchisor is also sufficient to establish a master-servant relationship depends in each case upon the nature and extent of such control as defined in the franchise agreement or by the actual practice of the parties." *Id.* (quoting *Green v. Indep. Oil Co.*, 201 A.2d 207, 210 (Pa. 1964)); *Johnson v. Dunkin' Donuts Franchising L.L.C.*, No. 11-1117, 2012 WL 1828028, *23 (W.D. Pa. May 18, 2012). The focus of the inquiry should be "whether the alleged master has day-to-day control over the manner of the alleged servant's performance." *Myszkowski v. Penn Stroud Hotel, Inc.*, 634 A.2d 622, 626 (Pa. Super. Ct. 1993). Where provisions of a franchise agreement can be read to give the franchisor control over the day-to-day operation of the franchise, courts have found that the jury should decide the level of the franchisor's right to control. *Drexel*, 582 F.2d at 788-789 (holding franchisor's right to control could not be determined as a matter of law from the terms of the franchise agreement because even though broadly-worded clauses seemed to give the franchisor "a means of dictating the most minute details" of how the franchise was run, more evidence was needed to understand the meanings of the terms of the franchise agreement); *Spencer v. Resorts & Spas, Ltd.*, 684 F. Supp. 842, 847 (E.D. Pa. 1988) (finding extent of franchisor's right to control was a jury question when the meaning of terms in the franchise agreement were uncertain); *Myers v. Holiday Inns, Inc.*, No. 87-2438, 1987 WL 16887, at *2 (E.D. Pa. Sept. 9, 1987) (ruling issue of franchisor's right to control operations of franchisee issue for the jury). Moreover, "[t]he fact that the franchise agreement expressly denies the

25

existence of an agency relationship is not in itself determinative of the matter."  *Drexel*, 582 F.2d
at 786.

We agree with Jani-King that to satisfy the predominance requirement, the Plaintiffs must
show that Jani-King has the right to control the manner in which its franchisees perform their
day-to-day activities through common evidence.  However, Jani-King takes their argument a step
too far.  Jani-King would like us to adopt the reasoning advanced in *Juarez*, 271 F.R.D. at 582-
83, and exclude from our analysis any evidence that shows merely the "common hallmarks of a
franchise."  This would mean ignoring any policies that Jani-King implemented to protect its
service mark and goodwill.  *See id.* at 583.  In *Juarez*, that approach was appropriate because
under California law "a principal-agent relationship exists only when the franchisor retains
complete or substantial control over the daily activities of the franchisee's business" and when
"the franchisor exercise[s] control beyond that necessary to protect and maintain its interest in its
trademark, trade name and goodwill."  *Id.* at 582-83 (internal quotations omitted).  That approach
would be inappropriate here, as Pennsylvania law is different.  Pennsylvania does not distinguish
between controls put in place to protect a franchise's goodwill and intellectual property and
controls for other purposes.  Rather, Pennsylvania is solely concerned with whether the
franchisor has the ability to control the manner of the franchisee's work.  In making that
determination under Pennsylvania law, the franchise agreement should be looked at specifically
to see how the nature and extent of the franchisor's right to control is defined.  *Drexel*, 582 F.2d
at 786.  It would be improper to set aside parts of the Franchise Agreement or other documents
when analyzing Jani-King's right of control.

We are satisfied that Plaintiffs have met the predominance requirement.  Plaintiffs have
pointed to specific provisions in the Franchise Agreement, the Policies Manual, and the Training

Manual (collectively "Jani-King Documents") to show that Jani-King has the ability to control the manner in which franchisees perform their day-to-day tasks. All the proposed class members are bound by the Jani-King Documents, which include mandates regarding how often the franchisee must communicate with customers, how franchisees must address customer complaints, where franchisees can solicit business, what franchisees must wear, what types of records the franchisee must keep, how the franchisee can advertise, how far in advance franchisees must inform the franchisor of vacations, and how quickly the franchisee must be able to be reached. In addition, Jani-King controls the franchisees' work assignments, has the right to inspect the franchisees work, and has the ability to change the policies and procedures as it sees fit.

Even though Jani-King has listed a number of areas over which franchisees have day-to-day control, Plaintiffs nevertheless have satisfied their burden. At this stage, Plaintiffs do not have to prove each element of their claim, but rather show that "each element is capable of proof through common evidence." *Hydrogen Peroxide*, 552 F.3d at 311. On the record before us, the issue of Jani-King's right to control franchisees is capable of common proof, as the Jani-King Documents could be read to give Jani-King control over the manner in which franchisees conduct business. So too, many other factors that must be considered when determining whether an individual is an employee or an independent contractor can be addressed based on the common Jani-King Documents. The Jani-King Documents address the terms of agreement, the skill required, the supplier of the tools, the payment structure, termination rights, and whether the work performed by the franchisee is a regular part of Jani-King's business.

Jani-King, relying on *Myszkowski v. Penn Stroud Hotel, Inc.*, 634 A2d 622 (Pa. Super. Ct. 1993), claims that all these provisions cited show that Jani-King has control over a

franchisee's day-to-day responsibility actually deal with the *result* of a franchisee's work, not the manner in which the franchisee *performs* the work.  Therefore, these provisions cannot show that Jani-King was an employer, and the Plaintiffs must rely on other, individualized evidence to prove their claims.  We disagree.  In *Myszkowiski*, common quality-control programs and rules were not enough to establish that a franchisor had day-to-day control over the manner of a franchisee's performance, because despite the quality controls in place, the franchisee still had the ability to determine how he would meet the quality requirements.  634 A.2d at 324. Moreover, if the franchisor was unhappy with the franchisee's performance, his recourse was limited to either terminating the franchise relationship or threatening to terminate it.  *Id.*  The franchisor did not have the ability to compel the franchisee to alter his conduct; thus there was no master-servant relationship.  *Id.*  That is not true here.  The policies in the Jani-King Documents do not allow franchisees to decide how they will meet Jani-King's mandatory standards.  Instead, the policies, in many ways, dictate how a franchisee must handle issues that arise in the day-to-day running of the business.  In addition, Jani-King has the ability to change a franchisee's behavior by specifically requiring franchisees to address complaints about cleaning in a certain way or by mandating additional training sessions.  The policies in the Jani-King Documents go beyond dictating what results franchisees must accomplish.  Since the main issue in the WPCL claim can be resolved by evidence common to the class, common questions of law and fact predominate over individual ones.

### B.      Superiority

The second inquiry under Rule 23(b)(3) is whether a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).  "The superiority requirement asks the court to balance, in terms of fairness and

efficiency, the merits of a class action against those of alternate available methods of adjudication." *Prudential*, 148 F.3d at 316 (internal quotation omitted).  Factors relevant to this inquiry include:  (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b); *see In re Cmty. Bank of N. Va.,* 418 F.3d 277, 309 (3d Cir. 2005).  "Ultimately, the superiority requirement requires courts to weigh the merits of the class action device against the merits of individual adjudications."  *Sherman*, 2012 WL 748400, at *10 (citing *In re Cmty. Bank of N. Va.,* 418 F.3d at 309).

Jani-King has not advanced any reason why another method of adjudication would be superior to this class action, and we are aware of none.  This is a proper and desirable forum, considering the fact that all class members performed cleaning services for Jani-King in Pennsylvania, and most of the class members live in Pennsylvania.  The class should also not be overly difficult to manage because all class members can be identified through Jani-King's records.  Furthermore, there is no other pending litigation that addresses the WPCL claims at issue here, and we find no reason why a class member would have a greater interest than Plaintiffs in controlling the litigation.  In short, this class action is superior to individual adjudications.

**IV.     CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Class Certification will be granted.  An appropriate order follows.

BY THE COURT:

_____

**R. BARCLAY SURRICK, J.**