# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DARRYL WILLIAMS and HOWARD BROOKS**, on behalf of themselves and all others similarly situated,<br>**Plaintiffs,**<br>**v.**<br><br>**JANI-KING OF PHILADELPHIA, INC., JANI-KING, INC., and JANI-KING INTERNATIONAL, INC.,**<br>**Defendants.** | **Case No. 2:09-cv-01738-RBS**<br><br>**Hon. R. Barclay Surrick** |

This Class Action Settlement Agreement ("Settlement") is entered into between plaintiffs Darryl Williams and Howard Brooks (the "Plaintiffs" or "Class Representatives"), individually and on behalf of the Settlement Class described herein, and defendants Jani-King of Philadelphia, Inc., Jani-King International, Inc., and Jani-King, Inc. (together, "Jani-King"). The Class Representatives and Jani-King are collectively referred to as the "Parties."

### Factual Background

1.      The Class Representatives filed the above-captioned action as a putative class action alleging misclassification of Jani-King franchisees as independent contractors instead of employees in violation of the Pennsylvania Minimum Wage Act of 1968, 43 P.S. §§ 333.101, et seq. ("MWA"') and the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 et seq. ("WPCL") as well as other claims. This Court certified a class on the WPCL claim on March 11, 2015, and the Third Circuit upheld the decision on appeal.

2.      Jani-King denies any liability or wrongdoing of any kind associated with the alleged claims. If this litigation were to continue, Jani-King would argue that it is not the Plaintiffs' or the Settlement Class's employer under any applicable law. Additionally, Jani-King

would argue that Plaintiffs have not been misclassified, that class certification was inappropriately granted, and that there is no factual basis to support an award of damages to class members.

3.      The Class Representatives and Settlement Class are represented by Lichten & Liss-Riordan, P.C. (LLR), and Stephan Zouras LLP (together, "Class Counsel").  Class Counsel conducted a thorough investigation into the facts underlying this action, litigating this case over the course of ten years and briefing class certification and summary judgment.  The Parties were poised to go to trial in late March 2019.  Furthermore, Jani-King produced for the purpose of settlement negotiations data concerning the Settlement Class, including detailed accounting schedules evidencing the amounts paid by the Class for franchise fees, finder's fees, and insurance, along with revenue earned by each franchise, all of which Class Counsel reviewed and analyzed.  Based on Class Counsel's own independent investigation and evaluation, Class Counsel believe that the Settlement with Jani-King is fair, reasonable, and adequate, and is in the best interest of the Settlement Class in light of all known facts and circumstances, including the risks associated with trial and the significant delay associated with any appeals from a verdict in Plaintiffs' favor.  Although it denies any liability, Jani-King and its counsel have agreed to settle the claims on the terms set forth herein.

4.      The Parties believe that the Settlement is fair, reasonable, and adequate.  The Settlement was arrived at through arm's length negotiations conducted in mediation.  The Parties recognize the uncertainty, risk, expense, and delay attendant to continuing the action through trial and appeal.  Accordingly, the Parties desire to fully, finally, and forever settle and compromise all disputes and claims arising from or relating to the action upon the terms of this Settlement.

## Definitions

5.      "Claimants" means Settlement Class Members who complete and sign the Claim
Form attached to the Notice of Proposed Class Action Settlement (attached hereto as Exhibit A)
and timely submit that form to LLR.

6.      "Class Period" means March 20, 2006 through the date the Court grants
preliminary approval of the Settlement.

7.      "Class Settlement Fund" means the total amount of three million seven hundred
thousand dollars ($3,700,000) to be paid by Jani-King according to the schedule in this
Settlement in complete and final settlement of this action and all Released Claims of Settlement
Class Members.

8.      "Effective Date" means the first date that is three days after the date on which the
judgment entered pursuant to the Final Approval Order will be deemed final.  The judgment
entered pursuant to the Final Approval Order will be deemed final on the date upon which the
judgment is no longer subject to any further appeal or judicial reconsideration or review.  Thus,
"final" means the date of expiration of the time for the filing or noticing of any appeal from, or
other request for judicial reconsideration or review of, the judgment entered pursuant to the Final
Approval Order, without any appeal or other request for judicial reconsideration or review
having been filed or noticed; or, if an appeal or other request for further judicial review of the
judgment entered pursuant to the Final Approval Order is timely filed or noticed, the date on
which all resulting appellate or other judicial proceedings have been finally terminated, and the
judgment entered pursuant to the Final Approval Order is effective without the possibility of
further review by any court.

9.      "Net Settlement Fund" means the Class Settlement Fund less the Enhancement

3

Awards, the Attorneys' Fees and Expense Award, and the Administrative Costs.

10.     "Preliminary Approval Order" means the Order conditionally certifying the Settlement Class, granting preliminary approval of this Settlement, and approving the Notice Plan, to be entered by the Court without material alteration to the form attached hereto as Exhibit B.

11.     "Qualifying Fees" means the lesser of (a) the actual, total amount of the initial franchise fees, fees for additional business, and insurance fees paid by a Claimant during the Class Period; or (b) the total amount of initial franchise fees, fees for additional business, and insurance fees that would be paid on franchise gross revenue of $3,500 per month, which the Parties agree is a reasonable estimate of the maximum amount of revenue that a Claimant would generate based on his or her own labor, rather than the labor of the Claimant's employees.

12.     "Released Claims" means any and all past, present, future or potential claims, including without limitation any claims, demands, losses, suits, proceedings, payment of obligations, adjustments, executions, offsets, actions, causes of action, costs, defenses, debts, sums of money, assertions of rights, accounts, reckonings, bills, bonds, covenants, contracts, controversies, agreements, promises, expenses (including without limitation court costs and attorneys' fees), requests for relief of any kind, statutory or regulatory obligations, judgments or any liabilities of any nature whatsoever, known or unknown, anticipated or unanticipated, fixed or contingent, matured or un-matured, accrued or un-accrued, whether statutory, in law, equity, civil or criminal, whether sounding in tort, contract, equity, nuisance, trespass, negligence or strict liability that the Class Representatives, the Settlement Class, and/or any of the Settlement Class Members ever had, now have, or may later claim to have at any time in the future against the Releasees, whether known or unknown, arising out of or in any way relating to the service

they provided to Pennsylvania customers or at an account, location, or address within the state of Pennsylvania pursuant to their relationship with Jani-King, including without limitation any and all Claims for breach of contract, breach of express or implied warranty, strict liability, products liability, negligence, negligent misrepresentation, violations of state consumer protection and other statutory laws, declaratory relief, injunctive relief, unjust enrichment and/or fraud. The Released Claims include all known and unknown claims, actions, and causes of action, and this Settlement Agreement is expressly intended to cover and include all such claims, actions, and causes of action, for losses or damages of any type.  The claims and rights released include, but are not limited to, claims under the Pennsylvania Minimum Wage Act of 1968,43 P.S. §§ 333.101, et seq. ("MWA'") and the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 et seq. ("WPCL"), and any and all claims that the Claimants were misclassified as an independent contractor under any state or federal law, rule, or regulation.

13.     "Releasees" means (1) Jani-King; (2) any predecessors and successors in interest, any current or former parent corporations, subsidiary corporations, affiliates, and assigns of Jani-King; (3) companies acquiring any or all of Jani-King's assets or capital stock; (4) any of Jani-King's past or present, divisions, suppliers, distributors, dealers, or sales branches; (5) current or former officers, directors, shareholders, agents, representatives, and employees of Jani-King; and (6) insurers of any of the foregoing persons or entities.

14.     "Settlement" means this Class Action Settlement Agreement and its attached exhibits.

15.     "Settlement Class" or "Settlement Class Member(s)" means any and all persons who, from March 20, 2006, through the date the Court grants preliminary approval of the Settlement, signed franchise agreements with Jani-King of Philadelphia, Inc., Jani-King Inc., or

Jani-King International, Inc., and performed cleaning services in Pennsylvania pursuant to such agreement.  The Settlement Class and Settlement Class Members exclude all persons who timely opt out of the Settlement Class under the terms of the Preliminary Approval Order.

**Effectiveness of Settlement**

16.     This Settlement will become final and effective only upon the Effective Date, after the Court has entered the Final Approval Order and a separate judgment dismissing the action with prejudice and the judgment becomes Final.

17.     In the event that this Settlement is not approved by the Court, fails to become effective, or is reversed, withdrawn, or modified by the Court, or should the Parties or the Court receive any response to a CAFA Notice referred to below from any state or federal officials within the 90 days after the CAFA Notice has been mailed, and other arrangements satisfactory to the Parties and the Court are not made as a result of the response:

  a.  This Settlement will be void *ab initio* and of no force or effect, and will not be admissible in any judicial, administrative, or arbitral proceeding for any purpose or with respect to any issue, substantive or procedural; and

  b.  None of the Parties to this Settlement will be deemed to have waived or assigned any claims, objections, defenses, or arguments in this action.

**Settlement Terms**

18.     Jani-King will pay a total amount of three million seven hundred thousand dollars ($3,700,000) to create the Class Settlement Fund.  The Class Settlement Fund will be paid in two installments.  The first installment ($1,850,000) will be paid within thirty (30) days of the Effective Date.  The remaining installment ($1,850,000) will be paid no later than September 1,

2020, assuming the Effective Date has passed.[1]  The date of the payment of the first installment

is referred to as the "Initial Payment Date," and the date of the payment of the remaining

installment is referred to as the "Final Payment Date."  Under no circumstances will Defendants

be required to pay more than the Class Settlement Fund for any reason whatsoever under this

Settlement.  The Parties agree that this is a non-reversionary settlement.

19.     If Jani-King is late on any payment, Class Counsel will send written notice to

Defendants, with a copy to Defendants' counsel.  If Defendants do not make the payment within

7 days after receipt of the written notice, Defendants will owe 6% statutory interest compounded

annually on the payment from its due date until it is paid.

20.     As additional consideration for this Settlement, Jani-King has made certain

changes to its franchise agreement aimed at reducing its overall control of franchisees.  To this

end, franchisees whose franchise agreements have not expired or been terminated will be

required to sign updated franchise agreements, attached here as Exhibit D, that increase

franchisees' rights, including by reducing or eliminating various controls.  The revised franchise

agreement, for instance, eliminates the post-termination non-compete provision and shortens the

non-solicitation provision with respect to Jani-King accounts to twelve (12) months.

Additionally, franchisees may sign new business that they generate (subject to Jani-King's

review of the price to make sure it is not too low) without paying finder's fees to Jani-King and

are permitted to own the contracts for any accounts they generate themselves (subject to Jani-

King's right of first refusal to purchase the account if they intend to transfer the account).

21.     Additionally, Jani-King will work to transition its business to franchisees that

---

[1] If the Effective Date has not passed by then, causing the first installment to be delayed until after September 1, 2020, the parties will cooperate on agreeing to a payment date for the remaining installment.

manage multiple larger accounts and employ their own workers.  Franchisees with monthly revenues of $5,000 per month or less will have the option to have Jani-King buy out and terminate their existing franchise agreements at a rate of two (2) times the gross monthly revenue (not the net revenue) of their existing accounts, taken from the prior month's gross revenue at the time of the buy-out.  To the extent a franchisee's franchise has no gross revenue in the prior month, the buy-out amount will be $0. This buy-out will be in addition to whatever share of the settlement proceeds the franchisees receive under the Settlement.  Jani-King will ask all of its active franchisees in connection with the settlement if they are interested in hiring franchisees who accept the buyout and will also specifically inform the franchisees who pick up the bought-out contracts of the identity of the prior franchisees who serviced the contracts, and vice versa, to give them an opportunity to hire the prior franchisees to work on those contracts. Jani-King will also send out communications to franchisees about prior franchisees who are interested in being hired.

22.     Going forward, all franchisees will be subject to a minimum royalty of $350/month, indexed for inflation. If a franchisee's business is not large enough to generate royalties in excess of the minimum, Jani-King will have the right not to renew the franchise at the end of its ten (10) year term.

23.     Subject to the Court's approval, all attorneys' fees will be paid from the Class Settlement Fund and will not exceed one-third of the settlement fund ($1,233,333.00). Attorneys' fees will be paid in two equal installments from the two settlement payments described in Paragraph 18.  Defendants agree not to oppose a motion by Class Counsel for attorneys' fees up to this amount.  In addition to the fees, Class Counsel will request payment for their out-of-pocket costs from the settlement fund.  Defendants will not oppose Class Counsel's

request for a cost reimbursement.  The effectiveness or validity of this Settlement is not conditioned upon any specific award of attorneys' fees and costs by the Court. Class Counsel will file any motion for approval of attorneys' fees and costs fourteen (14) days prior to the deadline for submitting claim forms, opt-out requests, or objections and will make such filing available to Settlement Class Members through the class administration website address published in the Class Notice.

24.     Class Counsel will seek approval for payment from the Class Settlement Fund of an amount not to exceed $10,000 each to be paid to Named Plaintiffs Darryl Williams and Howard Brooks and Pamela Myers, as an enhancement for their services as Class Representatives.  Defendants will not oppose these enhancement awards.  Payment by Defendants of the Class Settlement Fund will constitute full payment of any obligation to pay the enhancements, if any, awarded by the Court (the "Enhancement Award").  The effectiveness or validity of this Settlement is not conditioned upon any specific Enhancement Award by the Court.  Class Counsel will file any motions for the Enhancement Award fourteen (14) days prior to the deadline for submitting claim forms, opt-out requests, or objections and will make such filing available to Settlement Class Members through the class administration website address published in the Class Notice.  Any Enhancement Awards approved by the Court will be paid on the Initial Payment Date from the first distribution of settlement funds, as described in Paragraph 18.

25.     All costs incurred by Lichten & Liss-Riordan or its designated settlement administrator ("Settlement Administrator") (hereafter collectively referred to as "LLR") in administering the settlement (the "Administrative Costs") will be paid out of the Class Settlement Fund.  Defendants will have no responsibility for paying Administrative Costs

beyond their payment of the Class Settlement Fund.

26.     In exchange for Defendants' payment of the Class Settlement Fund and the other relief described above, the Class Representatives and all Settlement Class Members, regardless of whether any Settlement Class Member executes and delivers a written release, on behalf of themselves, as well as on behalf of all of their heirs, successors in interest, assigns, transferees, and grantees, fully and forever release, remise, acquit, and discharge Releasees from the Released Claims.  By executing this Agreement, the Parties acknowledge that, upon entry of the Final Approval Order by the Court, the action and related action will be dismissed with prejudice pursuant to the terms of the Final Approval Order, an order of dismissal with prejudice will be entered, and all Released Claims will thereby be conclusively settled, compromised, satisfied, and released as to the Releasees.  The Final Approval Order will provide for and effect the full and final release, by the Class Representatives and all Settlement Class Members, of all Released Claims.  The Settlement Class Members hereby acknowledge that they are aware that they or their attorneys may hereafter discover claims or facts in addition to or different from those which they now know or believe to exist with respect to the Released Claims, but that it is still their intention to hereby fully, finally, and forever settle, release, extinguish and waive all of the Released Claims, known or unknown, suspected or unsuspected, that they had, now have or, absent this Agreement, may in the future have had against Releasees.  In furtherance of such intention, the release herein given by the Settlement Class Members to the Releasees will be and remain in effect as a full and complete general release of the Released Claims notwithstanding any discovery of the existence of any such additional or different claims or facts.

**Preliminary Approval and Notice**

27.     As soon as practicable after the execution of this Agreement, but at the latest by

April 12, 2019, Plaintiffs will move the court to enter the Preliminary Approval Order attached hereto as Exhibit B.

28.     LLR will provide notice to Settlement Class Members *via* First Class Mail, using the addresses Jani-King has on file for each Class Member within ten (10) days of the Court's entry of the Preliminary Approval Order.  If any Notice sent to any potential Settlement Class Member *via* first-class mail is returned to the Claims Administrator as undeliverable, LLR will attempt to find an updated address for that Settlement Class Member and will promptly re-send the Notice.  If any Notice is returned as undeliverable a second time, no further postal mailing shall be required.  It will be conclusively presumed that, if an envelope so mailed has not been returned within thirty (30) days of the mailing, the member of the Settlement Class received the Notice(s) applicable to that member.

### Claims Process

29.     Settlement Class Members must complete two steps to receive payments from the Net Settlement Fund. First, Settlement Class Members must complete and sign the Claim Form attached to the Notice of Proposed Class Action Settlement (attached hereto as Exhibit A) and submit that form to LLR. The notice to class members will set a deadline for submitting the Claim Form of sixty (60) calendar days after the commencement of sending the notice.

30.     Second, Settlement Class Members will be required to either (a) execute an updated franchise agreement or (b) for franchisees with less than $5,000 in monthly gross revenue, accept a buy-out and termination of the franchise agreement in the buy-out amount of two (2) times the prior month's gross monthly revenue, within one hundred fifty (150) calendar days after notice to Settlement Class Members is sent (ninety (90) days after the claim submission deadline). Qualifying franchisees who elect to execute an updated franchise

agreement do not waive, and may still later elect, the buy-out option.

31.     To facilitate timely execution of the updated franchise agreement and buy-out agreements, Class Counsel will provide counsel for Jani-King with copies of Claim Forms received on a weekly basis. Jani-King will then send each Claimant an updated franchise agreement and Franchise Disclosure Document for review and execution. To ensure compliance with federal franchise regulations, Claimants will be required to wait fifteen (15) days before signing the updated franchise agreement and will be required to sign the agreement and any other Jani-King required forms in person with an authorized representative of Jani-King.

32.     Counsel for Jani-King will report weekly to Class Counsel the names of franchisees who have completed the second step of the claims process. Claimants are not eligible to receive a share of the Net Settlement Fund until Jani-King confirms that they have completed this step.

33.     Each Claimant's proportionate share of the Net Settlement Fund will be calculated using the following formula: the Qualifying Fees paid by that Claimant during the Class Period divided by the Qualifying Fees paid by all Claimants during the Class Period.

34.     LLR will issue and mail settlement payments and associated tax reporting forms to Claimants.  Settlement payments will be made by check in two installments, with each installment to be mailed as soon as practicable after Defendants make the corresponding payment under the Settlement.

35.     Claimants will have ninety (90) calendar days to cash their settlement checks after issuance by LLR.  If a Claimant does not cash his or her settlement check within the 90-day period, LLR may place a stop payment on the check.  LLR will make efforts to contact Claimants who do not cash their checks and will re-issue new checks as necessary.

36.     The value of any checks that are not cashed for which LLR cannot locate the class member to whom to send a new check will be added to the residual funds, as described below.

37.     Class members will be permitted to submit late Claim Forms until 90 days before the final distribution.  LLR will distribute funds to all Claimants who have submitted claims and executed updated franchise agreements or buy-out agreements by 30 days before the final distribution, but will hold back a sufficient amount of funds to resolve any disputes regarding the distribution of funds.  Following resolution of any claim disputes, LLR will distribute all remaining funds to Claimants.

38.     Each Claimant will be solely responsible for any tax liabilities associated with receipt of a payment from the Net Settlement Fund.  Neither Defendants nor Class Counsel will have any liability or obligation of any kind with respect to tax withholding for such payments. The Parties agree that nothing contained herein is intended to constitute legal advice to any Claimant regarding the taxability of any amount paid hereunder, nor will it be relied upon as such.  The tax issues for each Claimant are unique, and each Claimant is advised to obtain tax advice from his, her, or its own tax advisor with respect to any payments resulting from this Settlement.

39.     Class Counsel represents and warrants to Defendants that the formula for allocating the Net Settlement Fund to the Claimants is reasonable and that the settlement payments are designed to provide a fair settlement to all Settlement Class Members.

**Process for Settlement Class Members To Object or Opt Out**

40.     Settlement Class Members who wish to object to this Settlement must file a written objection with the Court and serve copies of the objection on Class Counsel and Defendants' counsel no later than sixty (60) days after notice to Settlement Class Members is

commenced.  Unless they have timely filed and served a written objection or are otherwise permitted by the Court, Settlement Class Members will not be entitled to speak at the final approval hearing.  Settlement Class Members who fail to file and serve a timely written objection will be deemed to have waived any objection and will be foreclosed from objecting to this Settlement.

41.     Settlement Class Members who wish to opt out of this Settlement must send a signed, written notice containing their name, address, and telephone number and indicating their decision to opt out to Class Counsel no later than sixty (60) days after notice to Settlement Class Members is commenced.

42.     In the event that a Settlement Class Member both files a written objection and sends a signed, written opt-out notice in compliance with the terms of the Settlement, the opt-out notice will control, the Settlement Class Member will be excluded from the Settlement, and the Parties will notify the Court that the objection should be disregarded.

43.     If more than 20 Settlement Class Members opt out, or if Settlement Class Members whose aggregate share of the settlement exceeds 5% of the total settlement fund opt out, Defendants will have the right (but not the obligation) to terminate this Settlement.  If Defendants exercise their right to terminate, the Settlement will be void *ab initio* and of no force or effect, and will not be admissible in any judicial, administrative, or arbitral proceeding for any purpose or with respect to any issue, substantive or procedural. In addition, none of the Parties to this Settlement will be deemed to have waived or assigned any claims, objections, defenses, or arguments in this action, including with respect to the issue of class certification.

44.     The Parties and LLR have not and will not solicit or otherwise encourage, directly or indirectly, Settlement Class Members to object to or opt out of this Settlement.  Defendants

will not discourage, directly or indirectly, Class Members from filing claims or submitting a Claim Form.

## CAFA Notice

45.      Pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715, within ten (10) days of filing this Settlement with the court, Jani-King will mail a notice of proposed settlement pursuant to CAFA, substantially in the form attached to this Settlement as Exhibit C ("the CAFA Notice") to the Attorney General of the United States, the Attorney General of the Commonwealth of Pennsylvania, and the Attorney General of each other state where one or more members of the Settlement Class reside according to Jani-King's records. The Parties intend and believe that the CAFA Notice described in this section complies with the requirements of CAFA, will seek approval of these procedures for CAFA Notice in the Class Representative's Motion for Final Approval of the Settlement, and will request the Court to adjudicate the validity of the CAFA Notice in the motion for final approval of the Settlement and bar any Settlement Class member's claim to void or avoid the Settlement under CAFA.

## Final Court Approval

46.      Class Counsel will make a Motion for Final Approval, including a request for attorneys' fees and expenses and Enhancement Awards.  Upon final approval of this Settlement, at or after the final approval hearing, the Parties will present a Judgment and Order Granting Final Approval of Class Action Settlement to the Court for its approval and entry in a form acceptable to the Parties' respective counsel.  After entry of the Judgment and Order Granting Final Approval of Class Action Settlement, the Court will have continuing jurisdiction over this action solely for purposes of: (a) enforcing this Settlement; (b) addressing settlement administration matters; and (c) addressing such post-judgment matters as may be appropriate

under Court rules or applicable law.

47.     LLR will submit to the Court in conjunction with the Final Approval papers a statement including, among other things, the number of Notice packets it mailed to the Settlement Class, the number re-mailed, the number ultimately undeliverable, the number of Claim Forms received, the number of defective Claim Forms received and efforts to cure made, the number of objections received, the total charges for services rendered, and the anticipated future charges beyond the date of final approval should final approval be granted.

48.     If the Court does not grant final approval of the proposed settlement and enter judgment as set forth in this Settlement for any reason, then the Class Representatives and Jani-King, by and through their respective counsel, will cooperate in good faith and make best efforts to reach agreement in order to obtain final approval of the Court.

**Miscellaneous**

49.     The signatories to this Settlement hereby represent that they are fully authorized to enter into this Settlement and bind the Parties hereto to the terms and conditions hereof.

50.     This Settlement will be binding upon and inure to the benefit of the Parties hereto and their respective heirs, trustees, executors, administrators and successors.  The Parties hereto represent, covenant, and warrant that they have not, directly or indirectly, assigned, transferred, encumbered, or purported to assign, transfer, or encumber, to any person or entity any portion of any liability, claim, demand, action, cause of action or right herein released and discharged except as set forth herein.

51.     This Settlement contains the entire agreement between the Parties relating to the settlement and transaction contemplated hereby, and all prior and contemporaneous agreements, understandings, representations, and statements, whether oral or written, and whether by a Party

or such Party's legal counsel, are merged herein.  No rights hereunder may be waived except in writing.

52.     This Settlement may not be changed, altered, or modified, except in writing and signed by the Parties hereto, and approved by the Court.  The prior sentence notwithstanding, the Parties agree that any deadlines set forth in this Settlement or supporting documentation may be modified without seeking Court approval so long as such modification does not restrict the substantive rights of the Parties or Settlement Class. This Settlement may not be discharged except by performance in accordance with its terms or by a writing signed by the Parties hereto.

53.     The Parties agree that the terms and conditions of this Settlement are the result of lengthy, intensive, arms-length negotiations between the Parties and that this Settlement will not be construed in favor of or against any Party by reason of the extent to which any Party or his, her, or its counsel participated in the drafting of this Settlement.

54.     Nothing contained herein, nor the consummation of this Settlement, is to be construed or deemed an admission of liability, culpability, negligence, or wrongdoing on the part Jani-King.  Each of the Parties has entered into this Settlement with the intention to avoid further disputes and litigation with the attendant inconvenience and expenses.  This Settlement is a settlement document and will, pursuant to Federal Rule of Evidence 403 and any similar principle of Pennsylvania law, be inadmissible in evidence in any proceeding other than a proceeding to approve, interpret, or enforce this Settlement.

55.     This Agreement is entered into in accordance with the laws of the Commonwealth of Pennsylvania and will be governed by and interpreted in accordance with those laws, excluding any choice of law provisions.

56.     Unless otherwise specifically provided herein, all notices, demands or other

communications given hereunder will be in writing and will be deemed duly given as of the

second business day after delivery by overnight courier (*e.g.*, UPS, DHL or Federal Express),

addressed as follows:

> To Plaintiffs:
> Shannon Liss-Riordan
> Lichten & Liss-Riordan, P.C.
> 729 Boylston Street, Suite 2000
> Boston, MA 02116
>
> To Defendants:
> Kerry L. Bundy
> Faegre Baker Daniels LLP
> 2200 Wells Fargo Center
> 90 South Seventh Street
> Minneapolis, MN 55402-3901

57.     Paragraph titles or captions contained herein are inserted as a matter of

convenience and for reference, and in no way to define, limit, extend, or describe the scope of

this Settlement or any provision hereof.  Each term of this Settlement is contractual and not

merely a recital.

58.     The Parties agree to cooperate fully with each other to accomplish the terms of

this Settlement, including but not limited to by executing such documents and taking such other

action as may reasonably be necessary to implement the terms of this Settlement.  The Parties to

this Settlement will use their best efforts, including all efforts contemplated by this Settlement

and any other efforts that may become necessary by order of the Court, or otherwise, to

effectuate this Settlement and the terms set forth herein.  As soon as practicable after execution

of this Settlement, Class Counsel will, with the assistance and cooperation of Jani-King and their

counsel, take all necessary steps to secure the Court's final approval of this Settlement.

59.     The Parties agree that, to the fullest extent permitted by law, neither this

Settlement nor any act performed or document executed pursuant to or in furtherance of this

Settlement: (1) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any claim of any Class Representative, Settlement Class Member, or Jani-King franchisee; or (2) is or may be deemed to be or may be used as an admission of, or evidence of, any wrongdoing, fault, omission or liability of Jani-King in any proceeding in any court, administrative agency or other tribunal, except that Jani-King may file this in any action that may be brought against either of them in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith, settlement, judgment bar, or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.  Jani-King denies each and all of the claims alleged in this action.  Nothing in this paragraph will preclude any party to this Settlement from using this Settlement or any act performed or document executed pursuant to this Settlement in a proceeding to consummate, monitor or enforce this Settlement or judgment pursuant to its terms.

60.     The Parties agree that, upon approval of this Settlement by the Court, this Settlement will be binding and enforceable pursuant to the Federal Rules of Civil Procedure.

61.     This Settlement may be executed in counterparts with handwritten signatures transmitted by facsimile or electronic mail.  When each Party has signed and delivered at least one such counterpart, each counterpart will be deemed an original, and, when taken together with other signed counterparts, will constitute one Settlement, which will be binding upon and effective as to all Parties.

Date: April  9 , 2019        LICHTEN & LISS-RIORDAN, P.C.


*s/ Shannon Liss-Riordan*
_____
Shannon Liss-Riordan, Esq.
Attorneys for Plaintiffs


FAEGRE BAKER DANIELS LLP


*s/ Kerry Bundy*
_____
Kerry L. Bundy, Esq.
Attorneys for Jani-King

# EXHIBIT A

## NOTICE OF CLASS ACTION SETTLEMENT
## AND SETTLEMENT APPROVAL HEARING

**If you signed a franchise agreement with Jani-King of Philadelphia, Inc., Jani-King, Inc., or Jani-King International, Inc. and performed cleaning services in Pennsylvania under that agreement at any time since March 2006, a class action settlement may affect your rights.**

## PLEASE READ THIS ENTIRE NOTICE CAREFULLY.

**The U.S. District Court for the Eastern District of Pennsylvania has authorized this Notice. This is not a solicitation from a lawyer.**

Dear Jani-King franchisee or former franchisee:

This notice is to inform you of a proposed class action settlement in the case of <u>Williams et al. v. Jani-King of Philadelphia Inc., et al.</u>, E.D. Pa. Case No. 09-1738, pending in federal court in Philadelphia, Pennsylvania.

This case was brought by Jani-King franchisees who alleged that they were misclassified as independent contractors under Pennsylvania state law and were required to pay franchise fees and other costs that employees cannot be required to pay pursuant to the terms of their franchise agreements. The Parties have now reached an agreement to settle this case for a total of $3.7 million. Plaintiffs' attorneys will ask the court to award them one-third of the total settlement for their fees incurred for bringing and prosecuting these claims for the past ten years. The attorneys will also ask to be awarded additional amounts for the costs they spent litigating the lawsuit. In addition, $30,000 will be requested to distribute among the three lead plaintiffs who initiated and pursued this lawsuit on behalf of the Class. The remainder of the settlement fund will be distributed to individuals who purchased a franchise from Jani-King of Philadelphia Inc. and operated in Pennsylvania since March 2006 and who submit claims to Plaintiffs' counsel.

| What are your options? | |
| --- | --- |
| **Participate in Settlement** | **Complete & return claim form. Sign updated franchise agreement. Give up certain rights. Receive share of settlement funds.**<br><br>If you participate in the settlement, you will receive a share of the settlement funds as described in this notice in exchange for signing an updated franchise agreement providing you with additional rights under your franchise agreement. You will also give up certain legal rights, including the right to sue Jani-King for claims you may have against it.<br><br>**Additional Option if your Revenue is Below $5,000 per month: you may sell your franchise to Jani-King.**<br><br>If you participate in the settlement and your franchisee has monthly gross revenue below $5,000, you will have the option to sell your franchise to Jani-King in addition to receiving the settlement payment. Jani-King will pay you two (2) times your prior month's gross monthly revenue and will assist you in obtaining work with another franchisee as described in this notice. |
| **Exclude Yourself from Settlement** | **"Opt-out" of the settlement. Preserve certain legal rights.**<br><br>You may "opt-out" or exclude yourself from the settlement by sending a letter to Class Counsel as described in this notice. You will not receive a share of the settlement, you will not be allowed to object to the settlement, and you will not give up any rights against Jani-King. |
| **Object to Settlement** | **Remain in settlement class, but oppose it. Explain to judge why settlement should not be approved, but get benefits if it is approved.**<br><br>If you disagree with the settlement, you can oppose it. To object, you must send a written objection letter to the judge as described in this notice and provide a copy to the lawyers in this case. You will remain a part of the settlement class and the judge will consider your objection. If the settlement is approved, you will be part of the settlement. |
| **Do Nothing** | **Remain in the settlement class. Give up certain rights against Jani-King. Do not share in settlement proceeds.** |

2

**To receive a settlement payment, you must:**

1. **Fill out the enclosed claim form and return it to Plaintiffs' counsel at the address below, by mail, fax, or e-mail.**

2. **Sign an updated franchise agreement or, if you qualify, accept a Jani-King buy-out.**

In connection with the settlement, Jani-King is making changes to its operations in Pennsylvania.  Franchisees who want to participate in the settlement and continue with Jani-King will be required to sign updated franchise agreements that will include beneficial changes. For instance, franchisees will be allowed to sign up new customers without having to pay finders' fees to Jani-King and without Jani-King owning the contract (subject to a right of first refusal).  The post-termination non-compete provision in the franchise agreement will be removed, and the non-solicitation provision for Jani-King customers will be shortened to twelve months.  Other changes will be made that will reduce Jani-King's control over franchisees.

Once you submit your claim form, Jani-King will provide you with an updated franchise agreement and Franchise Disclosure Document (FDD) to review and execute at the address indicated on your claim form. Franchise disclosure laws require that you have at least fourteen (14) days to consider the new franchise agreement before you sign it. If you return your claim notice by the **[60 days from notice mailing date]** deadline, you will have until **[150 days from notice mailing date]** to review and execute your new franchise agreement. You will receive specific instructions and deadlines for executing the new franchise agreement when it is sent to you. **In order to receive settlement proceeds, you must execute a new franchise agreement unless you are eligible to (and choose) the buy-out option below instead**.

Franchisees with monthly revenues of $5,000 per month or less will have the alternate option to have Jani-King purchase their existing servicing contracts and terminate their franchise agreement at a rate of two (2) times the gross monthly revenue of their existing accounts.  To the extent your franchise has no gross revenue in the prior month, the buy-out amount will be $0. This buy-out payment, if accepted, will be provided in addition to your share of settlement funds. Jani-King will assist franchisees who accept the buy-out but would like to continue working on their current accounts as employees of the franchisees purchasing those accounts by informing the franchisees who purchase these accounts of the identity of the bought-out franchisee, and vice versa. Jani-King will also send out communications to franchisees about prior franchisees who are interested in being hired. Even if you initially chose to sign an updated franchise agreement, if you are eligible for the buy-out option you may elect it up until the **[150 days from notice mailing date]** deadline.

Under the new franchise agreement, franchisees will have a minimum monthly royalty fee of $350/month (indexed for inflation). For franchisees who do not have enough business to

meet this minimum fee, Jani-King may choose not to renew the franchise at the end of the ten-year term.

The settlement funds will be distributed in proportion to the fees paid by franchisees since March 2006.  The fees consist of franchise fees, finder's fees, and insurance payments. The calculation of the fees paid by franchisees during this time period will be based on best estimates available from Jani-King's records. Your share of the settlement funds will be determined based on the lesser of the total fees you paid during the class period or the total amount of fees that would be paid on franchise gross revenue of $3,500 per month.  Assuming the Court approves the settlement promptly after the final approval hearing, the settlement will be paid to class members in two installments – one in Fall 2019 and one in Fall 2020.  The payments you will receive under this settlement will be taxable; thus, we are also enclosing a W-9 tax form for you to complete, and you will receive 1099 tax forms for your settlement payments.

In exchange for receiving these payments and benefits, the class will release defendants Jani-King of Philadelphia Inc., Jani-King, Inc., and Jani-King International, Inc. from all claims they may have against defendants.

**To be eligible to receive your payment from the settlement, you must first fill out the enclosed claim form and return it to Plaintiffs' counsel at the following address, by mail, fax, or e-mail:**

Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Phone: (617) 994-5800
Fax: (617) 994-5801
Ustina Ibrahim (settlement administrator)
claims@llrlaw.com
www.llrlaw.com

**Please return your claim form by [60 days after mailing of notice commences], to ensure you receive your first payment under the settlement in approximately November 2019 (assuming timely court approval of the settlement).** If you move over the next year, please contact the office listed above with your updated address to ensure that you will receive your next settlement payment next year.

**If you disagree with the settlement, you have two options.**

**First**, you may choose to opt out of the settlement. If you opt out, you will not be bound by the settlement and will be free to bring your own claims against the defendants, but you will not receive any of the payments under the settlement or its other benefits. To opt out, you must send a letter to Plaintiffs' counsel at the address below. That letter must include your

4

name, your franchise name (if different), your address, telephone number and state that you choose to opt out of the settlement.  This letter must be postmarked no later than **[60 days after mailing of notice commences]** for it to be effective.

**Second**, you may remain in the settlement class but object to the settlement and ask the judge not to approve it. If you object to the settlement, you must send a written letter of objection to the judge in this case and send copies of the objection to Plaintiffs' and Defendants' counsel at the addresses below. The written notice must explain why you object to the settlement and whether your objection pertains only to you or to the entire class.  Include your name and address on the statement.  This letter must be postmarked no later than **[60 days after mailing of notice commences]** for it to be considered by the judge.

| **The Court** | **Plaintiffs' Counsel** | **Defendants' Counsel** |
|---|---|---|
| Hon. Richard Barclay Surrick | Shannon Liss-Riordan | Kerry Bundy |
| United States District Court | Lichten & Liss-Riordan, P.C. | Faegre Baker Daniels LLP |
| 601 Market Street | 729 Boylston Street Suite 2000 | 90 S. Seventh Street |
| Philadelphia, PA 19106 | Boston, MA 02116 | Suite 2200 |
| | | Minneapolis, MN 55402 |

**You may not opt-out of the settlement <u>and</u> also object to it**. If you attempt to do both, your opt-out notice will be effective, and you will be excluded from the class. Plaintiff's counsel will advise the court that you are not a class member, and your objection to the settlement will not be considered.

There will be a court hearing on ▢, 2019, at ▢:00 p.m., at the federal courthouse in Philadelphia, located at 601 Market Street Philadelphia, PA 19106, Courtroom 8614.  At this hearing, the federal district court judge presiding over this case, the Honorable Richard Barclay Surrick, will consider whether or not to approve this settlement.  You are free to attend the final approval hearing, but you are not required to attend. You will not be allowed to make an objection to the settlement at the hearing unless you mailed an objection notice by the deadline above. Under federal law, if the settlement is approved by the Court, you will be bound by the settlement and will not be permitted to pursue separate claims that were pursued in the lawsuit unless you choose to opt out of the settlement.

This notice only summarizes the lawsuit, the settlement, and related matters.  This notice has been approved by the federal court.  To receive a full copy of the settlement agreement or other information about the settlement, or if you have any questions regarding the case or the settlement, you may contact Plaintiffs' counsel at the address and phone number above.

You can also visit the Internet website dedicated to this class action:

**http:// [website URL]**.

All settlement-related documents will be available on this website**,** as well as the complaint and certain other papers related to the case.

Sincerely,

| /s/ Shannon Liss-Riordan | /s/ David J. Cohen |
|---|---|
| Shannon Liss-Riordan, Pro Hac Vice | David J. Cohen |
| Lichten & Liss-Riordan, P.C. | Stephan Zouras LLP |
| 729 Boylston Street, Suite 2000 | 604 Spruce Street |
| Boston, MA 02116 | Philadelphia, PA 19106 |
| (617) 994-5800 | (215) 873-4836 |

*Class Counsel*

## CLAIM FORM

### Williams et al. v. Jani-King of Philadelphia Inc., et al.,
### E.D. Pa. Case No. 09-cv-1738

To participate in the settlement that is described in the enclosed notice, you must complete and submit this claim form by mail, e-mail, or facsimile to:

> Lichten & Liss-Riordan, P.C.
> 729 Boylston Street, Suite 2000
> Boston, MA 02116
> Fax: (617) 994-5801
> Ustina Ibrahim (settlement administrator)
> claims@llrlaw.com
> www.llrlaw.com

**To assure you receive your first payment this year
(assuming timely court approval of the settlement),
completed claim forms must be received by [60 days after mailing of notice
commences]**

**Personal Information (PLEASE PRINT CLEARLY):**

Name:_____

Franchise Name:_____

Home Address:_____

_____

Home or Mobile Phone:_____

E-mail (optional): _____

Estimated date you bought a Jani-King franchise: _____

Estimated dates you performed work as a Jani-King franchisee:

_____

My monthly gross revenue is <u>below</u> $5,000 per month, and I am interested in having Jani-King "buy-out" my franchise for two (2) times my prior month's gross monthly revenue instead of executing a new agreement (please indicate yes or no): _____

7

**TO QUALIFY FOR A SHARE OF THE SETTLEMENT, YOU MUST:**
**(1) COMPLETE AND RETURN THE ENCLOSED TAX FORMS, AND**
**(2) SIGN TO INDICATE YOUR ACCEPTANCE OF THE FOLLOWING CONDITIONS:**

I attest, under penalty of perjury, that the information above is true and correct to the best of my memory.  I further agree that in consideration for my receipt of my share of settlement funds, I am discharging any and all past, present, future or potential claims, including without limitation any claims, demands, losses, suits, proceedings, payment of obligations, adjustments, executions, offsets, actions, causes of action, costs, defenses, debts, sums of money, assertions of rights, accounts, reckonings, bills, bonds, covenants, contracts, controversies, agreements, promises, expenses (including without limitation court costs and attorneys' fees), requests for relief of any kind, statutory or regulatory obligations, judgments or any liabilities of any nature whatsoever, known or unknown, anticipated or unanticipated, fixed or contingent, matured or un-matured, accrued or un-accrued, whether statutory, in law, equity, civil or criminal, whether sounding in tort, contract, equity, nuisance, trespass, negligence or strict liability that the Class Representatives, the Settlement Class, and/or any of the Settlement Class Members ever had, now have, or may later claim to have at any time in the future against the Releasees, whether known or unknown, arising out of or in any way relating to their misclassification and wage claims arising out of their franchise relationship with Jani-King, including without limitation any and all Claims for breach of contract, breach of express or implied warranty, strict liability, products liability, negligence, negligent misrepresentation, violations of state consumer protection and other statutory laws, declaratory relief, injunctive relief, unjust enrichment and/or fraud. The Released Claims include all known and unknown claims, actions, and causes of action that are related to the claims raised in this case, and this Settlement Agreement is expressly intended to cover and include all such claims, actions, and causes of action, for losses or damages of any type. The claims and rights released include, but are not limited to, claims under the Pennsylvania WPA or WPCL and any and all claims that the Claimants were misclassified as an independent contractor under any state or federal law, rule, or regulation.


_____          Dated: _____
 (Signature)

8

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DARRYL WILLIAMS and HOWARD BROOKS, on behalf of themselves and all others similarly situated,**<br>                         **Plaintiffs,**<br><br>       **v.**<br><br>**JANI-KING OF PHILADELPHIA, INC., JANI-KING, INC., and JANI-KING INTERNATIONAL, INC.,**<br>                         **Defendants.** | **Case No. 2:09-cv-01738-RBS**<br><br>**Hon. R. Barclay Surrick** |

**ORDER PRELIMINARILY APPROVING**
**UNOPPOSED CLASS ACTION SETTLEMENT**

**AND NOW**, this _____ day of _____ 2019, upon consideration of Plaintiffs' Unopposed Motion for Preliminary Class Action Settlement Approval and all related materials, it is hereby **ORDERED** as follows:

1.      The Court preliminarily approves the Settlement set forth in the Parties' Settlement Agreement, which appears to be the product of serious, informed, and extensive arm's-length negotiations between the Parties and appears to be fair, adequate and reasonable to the Settlement Class so as to fall within the range of possible final approval.

2.      The Court approves the proposed form and content of the Settlement Notice and Claim Form attached as Exhibit A to Plaintiffs' Preliminary Approval Motion and orders the Parties to proceed with dissemination of the Notice as provided in the Settlement Agreement.  The Court finds that the proposed process for providing notice to the Classes as set forth in the Settlement Agreement fulfills the requirements of Federal Rule of Civil Procedure 23(c)(2)(A) and due process, provides the best notice practicable under the circumstances and will provide adequate notice to all Class members.

3.      All claim forms, opt-out requests, and objections shall be due within 60 days of the date the Class Notice mailing is commenced.

4.      Fourteen (14) days prior to the deadline for submitting claim forms, opt-out requests, and objections, Class Counsel will file with the Court any motion for attorneys' fees and costs and any motion for an enhancement award for class representatives.

5.      Upon passage of the deadline for claims forms, opt-out requests, and objections, Settlement Class Counsel shall promptly file a motion for final settlement approval.

6.      The Court will hold a final settlement approval hearing at _____ on _____ in Courtroom 8A of the James A. Byrne U.S. Courthouse, 601 Market Street, Philadelphia, PA.  At this hearing, the Court will determine whether to finally approve the proposed Settlement, enhancement awards, attorneys' fees and cost reimbursements requested by Settlement Class Counsel and whether to enter final judgment in this case in light of any written objections, opt-outs, or requests to be heard submitted in accordance with the procedures described in the Notice.

**BY THE COURT:**

_____

**HON. R. BARCLAY SURRICK**

# EXHIBIT C



FaegreBD.com

USA ▾ UK ▾ CHINA

**Larry E. LaTarte**
*Partner*
LarryLaTarte@FaegreBD.com
Direct **+1 612 766 7475**

**Faegre Baker Daniels LLP**
2200 Wells Fargo Center ▾ 90 South Seventh Street
Minneapolis ▾ Minnesota 55402-3901
Phone **+1 612 766 7000**
Fax **+1 612 766 1600**

[date]

<u>*By Certified Mail*</u>

Federal and State Officials
Identified in Exhibit A in the Enclosed Disc

Re:     **NOTICE UNDER THE CLASS ACTION FAIRNESS ACT OF 2005, 28 U.S.C.
1711** *et seq.*, *Brooks v. Jani-King of Philadelphia, Inc.*, **Case No. 2:09-cv-1738-RBS
(E.D. Pa.)**

Dear Sir or Madam:

I send this letter and the enclosed disc to you on behalf of the parties to the action referenced above
(the "Parties") regarding a class settlement proposed for preliminary approval on April __, 2019.
This communication constitutes the notice required by the Class Action Fairness Act of 2005, 28
U.S.C. §§ 1711 *et seq.* (CAFA).

The proposed settlement resolves the class action lawsuit brought by Plaintiffs against Jani-King of
Philadelphia, Inc., Jani-King, Inc., and Jani-King International, Inc. ("Defendants") alleging that
Plaintiffs were misclassified as independent contractors, rather than employees, of Jani-King of
Philadelphia, Inc., and that, as a result, Defendants violated certain Pennsylvania wage statutes.
Defendants deny all of Plaintiffs' material allegations.

As CAFA Section 1715(b) requires, the enclosed disc includes:

1. **<u>Complaint</u>**. A copy of the Complaint – Class Action and exhibits, filed on March 20, 2009
   in the Philadelphia County Court of Common Pleas on behalf of Pamela Myers, Darryl
   Williams, and Wyatt Seals ("Complaint"). (Exhibit __.)

2. **<u>Notice of Dismissal</u>**. A copy of the District Court's Memorandum opinion dated
   December 5, 2012, dismissing Count IV of the Complaint.

3. **<u>Motion for Preliminary Approval</u>**. A copy of the April __, 2019 Plaintiffs' Unopposed
   Motion for Preliminary Class Action Settlement Approval ("Motion"), memorandum in
   support, and exhibits, including:

   a.   A copy of the April __, 2019 Settlement Agreement. (Exhibit __ to the Motion.)

Federal and State Officials                    -2-                    April 5, 2019

      b.   A copy of the proposed notice to settlement class members (Exhibit __ to the Motion.)

4. **Class Members by State**. The proposed settlement class includes individuals who signed a franchise agreement with Jani-King of Philadelphia, Inc., Jani-King, Inc., or Jani-King International, Inc. and performed cleaning services in Pennsylvania under that agreement at any time since March 2006. Pursuant to CAFA § 1715(b)(7)(A), the table presented in Exhibit __ (included in the enclosed disc) sets out the class members and the best information available to Defendants as to each state in which they reside.

5. **Estimated Settlement Shares**. The proposed settlement provides a total settlement amount of $3,700,000 that would be used to pay settlement benefits to settlement class members, plaintiffs' attorneys' fees, a service award to the named plaintiffs, and costs and expenses. Class members who file a qualified claim and either execute a new franchise agreement conferring additional rights on franchisees and/or accept a buy-out from Defendants will be entitled a proportional share of the settlement proceeds calculated based on Qualified Fees paid to Defendants during the class period. The estimated proportional settlement shares presented in Exhibit __ are the most reasonable estimate available of potential shares of the entire settlement. Settlement class members accepting a buy-out offer will additionally receive a payment equal to two (2) times their franchise's previous month's gross revenue.

There are no judicial hearings scheduled in the class action, no judicial opinions relating to the Settlement Agreement or class notice plan, no other agreements contemporaneously made between class counsel and counsel for defendants, and no final judgment in this case.

Please contact me if you would like any further information.

                              Sincerely,


                              Larry E. LaTarte

Enclosures

cc by email:

(All Counsel of Record on attached list)

COUNSEL OF RECORD

| | |
|---|---|
| **DAVID J. COHEN**<br>STEPHAN ZOURAS LLP<br>604 SPRUCE STREET<br>PHILADELPHIA, PA 19106<br>dcohen@stephanzouras.com | **RYAN F. STEPHAN**<br>STEPHAN ZOURAS LLP<br>100 N. Riverside Plaza, Suite 2150<br>Chicago, IL 60601<br>rstephan@stephanzouras.com |
| **JAMES B. ZOURAS**<br>STEPHAN ZOURAS LLP<br>100 N. Riverside Plaza, Suite 2150<br>Chicago, IL 60601<br>jzouras@stephanzouras.com | **SHANNON LISS-RIORDAN**<br>Lichten & Liss- Riordan PC<br>729 Boylston St., Suite 2000<br>Boston, MA 02116<br>sliss@llrlaw.com |
| **ADELAIDE PAGANO**<br>LICHTEN & LISS-RIORDAN PC<br>729 Boylston St., Suite 2000<br>Boston, MN 02116<br>apagano@llrlaw.com | **PATRICK HOWARD**<br>Saltz Mongeluzzi Barrett & Bendesky<br>1650 Market St., 52nd FL<br>Philadelphia, PA 19103<br>phoward@smbb.com |

# EXHIBIT D

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

# JANI-KING OF «Region», INC.

## FRANCHISE AGREEMENT

THIS AGREEMENT (this "*Agreement*") is made and entered into in Addison, Dallas County, Texas by and between JANI-KING OF «Region», INC., a Texas Corporation, hereinafter referred as "*Franchisor*", and _____ hereinafter referred to, singularly or collectively, as "*Franchisee*", doing business as a:

[   ] Corporation, incorporated under the          [   ] Limited Liability Company, formed under the
      laws of _____,                      state of _____

for the purposes of allowing Franchisee to operate a business as a Franchisee of Franchisor. Franchisee and Franchisor may be jointly referred to as the "*Parties*." Jani-King International, Inc., and its various subsidiaries (including, without limitation, Franchisor) are collectively referred to herein as "*Jani-King*."

## FRANCHISE SUMMARY

EFFECTIVE DATE: _____, 2_____.          PLAN: _____

INITIAL FRANCHISE FEE DOWN PAYMENT:

   ($_____) _____ Dollars

PROJECTED INITIAL FRANCHISE FEE MONTHLY PAYMENT:

   $_____ PER MONTH FOR _____ MONTHS

INITIAL BUSINESS:

   ($_____) _____ (Thousand)

INITIAL OFFERING PERIOD: _____ (_____) Days

TERRITORY:  Counties:
«State1»
«State2»

in the State of _____.

FRANCHISEE ADDRESS:
_____

CITY: _____     STATE: _____     ZIP CODE: _____

COUNTY: _____     TELEPHONE NUMBER: (_____)_____

EMAIL: _____

FEDERAL TAX ID#: _____     STATE TAX ID#(if applicable): _____

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

## SECTION 1

## RECITALS

1.1. WHEREAS, Jani-King owns a system (the "*System*") consisting of the Proprietary Marks (as defined herein), and certain proprietary know-how and other Confidential Information (as defined herein) for:

(a) the franchising of comprehensive cleaning and maintenance businesses using the System and the Confidential Information, and the supply and distribution of complete cleaning and/or maintenance related services, including, but not limited to, commercial, industrial, and institutional cleaning (the "*Services*"); and

(b) the supply and distribution of cleaning and maintenance products using the System and the Confidential Information, and the promotion, sale, and delivery of the same (the "*Products*").

1.2. WHEREAS, Franchisor is authorized to grant a license to use the System, the Proprietary Marks, and/or the Confidential Information.

1.3. WHEREAS, Franchisee desires to use the System in Franchisee's business as a Jani-King Franchisee.

1.4. WHEREAS, the Parties to this Agreement desire that the Franchisor grant to the Franchisee a license to use the System developed by Jani-King in the Territory for the operation of a cleaning and maintenance business, and agree that such business will be governed by the terms, covenants, and conditions contained in this Agreement and the brand standards in Franchisor's Policy and Procedures Manual (the "*Manual*").

1.5. NOW, THEREFORE, in consideration of the full and faithful performance of each and every one of the covenants, terms, and conditions contained herein, the Parties agree as follows:

## SECTION 2

2.1. Franchisor grants to the Franchisee, upon the terms and conditions herein contained, a license and right to use the System developed by Jani-King in connection with the Franchisee's operation of a Jani-King cleaning and maintenance business ("*Franchised Business*") in the territory described in the Franchise Summary (the "*Territory*"). The "*Franchise Summary*" is defined as all information contained on the first page of this Agreement appearing below the words "FRANCHISE SUMMARY."

## SECTION 3

## GRANT OF FRANCHISE

3.1. For and in consideration of the full and faithful performance of each and every one of the covenants, terms and conditions herein contained and agreed to by Franchisee, Franchisor grants to the Franchisee the right to establish and operate the Franchised Business within the Territory.

3.2. Franchisee will operate the Franchised Business at or from a location of its choosing within the Territory subject to the approval of Franchisor and Franchisee's continued compliance with the terms and conditions set forth herein.

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES

<u>SECTION 4</u>

**FRANCHISEE PLEDGES**

4.1. To operate the Franchised Business in the Territory described herein using the System.

4.1.1.   Franchisee agrees that it will not use any name in the operation of the Franchised Business other than those specifically authorized by Franchisor. Franchisee is authorized to use the title "Authorized Franchisee of Jani-King®" and/or "Independent Franchisee of Jani-King®" in conjunction with the operation of its Franchised Business. Franchisee is not authorized and agrees not to use the trademark "Jani-King" in any part of a corporate name or other legal name of an entity used to purchase the franchise. Franchisee is prohibited from using (i) any other janitorial, maintenance, or cleaning service name in conjunction with their formal name (for example, "ABC Custodials", "ABC Maintenance", "ABC Cleaning Services"), (ii) a name prefix of "Jani-", or any other similarly spelled or sounding prefix, (iii) the words "Services", "Cleaning", and "Maintenance", or (iv) any other trademarks, trade names, or service marks, or any name that has not been granted prior written approval by Jani-King's Corporate Office. All directory listings, letterhead, or any other visual or printed matter used by Franchisee to communicate to anyone must conform to Franchisor's brand standards.  Franchisee is prohibited from using the term "dba Jani-King" in conjunction with the operation of its Franchised Business.

4.1.2. Franchisor has developed and used, and continues to develop, use, and control in connection with its System certain Proprietary Marks that have become associated with its System so as to impart to the public superior standards of quality and service. The "*Proprietary Marks*" as used in this Agreement means all trademarks, trade names, trade dress, service marks, slogans, and logos, including, but not limited to, the mark "Jani-King", the mark "The King of Clean" or any other trademark or service mark which may be authorized in writing by an officer of Franchisor now or at any time in the future.

4.1.3. Franchisor has developed and continues to develop, in connection with its System, certain brand standards, customer information, guidelines, recommendations, and advice containing confidential information, programs, devices, methods, techniques, and/or processes which are not generally known to the public pertaining to franchising, promotion, marketing, operation, and management of a business, including, but not limited to, the System, as defined herein, which includes but is not limited to information regarding the operational, sales, promotional methods and techniques, and marketing methods and techniques related to the System. Such information includes, but is not limited to: (a) Jani-King's DVDs, manuals, forms, the information contained and compiled therein, and the updates and memoranda thereto; (b) names of agents, suppliers, and customers, and their requirements, specifications, and preferences; (c) the contractual arrangements with agents, suppliers, and customers; (d) the financial details (including but not limited to credit and discount terms) of relationships with its agents, suppliers, or customers; (e) the names of prospective customers and their requirements, specifications, and preferences; (f) Jani-King's accounting software; (g) information concerning and presented at Jani-King meetings; (h) security and access information; (i) information provided through initial and ongoing specialized training; and (j) Jani-King's business plans and strategies (collectively, the "*Confidential Information*").

4.1.4. All use of the Proprietary Marks and Confidential Information by Franchisee must be in accordance with the terms of this Agreement and the brands standards in the Manual and inure to the benefit of Franchisor and all such Proprietary Marks and Confidential Information will remain the sole property of Franchisor.

4.1.5. Franchisee has the right to advertise the Franchised Business within the Territory in accordance with the terms of this Agreement and the brand standards in the Manual. Franchisee may conduct its own advertising campaigns using such items as direct mail, flyers, newspaper ads and other approved forms of advertising. Franchisee agrees to submit to Franchisor, prior to use by Franchisee, samples of any and all advertising and promotional plans and materials of any type which contain in any manner any of the Proprietary Marks, including

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

without limitation the trade names, trademarks, service marks, slogans and logos as are now or which in the future may be approved for use by Franchisee.  Franchisee shall obtain Franchisor's prior approval of all advertising that Franchisee desires to use in connection with its Franchised Business by submitting it to Franchisor at least thirty (30) days prior to publication, including any advertising on the Internet, which Franchisor may grant or withhold in its sole determination.  To protect the System, Proprietary Marks, and Jani-King name, Franchisor has the right to require Franchisee to include certain statements in and/or make changes to Franchisee's proposed advertising prior to approval. Franchisee's advertising materials may not contain any statement or material which, in Franchisor's sole determination may be considered: (a) in bad taste or offensive to the public or to any group of persons; (b) defamatory of any person or an attack on any competitor; (c) to infringe upon the use, without permission, of any other persons' trade name, trademark, service mark or identification; or (d) inconsistent with the public image of the System. Franchisee acknowledges that advertising the Franchised Business in accordance this Agreement and Jani-King's brand standards is essential to protect the goodwill toward the System, Proprietary Marks, and Jani-King name.

Franchisee acknowledges and agrees that any and all copyright in and to advertising materials developed by Franchisee or on Franchisee's behalf will be Franchisor's sole property, and Franchisee must execute such documents (and, if necessary, require its independent contractors to execute such documents) as may be deemed reasonably necessary by Franchisor to give effect to this provision.

4.1.6. Franchisee shall not develop, create, distribute, contribute to, disseminate or use any digital or Internet communication including websites, blogs, instant message services, social media sites such as Facebook, Twitter, and Instagram, and all other digital communication methods or any multimedia, telecommunication, mass electronic mail, or audio/visual advertising, promotional or marketing materials ("**Digital Advertising**"), directly or indirectly related to the Franchised Business, Franchisor, the System, or Proprietary Marks, without Franchisor's prior written consent, which consent may be withheld in Franchisor's sole determination.  All Digital Advertising is subject to Section 4.1.5 above.  Franchisee shall not maintain a website, unless such presence is a page on Jani-King's own website domain. Franchisor reserves the right to develop, publish and control the content of all Digital Advertising. Franchisee acknowledges that Franchisor shall own all Digital Advertising related to, containing, or associated with the System, Proprietary Marks, or Jani-King name.

4.2.1. Franchisee agrees to devote sufficient time and effort to its business pursuant to this Agreement.

4.2.2. Franchisee will comply with established Jani-King brand standards, as they may be amended from time to time, and agrees not to deviate there from without prior written consent of Franchisor.

4.2.3. All of Franchisee's owners, shareholders, members, officers, directors, and managers (each, a "***Principal***" and collectively, the "***Principals***") who will actively participate in the operations of the Franchise Business agree to successfully complete the initial training program within six months of the signing of this Agreement.

4.3. In consideration of the rights herein granted under the plan identified in the Franchise Summary (the "***Plan***"), and the initial services to be performed by Franchisor in connection with Franchisee's use in the Territory of the System, Proprietary Marks and Confidential Information as pledged herein, Franchisee will pay to the Franchisor, upon execution of this instrument, the INITIAL FRANCHISE FEE DOWN PAYMENT, as stated in the Franchise Summary herein (the "***Initial Franchise Fee Down Payment***"). Franchisee authorizes Franchisor's deduction of Initial Franchise Fee Monthly Payments, as stated in the Franchise Summary herein, (the "***Initial Franchise Fee Monthly Payments***") from the Gross Revenue, as defined herein, in the amount and number of payments stated in the Franchise Summary, provided Franchisee's franchise produces Gross Revenue in an amount equal to or greater than the Initial Franchise Fee Monthly Payments. The Initial Franchise Fee Down Payment plus

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

the Initial Franchise Fee Monthly Payments equal the "***Initial Franchise Fee***."

4.3.1. Payment of this sum will entitle Franchisee to the non-exclusive right to use the System developed by Jani-King in connection with the Franchised Business in the Territory described herein. Franchisor will secure commercial cleaning and maintenance contracts and offer to Franchisee the opportunity to perform services in accordance with those commercial cleaning and maintenance contracts which contracts will have cumulative initial gross monthly billings in the amount equal to the amount stated as the "INITIAL BUSINESS" in the Franchise Summary (the "***Initial Business***"). Franchisor will assign to Franchisee the cleaning and maintenance contracts that Franchisee accepts, subject to the terms of this Agreement and a separate assignment agreement. The assignment is conditioned upon to, among other things, Franchisee's payment in full of all fees owed to Franchisor.

4.3.2. Except as otherwise noted herein, the Initial Franchise Fee is non-refundable and is in addition to royalties and other payments set out herein.

4.3.3. ANY COMMERCIAL CLEANING AND MAINTENANCE CONTRACTS THAT FRANCHISOR OFFERS TO FRANCHISEE THE RIGHT TO PROVIDE SERVICES WILL COUNT AGAINST THE INITIAL BUSINESS, WHETHER FRANCHISEE ACCEPTS THE OFFER OR NOT. However, in the event that Franchisor is unable to secure and offer to the Franchisee the right to provide services to commercial cleaning and maintenance contracts with a cumulative total of initial gross monthly billings equal to or greater than the Initial Business within the time period stated as the "INITIAL OFFERING PERIOD" in the Franchise Summary (the "***Initial Offering Period***"), a portion of the Initial Franchisee Fee may be refundable. If the Franchisor fails to offer the full amount of Initial Business prior to the end of the Initial Offering Period, an amount equal to the lesser of (i) three times the amount of Initial Business not offered to the Franchisee or (ii) the total Initial Franchise Fee paid by Franchisee to Franchisor may be refunded. Any refund will be first applied to any money owed to Franchisor, Jani-King Leasing Corporation, an affiliate of Franchisor, and any unpaid fees or charges that would result in a negative due Franchisee Report (as defined in <u>Section 4.8.1</u> below). Any remaining portion of the refund will be credited to the Franchisee, unless agreed to otherwise in writing by Franchisor and Franchisee. A refund or other written agreement between the Parties, under this provision will fulfill Franchisor's obligation to offer any remaining portion of the Initial Business used to calculate the refund.

4.4. In addition to the Office Supply and Advertising Package provided to Franchisee by Franchisor as described in Schedule One of this Agreement, Franchisee is required to purchase the Professional Products and Equipment listed in Schedule One as the "Supply and Equipment Package", and also purchase, lease, or provide proof of ownership to Franchisor of the following "Additional Electrical Equipment" set forth in Schedule One:

For Plans E-4 and higher, a commercial vacuum cleaner, a commercial floor polisher, and a commercial wet/dry vacuum. For Plans E-10 and higher, Franchisee must also obtain a high speed burnisher. For Plans E-20 and higher, Franchisee must also obtain a self-contained extractor. These items are not included in the Office Supply and Advertising Package furnished by Franchisor.

The Supply and Equipment Package and the Additional Electric Equipment must be obtained by the Franchisee before any Initial Business will be offered. Franchisor reserves the right, upon thirty days' notice to Franchisee, to require Franchisee to purchase all cleaning equipment and supplies for the operation of its franchise from one or more of Franchisor's affiliates, or from a vendor approved by Franchisor.

4.5.1. Franchisee agrees to pay to Franchisor or Franchisor's designee, by the fifth day of each month a royalty fee equal to 10% of the monthly Gross Revenue (the "***Royalty Fee***"). Beginning on the month in which Franchisor satisfies the Initial Business offering obligation, Franchisee agrees the Royalty Fee will be the greater of (i) 10% of the monthly Gross Revenue, or (ii) $350.00 (the "***Minimum Royalty***"). The Minimum Royalty is subject to annual adjustment for increases in the Consumer Price Index. "***Gross Revenue***" is defined as all revenue invoiced by anyone for any contract services, one-time cleans, extra work, sales of supplies, equipment or goods

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

and any other revenue related to or derived from the provision of any cleaning and maintenance services including, but not limited to, commercial, industrial, and institutional, as well as the sale, leasing or distribution of related supplies and equipment in connection with the conduct and operation of the Franchised Business or otherwise directly or indirectly, in whole or in part, performed or sold by, or for the benefit of Franchisee, Franchisee's guarantors, agents, representatives, and/or employees, or the Principals or any of the spouses of the Principals, regardless of the entity or business name used.

4.5.2. Franchisee agrees to pay Franchisor an advertising fee (the "***Advertising Fee***") equal to 1.5% of Franchisee's Gross Revenue. Franchisee agrees to pay the Advertising Fee commencing on the fifth day of the month and continuing on the fifth day of every month thereafter for the remainder of the term. Franchisee agrees that Franchisor, in Franchisor's sole discretion, may increase the Advertising Fee up to 2% of Franchisee's Gross Revenue. Franchisee agrees that the Advertising Fee will be maintained and administered by Franchisor or its designee as follows:

The Advertising Fee will be used by us or our designee as follows:

(1) We will direct all advertising programs and will have sole discretion to approve or disapprove the creative concepts, materials and media used in the programs. The Advertising Fee is intended to be used to maximize general public recognition and acceptance of the registered trademarks and enhance the collective success of all franchises operating under the Jani-King System. None of the Advertising Fee is specifically or principally used for advertising that is principally a solicitation for the sale of franchises. In using the Advertising Fee, neither Franchisor, nor Franchisor's designees are required to make expenditures for Franchisee which are equivalent or proportionate to Franchisee's payment or to ensure that any particular franchisee benefits directly or pro rata from the placement of advertising. Neither Franchisor, nor Franchisor's designees are required to advertise in the area where you are located.

(2) The Advertising Fee may be used to satisfy any and all costs of maintaining, administering, directing, and preparing advertising (including, without limitation, the cost of preparing and conducting television, radio, internet, website, magazine, and newspaper advertising campaigns; direct mail and outdoor billboard advertising; vehicle decaling; public relations activities; employing advertising agencies to assist therein; travel and associated expenses of personnel dispatched to assist in account start ups and account bidding; and costs of our personnel and other departmental costs for advertising that is internally administered or prepared by us). Sums paid by Franchisee relating to the Advertising Fee will also be used to defray any of our administrative costs incurred in activities reasonably related to advertising programs. The Advertising Fee is a payment to us for advertising and related costs, and we do not have any duty to you related to the use of the Advertising Fee.

(3) The Advertising Fee may also be used in our National Vehicle Program ("***NVP***") which is a voluntary program through which Franchisee can purchase a select number of vehicles from a national vehicle manufacturer. In the event Franchisee participates in the NVP, Franchisee is required to have a decal installed on any vehicle purchased through the NVP. The cost and installation of the vehicle decal will be paid out of the Advertising Fee.

4.6. Franchisee further agrees to pay to Franchisor a finder's fee (each, a "***Finder's Fee***") on any additional business or contracts in excess of the Initial Business of which Franchisee accepts and Franchisor assigns to Franchisee, whether or not that additional business or contract resulted from an increase in the contract price for an existing business being serviced by Franchisee, an expansion of service for existing business being serviced by Franchisee at the same or other locations, or completely new business. Finder's Fees are in addition to royalty fees and other payments set out in this Agreement, and are calculated on the gross monthly billing for an account according to the formulas listed below. Franchisor has no obligation to offer Franchisee the right to provide service to additional business or contracts beyond the Initial Business. Should Franchisor, in Franchisor's sole discretion,

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

decide to offer Franchisee the right to service any additional business or contracts, Franchisee may either decline or accept the offer at the time it is made. Franchisor will assign to Franchisee the cleaning and maintenance contracts or additional business that Franchisee accepts, subject to the terms of this Agreement and a separate assignment agreement. The assignment is conditioned upon to, among other things, Franchisee's payment in full of all fees owed to Franchisor.

Following Franchisor's offer and Franchisee's acceptance of the right to provide service to any additional business or contract, the Franchisee agrees to pay an amount as a Finder's Fee according to the guidelines established by the Franchisor. Franchisor will, from time to time, establish such guidelines, policies and procedures as necessary to calculate the applicable Finder's Fee, taking into consideration industry standards and increases in costs and expenses of soliciting new accounts, and Franchisor reserves the right to increase or decrease the Finder's Fee in all categories. Currently, the following guidelines will apply, but any guideline or policy regarding the calculation of a Finder's Fee or the payment thereof, for any account, may be changed by the Franchisor at any time prior to the offering of the account:

(1) Upon acceptance of an assignment of any additional business or contract, the Franchisee will sign an Account Acceptance/Finder's Fee Agreement, which will include the Finder's Fee payment calculations, if any, according to the provisions set out in the Finder's Fee Schedules below.

(2) For each of the Finder's Fee Schedules set out below, the following terms apply to calculate the Finder's Fee for the additional business:

"OVER" / "UP TO": To determine the proper formula for a Finder's Fee payment structure within the appropriate Schedule, the Monthly Billing categories are listed by ranges, where the monthly billing will exceed the amount listed as "OVER", but be less than the amount listed as "UP TO". If the monthly billing may fluctuate, the proper category of Monthly Billing will be determined by the maximum gross monthly billing allowed by the account contract.

DOWN PAYMENT: The initial payment due at the time of acceptance of an assignment of any additional business or contract, or as otherwise established under these guidelines, calculated by multiplying the percentage stated in the appropriate category of Monthly Billing under Down Payment, times the appropriate gross monthly billing. All Down Payments will be calculated using the gross billing for the First Full Month of Service. "*First Full Month of Service*", for purposes of calculating the Down Payment, is defined as the first month in which the service is performed on or before the 15th day of the month. If a partial month is the First Full Month of Service, the gross monthly billing, for purposes of calculating the Down Payment, is determined as though the account had been serviced for the entire month. If the account begins service after the 15th, the following month will be used for purposes of the Down Payment, and no payment is due for the initial period. The Down Payment is due along with the monthly Franchisee Report for the First Full Month of Service (and second month as required) and may be payable as a deduction from the account billing on the Franchisee Report.

MONTHLY PAYMENT: The payment made each month for the designated number of months, calculated by multiplying the percentage stated in the appropriate schedule under Monthly Payment, times the gross monthly billing for the current accounting month. However, the total of the amounts paid as Monthly Payments (exclusive of the Down Payment) will not exceed a sum greater than 300% of: (a) for Variable Rate Accounts, the maximum gross monthly billing that would be generated in a month in which the building was at a 100% occupancy factor, exclusive of any Down Payment; or (b) for Public Event or Seasonal Accounts, the average gross monthly billing for the first 12 months service is performed under the account contract, exclusive of any Down Payment. Monthly Payments will begin the month following any scheduled Down Payment.

JANI-KING OF «Region», INC.        INT _____ INT _____
FRANCHISE AGREEMENT:  4/19       PAGE 7 OF 34
US.122707012.01

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES

MONTHS: The number of months a Monthly Payment must be made under the terms of the Account Acceptance/Finder's Fee Agreement, subject to the maximum sum described in the definition of Monthly Payment.

(3) Accounts will be identified according to the following definitions and the Finder's Fee will be calculated using the formula set out in the appropriate Finder's Fee Schedule for the type of account:

1. FIXED RATE ACCOUNT: An account that has a constant monthly billing established by the account contract, and has a term of one year or longer. The Finder's Fee may be paid in full at the time of acceptance of the account, in which event, Franchisee will pay three times the amount of the maximum gross monthly billing allowed under the contract, or the fee and payment will be structured according to the Schedule.

FINDER'S FEE SCHEDULE (FIXED RATE ACCOUNT):

| MONTHLY BILLING | | DOWN | MONTHLY | |
|---|---|---|---|---|
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
| 0 | 50 | $150(max) | N/A | N/A |
| 51 | 1,500 | 60% | 20% | 13 |
| 1,501 | 3,000 | 40% | 15% | 20 |
| 3,001 | 6,000 | 30% | 10% | 30 |
| 6,001 | 10,000 | 15% | 10% | 32 |
| 10,001 | Unlimited | 5% | 5% | 65 |

2. VARIABLE RATE ACCOUNT: An account with a monthly billing that may fluctuate, depending on the occupancy of the property, where the billing is based on a set price per square foot of service area, and has a term of one year or longer. Any city, State or Federal account, or Public School will be bid as a Variable Rate Account. The Finder's Fee may be paid in full at the time of acceptance of the account, in which event, Franchisee will pay three times the amount of the maximum gross monthly billing that would be generated in a month in which the building was at a 100% occupancy factor, or the fee and payment will be structured according to the Schedule.

FINDER'S FEE SCHEDULE (VARIABLE RATE ACCOUNT):

| MONTHLY BILLING | | DOWN | MONTHLY | |
|---|---|---|---|---|
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
| 50 | 3,000 | 30% | 5% | 72 |
| 3,001 | 6,000 | 15% | 5% | 72 |
| 6,001 | Unlimited | 5% | 5% | 72 |

3. SEASONAL ACCOUNT: An account that will be serviced for a limited period of time but may recur on a seasonal basis. This account may have a constant or fluctuating monthly billing amount. A Down Payment is due only for the initial season. Monthly Payments are due each month until the total paid as Monthly Payments is equal to 300% of the average gross monthly billing for the first 12 months service is performed under the account contract, which may occur over several seasons.

4. PUBLIC EVENT FACILITIES: An account involving a public facility that houses special events for a limited duration, but similar events recur on a regularly scheduled basis. The monthly billing will fluctuate, depending on the type of event or use of the facility, where the billing is based on the labor-hours required to service the property, and has a term of one year or longer. Monthly Payments are due each month until the total paid as Monthly Payments is equal to 300% of the average gross monthly billing for

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES

the first 12 months service is performed under the account contract.

5. APARTMENT TURNAROUND: An account where one or more apartments or other facilities are serviced on a recurring basis as a make ready between occupancies or other uses. The monthly billing will fluctuate depending on the number of units serviced, but the account contract has a term of one year or more.

FINDER'S FEE SCHEDULE (SEASONAL ACCOUNT, PUBLIC EVENT FACILITIES, OR APARTMENT TURNAROUND):

| MONTHLY BILLING | | DOWN | MONTHLY | |
|---|---|---|---|---|
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
| 0 | Any Amount | 20% | 10% | All* |

*Each month service is performed.

6. OTHER NON-STANDARD ACCOUNTS: The Franchisor will establish the Finder's Fee on any other account that does not fall within one of the above definitions, prior to the account being offered to the Franchisee for designation of service. The Finder's Fee on nonrecurring contracts, initial cleaning, or one-time cleaning contracts will vary but do not currently exceed 25% of the total invoiced amount.

(4) Franchisor will establish policies and procedures from time to time which regulate the amount and calculation, terms of payment, credits on termination or transfers of contracts, and other issues concerning Finder's Fees.

4.7. Franchisee agrees to pay Franchisor technology licensing fee ("*Technology Fee*") equal to 2.5% of Franchisee's Gross Revenue. Franchisee agrees to pay the Technology Fee commencing on the fifth day of the month and continuing on the fifth day of every month thereafter for the remainder of the term. Franchisee agrees that Franchisor, in Franchisor's sole discretion, may increase the Technology Fee up to 5% of Franchisee's Gross Revenue.

4.8. Franchisee agrees that Franchisor has the exclusive right to perform all billing and accounting functions for the services provided by Franchisee. Each month, Franchisee agrees to pay Franchisor 3% of Franchisee's Gross Revenue, as an accounting fee ("*Accounting Fee*"), to cover Franchisor's administrative costs and expenses for this service.

4.8.1. Franchisor each month will invoice customers serviced by Franchisee for the services rendered and supplies provided. Each month, after deduction of all appropriate fees and charges including, but not limited to, all royalty fees, Accounting Fees, any note payments, Finder's Fees, advertising fees, transfer fees, Technology Fees, charge-backs on past due invoices, any advances made to Franchisee by Franchisor, Non-Reported Business Fees, or attorneys' fees and court costs incurred by Franchisor in enforcing payment of accounts by customers, Franchisor will issue a report to Franchisee which will provide an accounting of Franchisee's business during the previous month (the "*Franchisee Report*"). On the fifth day of each month, Franchisor will disburse to Franchisee the amount of money appearing in the "Due Franchisee Column" of the Franchisee Report for the preceding month. Any money not collected in an account for any reason will be charged back to Franchisee. In the event the fifth day of the month falls on a Saturday, Sunday or recognized holiday, then all such amounts due to Franchisee will be disbursed before the end of the next business day.

4.9. Franchisee agrees to make all payments due Franchisor promptly in accordance with the terms of this Agreement, and recognizes that any failure on the part of the Franchisee to do so will be deemed a material breach of this Agreement, and will give Franchisor the right to terminate this Agreement immediately and retain all sums

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

previously paid to Franchisor by Franchisee.

4.10.1. During the term of this Agreement, Franchisee agrees to maintain and preserve full, complete and accurate books, records, and accounts regarding the Franchised Business.

4.10.2. Upon request by Franchisor, Franchisee will, at Franchisee's sole cost and expense, prepare and submit to Franchisor within 30 days after said request, a complete financial statement for the preceding 12-month period or any other calendar year, or a financial statement compiled and reviewed by a certified accountant or public accounting firm, together with such other information as Franchisor may reasonably require in order for Franchisor to determine that Franchisee is properly reporting and accounting for all Gross Revenue.

4.10.3. Franchisor reserves the right to inspect or examine any and all accounts, books, records, and tax returns (including payroll records) of Franchisee, the Principals, and any Affiliate (as defined below) of Franchisee or the Principals, at any reasonable time, so far as the same pertain to the Franchisee's obligations under this Agreement.  Franchisor also has the right, at any time, to have an independent audit made of the books or financial records of Franchisee, the Principals, and any Affiliate of Franchisee or the Principals. Any such inspection, examination, or independent audit will be performed at the cost or expense of Franchisor unless the same is necessitated by the failure of Franchisee to provide the reports requested or to preserve records as provided herein, or unless the inspection, examination or independent audit discloses that any statement or report made by Franchisee is in error to an extent of 5% or more, in which case Franchisee must immediately pay to Franchisor the amount in error and reimburse Franchisor for any and all costs and expenses connected with the inspection or audit (including, without limitation, reasonable accounting and attorneys' fees). Franchisee is solely responsible for keeping accurate, complete, and current payroll records. "***Affiliate***" means, at the time of determination: (i) any Person that directly or indirectly through one or more intermediaries controls, is controlled by or under common control with the Person specified; (ii) any director, manager (to the extent the Person is a limited liability company), officer or subsidiary of the Person specified; and (iii) any spouse, parent, child, sibling, mother in law, father in law, son in law, daughter in law, brother in law or sister in law of the Person specified. The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to elect a majority of the board of directors (or other governing body) or to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. In any event and without limiting the generality of the foregoing, any Person owning 10% or more of the voting securities of another Person will be deemed to control that Person. "***Person***" means any natural person, corporation, general partnership, limited partnership, limited liability company, proprietorship, joint venture, trust, association, union, entity, or other form of business organization or any governmental entity whatsoever.

4.11. Franchisee agrees to be solely responsible for the services and results of services performed at locations where cleaning and maintenance services are performed by Franchisee, and to hold harmless and indemnify Franchisor from any and all claims arising from actions by Franchisee or Franchisee's employees, agents, or representatives.

4.12. Franchisee agrees to maintain a clean and safe place of business in compliance with OSHA and other governmental and industry standards and to conduct the Franchised Business in a manner that would bring goodwill and public approval to Franchisee and Jani-King.

4.12.1. Franchisee is solely responsible for any leases of real or personal property in connection with the operation of the Franchised Business. Franchisee's office location, furniture, and décor will comply with Franchisor's brand standards. Franchisee must at all times during the term of this Agreement maintain such office and all fixtures, furnishings, signs, and equipment located thereon in good order and condition, and in a manner which will portray the goodwill and a positive image of the Jani-King name and reputation as such may be prescribed by Franchisor from time to time. No other business venture may operate out of the premises utilized by

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

Franchisee for Franchisee's office without the prior written consent of Franchisor.

4.13.1. Franchisee agrees to be solely responsible for and indemnify and hold harmless Franchisor, Jani-King International, Inc., and their officers, directors, and employees for all loss or damage originating from, in connection with, or relating to the operation of the Franchised Business and for all claims or demands for damages to property or for injury or death of persons directly or indirectly resulting from or related to the operation of the Franchised Business. Franchisee also agrees that before Franchisee will be authorized to begin operating its Franchised Business, Franchisee is required to obtain and carry the insurance listed below with the limits listed, naming Franchisor, Jani-King International, Inc., and their officers and directors as Additional Insureds from an insurer carrying an A.M. Bests' Rating of A or better. Franchisee must provide Franchisor with proof of such required coverage in the following minimum amounts:

| TYPE | LIMITS |
|---|---|
| Comprehensive General Liability | $1,000,000 (per occurrence) $ 2,000,000 (Aggregate) |
| Hired and Non-Owned Automobile Insurance | $1,000,000 (combined single limit) |
| Excess or Umbrella Insurance | $20,000,000 (Aggregate) |
| Workers' Compensation | Statutory Limits |

4.13.2. The various limits of the required insurance may be increased or have new types of coverage added as circumstances dictate. Franchisee must provide Franchisor with proof of the required insurance coverage and is required to notify their insurance carrier that the insurance carrier will provide any cancellation notice directly to Franchisor no less than 30 days prior to cancellation.

4.13.3. If Franchisee fails to secure the above listed insurance to the satisfaction of Franchisor, Franchisor may, in addition to other remedies, purchase such insurance for the benefit of Franchisee and seek prompt reimbursement from Franchisee for all premiums and other costs incurred. Franchisee is responsible for all premiums and other costs incurred by Franchisor up to and including the date Franchisor grants Franchisee written approval of Franchisee's insurance. Franchisee agrees to indemnify and hold Franchisor harmless from any claims, loss or damage.

4.13.4. As an alternative to the requirement of purchasing the above insurance, Franchisor may offer to Franchisee, and Franchisee may participate in Franchisor's Business Protection Plan ("**BPP**") to the extent offered. Participation in the BPP is voluntary, and Franchisee is not obligated or required to participate. If Franchisee does not participate in the BPP, Franchisee must provide Franchisor with a certificate of insurance showing that Franchisee has obtained the equivalent amount of insurance coverage with limits as shown above or as established in the Manual.

4.13.5. Participation in the BPP includes an initial membership in the Guardian Risk Purchasing Group ("**GRPG**"), a Texas non-profit corporation organized for the purpose of purchasing liability insurance on a group basis for persons or entities engaged in the janitorial industry. Membership in the GRPG is restricted to individuals and entities who are engaged in the janitorial industry. Members in the GRPG participate in GRPG's group insurance policies. GRPG's group insurance policies are not individual insurance policies and the policy limits are shared between all GRPG members. If Franchisee does participate in the BPP, Franchisee is not required to purchase the required liability insurance listed above. Insurance provided by GRPG does not include coverage on any personal or business use automobile(s) or Franchisee's equipment, supplies, or building if Franchisee's building is different from Franchisor's. Franchisee is required to purchase this insurance and supply proof of insurance to

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

Franchisor before Franchisee will be authorized to begin operations of the franchise. In the event Franchisee does not purchase this insurance, Franchisor reserves the right to purchase the insurance for Franchisee and charge Franchisee for the cost of the insurance.

In addition to the required coverages identified above, participation in the BPP also includes additional insured status under a Contractor's Pollution Liability Policy issued to Jani-King International, Inc.

In addition to the payment of insurance premiums, participation in the BPP includes non-refundable fees paid to Jani-King Insurance Services, LLC, a licensed insurance producer, as payment for the following services: (1) management of the Guardian Risk Purchasing Group; (2) assistance with risk assessment; (3) management of overall claims handling processes; (4) assistance with compliance of workers' compensation laws; (5) assistance with risk control; (6) assistance with Certificates of Insurance; (7) insurance coverage analysis; (8) assistance with premium audits; (9) general risk management services; (10) periodic safety training; and (11) other regulatory compliance assistance.

4.13.6. Franchisee's membership in GRPG can be terminated if Franchisee: (1) fails to pay any amount owed for Franchisee's participation in the BPP, (2) if Franchisee fails to report all revenue generated by Franchisee's participation in the janitorial industry, (3) if Franchisee files a fraudulent insurance claim under any of the insurance coverage obtained by Franchisee from GRPG, (4) if, in the sole discretion of Jani-King Insurance Services, LLC, Franchisee has excessive losses, or (5) if Franchisee does not participate in the janitorial industry for a full calendar year.

4.14. In connection with Franchisee's agreement to indemnify and hold harmless Franchisor, Jani-King International, Inc., their officers, directors, and employees (the "*Jani-King Parties*") for all loss or damage as set forth in Section 4.13.1 of this Agreement, Franchisee agrees to defend the Jani-King Parties and any of their subsidiaries named in any lawsuit based on such loss or damage and to pay all costs and reasonable attorneys' fees associated with such defense. If any of the Jani-King Parties wishes to retain their own counsel to defend any such action, Franchisee agrees to reimburse the Jani-King Parties for all reasonable costs and legal fees incurred by the Jani-King Parties for such defense. Said reimbursement must be made to Franchisor in a timely manner as such fees are incurred by Franchisor and billed to Franchisee.

4.16.   Franchisee represents and warrants that Franchisee is either a corporation or limited liability company (as indicated on Page 1 of this Agreement), duly incorporated or formed, validly existing and in good standing under the laws of Franchisee's state of incorporation or formation (as indicated on Page 1 of this Agreement). Franchisee has all the requisite power and authority to own and operate Franchisee's properties and carry on the Franchised Business and is duly licensed and qualified to transact business as a foreign entity in all jurisdictions in which the nature of the business conducted by it makes such qualification as a foreign entity necessary.

4.17. Prior to beginning operation of the franchise and before the Initial Offering Period will begin, Franchisee must submit proof of registration with all taxing authorities to which Franchisee will be responsible for paying taxes, including submitting a Federal tax identification number, and any state and municipal taxing identification numbers. Franchisee agrees to pay all personal property, sales, excise, use and other taxes, regardless of type or nature, which may be imposed, levied, assessed or charged, on, against or in connection with any services sold or furnished hereunder, whether from any state, municipality, county or parish, or other governmental unit or agency, which may have jurisdiction over such products, service and equipment. Franchisee must also pay all personnel performing services for Franchisee in full compliance with all Federal, state, local, and municipal laws, statutes, and regulations. Failure to pay taxes will result in termination of this Agreement.

4.18. Prior to beginning operation of the franchise and before the Initial Offering Period will begin, Franchisee must submit proof of a valid and active business checking account in Franchisee's name, such account

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

being with a reputable banking institution. Franchisee agrees to timely pay all debts, obligations, and encumbrances that might arise as a result of its operation of the Franchised Business.

4.19. Franchisee agrees to be solely responsible for the services, and results of such services, performed at locations where cleaning and/or maintenance services are performed by Franchisee and Franchisee's representatives. Franchisee agrees to be solely responsible for providing all labor, materials, tools, and supplies necessary to provide the service to such premises. Franchisee is solely responsible for choosing the times, manner, means, and methods of providing the services in conjunction with the instructions of the customer and in accordance with the terms of the contract under which the services are provided. All of such services will meet the customer's requirements and Jani-King's brand standards.

The following procedures apply if any customer on a contract we previously assigned to Franchisee as part of the Initial Business requests a transfer to another franchisee or cancels the contract:

(1) If an account cancels due to non-performance, theft, failure by Franchisee to service the account to the approval of the customer, failure by Franchisee to maintain good customer relations, or failure by Franchisee to comply with the brand standards in the Manual, Franchisee will not be offered the right to service an additional account to replace the cancelled account.

(2) If an account requests a transfer to a new franchisee due to non-performance, theft, failure by Franchisee to service the account to the approval of the customer, failure by Franchisee to maintain good customer relations, or failure by Franchisee to comply with the brand standards in the Manual, the contract for said account shall automatically revert to Franchisor for resale to another franchisee and Franchisee will not be offered the right to service an additional account to replace the transferred account.

(3) If an account cancels at no fault of the actions of Franchisee and before Franchisee has serviced the account for 12 full months, Franchisee will be offered the right to provide service to one or more accounts with cumulative gross monthly billings equal to at least the gross monthly billing of the cancelled account within a reasonable period of time at no additional cost to Franchisee. This provision applies until the cumulative time Franchisee has provided service to the original account and all replacement account(s) equals 12 months. If any replacement account or combination of accounts has a greater gross monthly billing than the cancelled account being replaced, the amount of gross monthly billing in excess of the cancelled account will be applied to the obligation of other Initial Business, or if the Initial Business obligation has been fulfilled, Finder's Fees will be charged. Franchisor is not otherwise obligated to replace the accounts that are serviced by Franchisee if the account(s) cancel before the full term of the account.

EXAMPLE: An account with a gross monthly billing of $1,000 cancels after seven months through no fault of Franchisee. Franchisor will replace the account with one or more accounts having cumulative gross monthly billing of at least $1,000 per month. If any of the replacement accounts also happen to cancel at no fault of Franchisee at any time during the next five months you service the account(s), Franchisor will replace the replacement account(s) with other account(s). If the cumulative gross monthly billings of the replacement accounts exceed $1,000, the gross monthly billing in excess of $1,000 would apply against other Initial Business obligation or Finder's Fees will be charged.

4.19.1. Franchisee is solely responsible for ensuring that its representatives are in uniforms that comply with Franchisor's brand standards, including that said uniforms are approved, neat, and clean at any time Franchisee's representatives are performing services at a customer's facility. A personal identifying name tag is considered a part of the uniform and is required for compliance with Franchisor's brand standards.

4.19.2. To protect the reputation of the Jani-King name and the Proprietary Marks, Franchisor may inspect any premises or communicate with any customers serviced by Franchisee from time to time to ensure that the

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

Franchisee meets the customer's requirements and Jani-King's brand standards.

4.19.3. Franchisee must cooperate fully with Franchisor, and pay an hourly rate ("*Service Fee*"), plus expenses and travel time, on each occasion Franchisor has to dispatch another franchisee to an account in order to correct a deficiency in satisfying the customer's requirement or complying with the brand standards of Jani-King. The Service Fee charged is currently $50 per hour and 75% of the Service Fee, plus expenses and travel time, is credited by Franchisor to the other franchisee who services the account. This fee may be increased at the sole discretion of Franchisor who will provide notice to Franchisee before such fee increase. In order to promote full compliance with the customer's requirement and all Jani-King brand standards, a Complaint Fee may also be charged to Franchisee as provided in <u>Section 4.19.5</u>.

4.19.4. Franchisee acknowledges that responding to customer demands, complaints, and emergencies is important for protecting customer goodwill toward the Jani-King name, the System, and Proprietary Marks. Franchisor may establish systems for customers to submit demands, complaints, and emergency communications to Franchisee through Franchisor's system. Franchisee shall address all customer demands, complaints, and emergencies in a timely and diligent manner. Franchisee will cooperate fully with Franchisor in investigating and resolving the demand, complaint, or emergency, and Franchisee will confirm resolution of the matter to Franchisor.

Franchisor can elect to dispatch another franchisee to correct deficiencies in satisfying a customer's requirements or complying with Jani-King's brand standards if Franchisor is not able to reach the Franchisee or the Franchisee is not available for an immediate visit or performance of services. Franchisee will be assessed the Service Fee, plus expenses, for another franchisee's time and effort to satisfy the customer's requirements or comply with Jani-King's brand standards. Notwithstanding the above, Franchisor reserves the right to dispatch another franchisee to the customer without contacting, or attempting to contact, Franchisee if Franchisor determines, in Franchisor's sole reasonable discretion, that the customer's premises has an emergency requiring immediate attention.

4.19.5. Franchisee will be charged a $50.00 complaint fee ("*Complaint Fee*") if there is a customer complaint, demand, or emergency which requires Franchisor or another franchisee to respond to or service the customer under the following circumstances: (1) Franchisee's failure to respond to the customer in a timely or diligent manner; (2) Franchisee's unavailability to provide immediate service to the customer; (3) Franchisee's failure to cooperate fully with Franchisor in investigating or resolving the matter; (4) Franchisee's failure to timely and diligently respond to Franchisor's efforts to contact Franchisee; or (5) if Franchisee was notified of the complaint, demand, or emergency and, after two hours following the opening of the customer's business the following day, the deficiency in satisfying the customer's requirements or complying with Jani-King's brand standards has not been corrected to the satisfaction of the customer.

"Service" or "respond to" the customer in this case means communicating with the customer to determine the nature of the complaint, demand, or emergency, and what needs to be done to resolve the situation, and to provide the customer relations necessary to try to protect the account from cancellation or damages to Jani-King's goodwill and does not mean providing cleaning or maintenance services to the customer to resolve a complaint.

4.19.6. The $50.00 Complaint Fee, plus the Service Fee and expenses, will be charged to the Franchisee responsible for the complaint, demand, or emergency even if the account must be transferred to save the account or if the account terminates for non-performance. The fees will be payable in the month they are incurred.

4.19.7. If Franchisee fails to comply with any provision of this Agreement, customer requirement, or Jani-King's brand standards, pursuant to the spirit and intent of this Agreement, and such deficiency continues for 72 hours after Franchisor has given notice to the Franchisee of non-compliance, Franchisor may exercise its right to have any or all customer contracts revert to Franchisor. Franchisor may re-assign the reverted contracts to Franchisee if Franchisor is satisfied that Franchisee will comply with all provisions of this Agreement, customer requirements and Jani-King brand standards, or, at the option of Franchisor, Franchisor may assign the reverted

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

contact(s) to another franchisee. In the event any contracts revert to Franchisor, any assignment of contracts may not include the same accounts to which Franchisee provided services prior to suspension.

4.19.8. Franchisor may also exercise the option to have a customer contract revert to Franchisor immediately upon receiving a request for transfer or cancellation from the customer, or if Franchisee provides any services to any customer and does not report and include such services in their Gross Revenue.

4.19.9. Franchisee will waive any and all payments for services which may become due and payable after the contract(s) revert to Franchisor or transfer to another franchisee and Franchisee will not be entitled to any refund, rebate, or reduction of any fees previously paid or pledged in connection with that customer's contract. If Franchisor does not exercise any option for any contract to revert hereunder, either in part or in full, with regard to any deficiency or default, the election not to exercise any option will not constitute a waiver of such rights with regard to any subsequent deficiency or default.

4.20. At Franchisor's request, Franchisee will provide to Franchisor a list of all customers to which Franchisee is providing service and copies of the contracts under which service is being performed. Franchisee is prohibited, without Franchisor's prior written approval, from disclosing to anyone other than Franchisee's employees the names of the customers or any list of customers to whom Franchisee is providing service.

4.21.1. In the event Franchisee voluntarily wishes to discontinue providing service to an account, Franchisee must notify Franchisor, in writing. If the account's monthly billing amount is less than $10,000, the written request must be made at least 10 days prior to the desired date of transfer. If the account's monthly billing is $10,000 or more, the written request must be made at least 30 days prior to the desired date of transfer. Upon Franchisor's receipt of Franchisee's request to discontinue providing service or in the event Franchisee fails to provide service to an account for a period of two days, for any reason, Franchisor may assign the contract to another franchisee. In either event, Franchisee agrees that any and all payments (regardless of when services were rendered) made after Franchisee no longer provided services to the account will be waived by Franchisee, and Franchisee will not be entitled to any refund or rebate of any fees paid or pledged previously to Franchisor for such business.

4.21.2. Franchisee may solicit potential customers to provide cleaning and maintenance services in the Territory through its Franchised Business. Franchisee may bid for contracts and enter contracts directly with the customers its solicits within the Territory. Franchisor may provide Franchisee with a form bid form and/or form customer contract that Franchisee may adopt for entering contracts with such customers. Franchisee shall obtain Franchisor's prior written consent, which consent shall not be unreasonably withheld, for each bid Franchisee makes to provide services to a customer by submitting the proposed bid, and all documentation related to determining the proposed bid, to Franchisor three (3) days prior to delivering the bid proposal to the customer. To protect the goodwill toward the System, Proprietary Marks, and Jani-King name, Franchisee will not submit bids that are too low for the Franchisee to feasibly provide services consistent with Jani-King's brand standards and the customer's requirements. Franchisee shall also obtain Franchisor's prior written consent for any contract different from Franchisor's form customer contract that Franchisee enters to provide services to a customer by submitting the proposed contract to Franchisor at least seven (7) days prior to entering the contract, which Franchisor may grant or withhold in its sole determination. Franchisee will pay no Finder's Fee if it submits a successful bid to a customer without assistance from Franchisor. If Franchisor assists Franchisee in submitting a bid to a potential customer, Franchisee will pay 50% of the Finder's Fee. "Assistance" and "assists" for purposes of this Paragraph means if, upon a request from the Franchisee or potential customer, the Franchisor measures the customer's site; engages in negotiation of the contract amount or terms; calculates the potential bid range or bid amount; accompanies the franchisee on a customer marketing pitch or sales call; prepares a proposal delivery of the bid; or provides analysis of documentation from the customer in connection with a potential bid.

Franchisee acknowledges that including terms in the bid for contract and customer contract in accordance this Agreement and Jani-King's brand standards is essential to protect the goodwill toward the System, Proprietary

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

Marks, and Jani-King name. Each contract entered directly by Franchisee for it to provide services to a customer must (a) name Franchisor as a third-party beneficiary, (b) require Franchisee to provide services that satisfy the customer's requirements and Jani-King's brand standards, (c) provide that Franchisor has the exclusive right to perform and will perform all billing and accounting functions for the services provided by Franchisee, (d) require Franchisee to maintain the confidentiality of the customer name and address, (e) identify Franchisee as an independent franchisee of Jani-King, (f) prohibit transfer, sale, assignment, or conveyance of the contract during the term of this Agreement except with Jani-King's consent, (g) state that Franchisee is solely responsible for all keys to the customer's premises and any costs incurred if the Franchisee's conduct results in the need to rekey or otherwise change the electronic or manual locks at the customer's premises, and (h) provide that Franchisee will comply with all brand standards for customer contracts in the Manual. Franchisee acknowledges that Franchisor, as a third-party beneficiary to the customer contract, has the right to suspend or cancel service in the event the customer becomes delinquent in payment for services.

4.22 Franchisor reserves the right to establish brand standards pertaining to the operation of Franchisee's Franchised Business or this Agreement. Franchisor also reserves the right to provide guidelines, recommendations, and advice for the Franchisee to adopt, modify, or reject in Franchisee's operation of the Franchised Business. Franchisor will keep a current, updated Manual of all such brand standards and guidelines, recommendations, and advice at Franchisor's corporate office. In the event that brand standards kept by Franchisor differ from those kept by Franchisee, the brand standards maintained in Franchisor's corporate office will be controlling. Franchisor will lend Franchisee one copy of the Manual. The Manual may take the form of one or more of the following: one or more looseleaf or bound volumes; bulletins; notices; videos; CD-ROMS and/or other electronic media; online postings; e-mail and/or electronic communications; facsimiles; or, any other medium capable of conveying the Manual's contents. The Manual will, among other things, set forth Franchisor's brand standards and guidelines, recommendations, and advice for operating your Franchised Business. Franchisee agrees to be bound by the brand standards upon receipt of same by Franchisee, and to operate its franchise in strict compliance with brand standards in the Manual.  Franchisor has the right to prescribe additions to, deletions from or revisions of the Manual (the "**Supplements to the Manual**"), all of which will be considered a part of the Manual. All references to the Manual in this Agreement will include the Supplements to the Manual. Supplements to the brand standards in the Manual will become binding on Franchisee as if originally set forth in the Manual, upon being delivered to Franchisee. The Manual and any Supplements to the Manual are material in that they will affect the operation of the Franchised Business, but they will not conflict with or materially alter Franchisee's rights and obligations under this Agreement.

4.23. Franchisee acknowledges that the System must continue to evolve in order to reflect the changing market and to meet new and changing customer demands, and that accordingly, variations and additions to the System and brand standards may be required from time to time in order to preserve and enhance the public image of the Jani-King name and Proprietary Marks. Accordingly, Franchisee agrees that Franchisor may, from time to time, hereafter or otherwise, change the System and brand standards, including, without limitation, the adoption and use of new or modified Proprietary Marks, Confidential Information, Products, and Services; and Franchisee agrees to be bound by these changes.

 Franchisee agrees to promptly comply with all such additions, modifications and changes at Franchisee's sole cost and expense.

4.24. Franchisee agrees that if Franchisee develops any new concept, process or improvement in the System or the Confidential Information, Franchisee will promptly notify Franchisor and provide Franchisor with all necessary information concerning same, without compensation. Franchisee acknowledges that any such concept, process or improvement will become the property of Franchisor, and Franchisor may utilize or disclose such information to other franchisees as Franchisor determines to be appropriate.

4.25.   Franchisee agrees to maintain a valid and operational email address at which Franchisee may receive communications from Franchisor. Franchisee agrees to update Franchisor as to any changes to such email

CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES

address.

4.26.    At any and all times that Franchisee is actively servicing customers, Franchisee is solely responsible for employing one or more employees, not including any Principals, in connection with the provision of commercial cleaning services by Franchisee to customers, as contemplated in this Franchise Agreement. Franchisee is solely responsible for maintaining accurate, complete and current payroll records, and to abiding by all applicable wage and hour laws, rules and regulations, and any other federal, state or local laws applicable to Franchisee's relationship with its employees.

4.27. Upon termination or non-renewal of this Agreement for any reason, Franchisee must immediately and permanently cease all use of the Proprietary Marks, Confidential Information, and all aspects of the System, and cease indicating verbally or in writing to customers and any other franchisee that Franchisee is a Jani-King franchisee or associated with Jani-King. Franchisee must immediately return to Jani-King all advertising matter, products, and writings that contain Jani-King's Proprietary Marks, trade name, logo or copyright, as well as any Confidential Information. All such lists, files, and the information contained therein will remain the exclusive property of Franchisor.

4.28. If this Agreement is terminated or not renewed for any reason, Franchisee must surrender to Franchisor all property belonging to Franchisor. Franchisee must also pay, in full, all amounts owed to Franchisor at the date of termination or non-renewal and surrender any and all equipment belonging to Jani-King. If Franchisee has proclaimed to have terminated or not renewed the Agreement and refused to surrender the items described herein, Franchisee agrees to pay Franchisor $500.00 per day for each day that it has not complied with the foregoing paragraph. The parties acknowledge that damages for Franchisee's failure to adhere to the foregoing paragraph are difficult to ascertain and therefore agree that this amount will be payable as liquidated damages and not as a penalty.

4.29 If this Agreement is terminated or not renewed, Franchisee may sell its customer contracts to Franchisor or another franchisee, provided it receives Franchisor's prior written consent, which consent shall not be unreasonably withheld. Franchisee shall not be permitted to sell its customer contracts if termination relates in any way to Franchisee's Event of Default.  Franchise shall not be permitted to sell its customer contracts unless Franchisee has fully-paid its financial obligations to Franchisor or Franchisor is satisfied that Franchisee will pay the amounts due to Franchisor from the proceeds of the sale. The amount paid to Franchisee from any sale of customer contracts, whether to another franchisee or Franchisor, will first be applied to satisfy all financial obligations owed by Franchisee to Franchisor.  As a condition precedent to Franchisee's receipt of payment from any sale, Franchisee shall assist with the transition of any customers to another franchisee and execute a general release in favor of Franchisor. If Franchisee proposes to sell the customer contracts to another franchisee, the proposed sale is subject to the transfer provisions in Section 10 and right of first refusal provisions in Section 11 of this Agreement. Upon termination or non-renewal, Franchisee forfeits all rights to its customers and customer contracts, and any customer contracts not sold by Franchisee shall revert to Franchisor.

## SECTION 5

## NONCOMPETITION AND CONFIDENTIALITY

5.1. Franchisor agrees to provide Franchisee with valuable initial and ongoing specialized training, the Confidential Information, and the Proprietary Marks. The initial specialized training provides training in Jani-King brand standards and its guidelines, recommendations, and advice related to operation of the Franchised Business. The ongoing specialized training includes updated information of the type provided in the initial training, as well as additional training and information compiled and developed over time as the System and brand standards evolve. Franchisee acknowledges that, whether or not the initial and ongoing specialized training, or Confidential

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

Information is denoted, labeled or marked as confidential, Franchisor considers such training and Confidential Information to be, and treats it as, confidential.

5.2. In consideration for the valuable initial and ongoing specialized training, and Confidential Information described above, Franchisee and all of the Principals agree as follows:

5.2.1. Franchisee, the Principals, and Franchisee's employees will not at any time, either during the term of this Agreement or after the termination of this Agreement, communicate or disclose to any person or entity (other than Franchisor or a person or entity expressly designated by Franchisor in writing), or use outside the scope of the Franchised Business governed by this Agreement, any of the initial or ongoing specialized training or Confidential Information acquired by Franchisee, the Principals, or Franchisee's employees.

5.2.2. Franchisee and the Principals agree to use all reasonable efforts to maintain as confidential the initial and ongoing, specialized training and Confidential Information. Accordingly, Franchisee and the Principals agree that each of Franchisee, the Principals, and Franchisee's employees may not duplicate, copy, record, or otherwise reproduce, in whole or in part, materials containing Confidential Information and/or information imparted through initial and/or ongoing specialized training, except as expressly authorized in writing by Franchisor.

5.2.3. Franchisee and the Principals agree that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee, the Principals, and Franchisee's employees may not, directly or indirectly, for itself/themselves or through, on behalf of, or in conjunction with any person, persons, partnership, corporation, or other business entity:

(a) Divert or attempt to divert to any competitor, by direct or indirect inducement or otherwise, any business or customer of the Franchised Business hereunder or any other Jani-King franchisee;

(b) Do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Jani-King's trademarks or trade names, or the Jani-King System;

(c) Employ, seek to employ, or otherwise directly or indirectly induce to leave his/her employment any person who is employed by or has been employed within the previous 12 months by Franchisor, or by any of Franchisor's affiliated companies;

(d) Own, maintain, operate, engage in, or have any interest in any business which is commercial cleaning industry or commercial cleaning franchising industry (hereinafter referred to as "***Competing Business***"), which Competing Business operates, solicits business, or is intended to operate or solicit business within the Territory of this Agreement.

5.3. The Parties agree that each of the foregoing covenants will be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this section is held unreasonable or unenforceable by a court or agency having valid jurisdiction over any final decision to which Franchisor is a party that is not appealed, Franchisee and the Principals expressly agree that Franchisee, the Principals, and Franchisee's employees will be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section.

5.4. Franchisee understands and acknowledges that Franchisor will have the right, in Franchisor's sole discretion, to reduce the scope of any covenant set forth in this Section, or any portion thereof, without Franchisee's consent, effective immediately upon written notice to Franchisee; and Franchisee agrees that Franchisee must comply with any covenant as so modified, which modified covenant will be fully enforceable notwithstanding the provisions of any other Sections hereof.

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

5.5. Franchisee acknowledges that any materials and information provided to Franchisee, the Principals, or Franchisee's employees by Franchisor will at all times be and remain the property of Franchisor. Franchisee also acknowledges that any materials, concept, process, or improvement developed in the operation or promotion of the business governed by this Agreement by Franchisee, the Principals, or Franchisee's employees will at all times be and remain the property of Franchisor. Franchisee agrees to give Franchisor notice of and all necessary information related to such development(s). Upon sale, assignment, termination, expiration, or transfer of this Agreement, Franchisee will deliver to Franchisor all property belonging to Franchisor (including, but not limited to, the materials described above) and/or relating to Franchisor's business. In addition, upon sale, assignment, termination, expiration, or transfer to this Agreement, Franchisee agrees to provide Franchisor, with a list of all customers that Franchisee is servicing or has serviced on or at any time during the 12 months preceding the date of such sale, assignment, termination, expiration, or transfer, and a copy of any contracts under which the service is or was provided.

5.6. Franchisee expressly agrees that the existence of any claims that Franchisee, the Principals, or Franchisee's employees may have against Franchisor, whether or not arising from this Agreement, may not constitute a defense to the enforcement by Franchisor of the covenants in this Section. Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees and all costs of court) incurred by Franchisor in connection with the enforcement of this section of this Agreement.

5.7. Franchisee acknowledges that a violation of any of the terms of this Section would result in irreparable injury to Franchisor for which no adequate remedy at law may be available. Franchisee acknowledges that the initial and ongoing specialized training, and Confidential Information described herein have been developed and compiled through Jani-King's time and effort in the franchising industry. Accordingly, Franchisee acknowledges that, in addition to Franchisor's remedies at law, Franchisor may seek and obtain preliminary and permanent injunctive relief restraining the breach or threatened breach by Franchisee; and Franchisee consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of this Section.

5.8. Franchisee is solely responsible for obtaining execution of covenants similar to those set forth in this Section (including covenants applicable upon and after the termination of a person's relationship with Franchisee) from any or all Principals and employees of Franchisee who have received or will receive initial and/or ongoing specialized training, or Confidential Information directly or indirectly from Franchisor. Every covenant required by this paragraph must be in a form satisfactory to Franchisor, including, without limitation, specific and express identification of Franchisor as a third party beneficiary of such covenants with the independent right to enforce them. Failure by Franchisee to obtain execution of a covenant required herein will constitute an Event of Default (as defined in <u>Section 8.3</u>) under the terms of this Agreement.

## SECTION 6

## FRANCHISOR PLEDGES

Franchisor pledges to do the following:

6.1.1. To offer Franchisee the opportunity to provide service to Franchisor's contracts located within the Territory, as defined herein, which have minimum cumulative gross monthly billings in an amount at least equal to the Initial Business. The contracts under which Franchisee will provide service are and will remain the property of Franchisor. The right to provide service to the Initial Business will be offered within the Initial Offering Period. The Initial Offering Period will begin on the date after:

(i)    all required equipment and supplies have been obtained by Franchisee,

(ii)   Franchisee has successfully completed training as indicated by Franchisee's signing and returning to

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

Franchisor the Acknowledgment of Completion of Training,

(iii) Franchisee's delivery to Franchisor of written proof that Franchisee has obtained the insurance required under this Agreement,

(iv) Franchisee's delivery of Articles of Incorporation or Formation and a certificate of good standing from the jurisdiction in which Franchisee was formed,

(v) Franchisee's delivery of a properly completed Internal Revenue Service Form W-9 Request for Taxpayer Identification Number certifying the Taxpayer Identification Number (Employer Identification Number) assigned by the Internal Revenue Service that will be used for operation of Franchisee's business,

(vi) Franchisee's delivery of proof of Franchisee's registration with all state and local tax authorities to which Franchisee will be responsible for paying taxes and any other governmental regulatory agencies that require registration of the Franchisee's business activities or business activities in general, including any identification numbers assigned to Franchisee's business by such tax authorities and governmental agencies within the Territory; and

(vii) Franchisee's delivery of proof of a valid and active business checking account held by Franchisee.

Notwithstanding items (i) through (vii) above, the Initial Offering Period may begin at a later date if requested by Franchisee and agreed to by Franchisor, or as provided below. As a condition to Franchisee being eligible to provide service under the Jani-King name to certain customers and to protect the reputation and goodwill of the Jani-King name, Proprietary Marks, and the System, Franchisee and Franchisee's employees may be required to undergo background checks.

6.1.2. The actual time to secure and offer, as described above, the Initial Business to the Franchisee may, at Franchisor's sole discretion, be automatically extended under the following conditions: (1) if Franchisee requests a delay in the offering of the Initial Business; (2) if Franchisee is in default under the terms and conditions of this Agreement or any other agreements between Franchisee and Franchisor; or (3) if any of the Initial Business previously provided to Franchisee requests a transfer to another Franchisee or requests to be cancelled due to non-performance in which case Franchisee is required to repeat and complete to Franchisor's satisfaction all training classes required by Franchisor. In the event of the occurrence of any of the above conditions, Franchisor will have the remainder of the Initial Offering Period or a minimum of 120 days, whichever is longer, from the date: (1) Franchisee notifies Franchisor that they are ready to accept the right to service other business and has provided any documentation required under this Agreement or under the Manual; (2) Franchisee has cured any default; or (3) the acknowledgment of retraining is signed, to offer the balance of Initial Business to Franchisee. Franchisor does not guaranty that the Initial Business will reach or remain at the level stated on the Franchise Summary throughout the term of this Agreement.

6.2. To provide Franchisee with the Office Supply and Advertising Package outlined in Schedule One of this Agreement.

6.3. To make available to Franchisee applicable confidential manuals, training aids, and other pertinent information concerning Jani-King brand standards and guidelines, recommendations, and advice.

6.4. To provide an initial training program to include Jani-King brand standards and guidelines, recommendations, and advice related to operation of the Franchised Business. Franchisee agrees to successfully complete the training within six months after the date of this Agreement. Franchisee further agrees that some or all of the initial training program may take place at Franchisor's principal place of business in Addison, Texas.

6.5. To offer Franchisee the right to provide service under the Jani-King name to customers until Franchisee has been offered the right to provide service to customers with cumulative gross monthly billings in an amount equal to or greater than the Initial Business.

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

6.6. To provide additional training and support for Franchisee at reasonable rates as established by Jani-King, currently at a rate of $50.00 per hour, plus expenses.

6.7. To allow Franchisee the non-exclusive right to use the Jani-King marks, insignia, logo, design and color scheme in the Territory subject to limitations and restrictions herein, and to allow Franchisee to utilize the processes, methods, materials, equipment, and promotional plans developed by Jani-King.

6.8. At Franchisor's discretion and at a reasonable cost, to make promotional materials, sales and service manuals, equipment, and other materials relevant to the operation of a Jani-King franchise available for loan to and use by Franchisee.

## SECTION 7

## ADDITIONAL SERVICES

7.1. There are no additional services provided by Franchisor to Franchisee except as explicitly set out in this Agreement.

## SECTION 8

## DEFAULT AND TERMINATION

8.1. <u>Right to Terminate Immediately</u>. Franchisor shall have the right, at its option, to terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure any default, effective immediately upon written notice to Franchisee, either by mailing or hand delivery, upon the occurrence of any of the following events (each of which constitutes an "***Event of Default***"):

(a) If any of the Principals is convicted of, pleads guilty or no contest to, pleas down to a lesser crime, or receives deferred adjudication for a felony, a crime involving theft, a crime involving moral turpitude, or any other crime or offense that is reasonably likely, in the sole opinion of Franchisor, to adversely affect the System, any Jani-King trademarks, trade names, or the goodwill associated therewith or Franchisor's interest therein.

(b) If Franchisee or any of the Principals discloses or divulges the contents of any Confidential Information, or any other trade secrets or confidential information provided to Franchisee by Franchisor in violation of the terms and conditions of this Agreement.

(c) If Franchisee abandons the Franchised Business or otherwise forfeits the right to do or transact business in the Territory where the Franchised Business is located.

(d) If Franchisee or any of the Principals purport to transfer any rights or obligations under this Agreement or any customer contract to any third party without the Franchisor's prior written consent.

(e) If Franchisee or any of the Principals makes any material misrepresentations or untrue or false statements on the franchise application or in other correspondence relating to the acquisition of the Franchised Business.

(f) If the Franchisee has three or more Events of Default within a 12-month period, whether or not corrected after notice.

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

(g) If Franchisee is declared insolvent or bankrupt, or makes any assignment or trust mortgage for the benefit of creditors, or if a receiver, guardian, conservator, trustee in bankruptcy or similar officer is appointed to take charge of all or a part of Franchisee's property by a court of competent jurisdiction. This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A., Sec. 101 et seq.)

8.2 <u>Right to Terminate Following 24-Hour Cure Period</u>.  Franchisee's conduct that reflects materially and unfavorably on the reputation of the Franchised Business or on the Jani-King name, the System, Proprietary Marks, or the associated goodwill and reputation thereof shall constitute an Event of Default. Franchisor shall have the right, at its option, to terminate this Agreement and all rights granted hereunder immediately for such Event of Default if Franchisee fails to cure the default to Franchisor's satisfaction within 24 hours of receiving written notice thereof.

8.3. <u>Right to Terminate Following 30-Day Cure Period</u>. Franchisee's failure to comply with any provision of this Agreement, the brand standards in the Manual, or any other agreement between Franchisor and Franchisee shall constitute an Event of Default. If Franchisee fails cure such Event of Default to the satisfaction of the Franchisor within 30 days after written notice of default has been given thereof, Franchisor may, at its option, terminate this Agreement and all rights granted hereunder effective immediately upon Franchisee's receipt of a written notice of termination. Events of Default by the Franchisee under this Section 8.3 include, without limitation, the occurrence of any of the following events:

(a) If Franchisee fails, refuses, or neglects promptly to pay any monies owing to Franchisor, or its subsidiaries or affiliates when due, or to submit the financial information required by Franchisor under this Agreement, or makes any false statements in connection therewith.

(b) If Franchisee (i) enters a contract with a customer without obtaining Franchisor's prior approval, (ii) takes payment directly from a customer, (iii) in any manner circumvents Franchisor's exclusive right to perform billing and accounting services for a customer, or (iv) otherwise does business with a customer without informing Franchisor of the terms of the customer contract or payment obligations of the customer.

(c) If Franchisee fails to maintain the brand standards that Franchisor requires in this Agreement or any other brand standards contained in Jani-King manuals, including the Manual.

(d) If Franchisee engages in conduct which reflects unfavorably on the Jani-King name, the System, Proprietary Marks, or the associated goodwill and reputation thereof.

(e) If Franchisee fails, refuses, or neglects to obtain the Franchisor's prior written approval or consent as required by this Agreement, other than as provided in <u>Section 8.1(d)</u>.

(f) If Franchisee or any of the Principals misuses or makes any unauthorized use of the Jani-King proprietary trademarks, trade names, service marks or other materials, including any forms of advertising, or otherwise materially impairs the goodwill associated with the Jani-King name or Franchisor's rights.

(g) If Franchisee fails, refuses, or neglects to comply with the requirements set forth in <u>Section 4.10.2</u>.

(h) If Franchisee ceases to be duly organized, validly existing, and in good standing under the laws of the state of Franchisee's formation or incorporation or to be duly licensed and qualified to transact business as a foreign entity in all jurisdictions in which the nature of the business conducted by it makes such qualification as a foreign entity necessary.

(i) Any other event specifically designated in this Agreement as an Event of Default.

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

8.3. The termination of this Agreement will be without prejudice to any remedy or cause of action which Jani-King may have against Franchisee for the recovery of any monies due Jani-King or any equipment or property of Jani-King, or to any other right of Jani-King to recover damages for any breach hereof.

8.4. If the provisions of this Agreement provide for periods of notice less than those required by applicable state law, or provide for termination, cancellation, non-renewal or the like other than in accordance with applicable state law, Section 12.2.2. of this Agreement will apply.

## SECTION 9

## TERM AND EXTENSION

9.1. Subject to Section 9.2 herein, this Agreement and the franchise and license granted hereunder, unless sooner terminated, will be and remain in full force and effect for a period of 10 years from and after the Effective Date of this Agreement which is the date identified in the Franchise Summary. This Agreement will expire 10 years after the Effective Date unless extended pursuant to the terms contained herein.

9.2. Provided Franchisee (i) is not in default of this Agreement, (ii) has delivered to Franchisor the required notice, and (iii) has not been required to pay the Minimum Royalty in any of the final 3 months of the current term of this Agreement, Franchisee will have the option to renew this Agreement for an additional period of 10 years and for two subsequent, additional 10-year periods following the first extension (a total of 40 years when initial periods and renewal terms are combined). Prior to the expiration of each 10-year term, Franchisee must notify Franchisor, in writing, of Franchisee's intention to renew the Agreement not less than seven months, nor more than 12 months prior to the end of the then current term.

9.3. As a condition to and at the time of any renewal, Franchisee is required to execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and Franchisor's subsidiaries, and their respective officers, directors, agents, and employees in their corporate and individual capacities, including without limitation, claims arising under this Agreement and any federal, state and local laws, rules, and ordinances.

9.4. As a further condition to and at the time of any renewal, Franchisee agrees to execute Franchisor's then current franchise agreement being used by Franchisor, which may differ substantially from the agreement under which the Franchisee has operated, and any other ancillary agreements and documents as Franchisor may require. Franchisee understands that the most current, executed agreement between Franchisee and Franchisor will govern relations between Franchisor and Franchisee for the following 10 years. However, no additional Initial Franchise Fee or renewal fee must be paid by Franchisee at the time of renewal, nor will Franchisor be obligated to provide any additional Initial Business or training.

## SECTION 10

## TRANSFER

10.1. This Agreement will inure to the benefit of the successors and assigns of Franchisee. The interests of Franchisee in this Agreement are personal and may not be sold, assigned, transferred, shared or divided in any manner, by operation of law or otherwise (each, a "*Transfer*"), by Franchisee without the written consent of Franchisor, which consent will not be unreasonably withheld. Franchisee will provide to Franchisor prior to the Transfer, a copy of any written agreements relating to the proposed Transfer, or any additional information which Franchisor may require in order to determine if Franchisor will grant Franchisor's consent to the proposed Transfer. For purposes of this Agreement, any change in stock ownership, voting or other control whatsoever of a corporation or other entity which acts as a Franchisee under this Agreement constitutes a Transfer. For all purposes herein, a

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

beneficiary of a trust which owns a beneficial interest in a Franchisee which is an entity will be deemed to have an interest in this Agreement. Provided further, for all purposes herein, in the event that a trust owns a beneficial interest in Franchisee which is an entity, any change in the beneficial interest of a beneficiary will constitute a Transfer. Any transaction or series of transactions which would have such an effect must be approved by Franchisor on the same basis as any other Transfer as set forth herein. Franchisee hereby covenants and warrants (i) that Franchisee's certificate or articles of incorporation or formation, corporate charter, by-laws, LLC agreement, and/or company agreement limit Transfers as described in this Section 10, and (ii) if Franchisee is a corporation, that each security will bear a legend (in a form to which Franchisor consents) indicating that any Transfer is subject to this Section 10.

10.2. In the event Franchisee seeks to transfer a customer contract to another franchisee, rather than the Franchised Business as a whole, Franchisee must obtain Franchisor's prior written consent before transferring any customer contract to another franchisee, which consent will not be unreasonably withheld. Franchisee may not transfer a customer contract to a Competing Business outside the Jani-King franchise system.

10.3. Franchisee agrees to pay to Franchisor the lesser of $4,000.00 or 10% of the sales price or exchanged value as a transfer fee (the "***Transfer Fee***"). This Transfer Fee must be paid before Franchisor will grant consent to the Transfer. If no monetary consideration or other exchange of value is made for the Transfer of a franchise, no Transfer Fee will be charged for a transfer to: (1) any party currently holding an interest in the franchise at the time of the Transfer; (2) a controlled corporation in which the current owners of the franchise retain 90% percent or greater of the outstanding shares of stock; or (3) if the Transfer is to an immediate family member of the current owner (for the purposes of this Section 10.2, family members include Franchisee's mother, father, brother, sister, and children only), whether an *inter vivos* Transfer or upon death. An administrative fee will be charged to cover necessary and reasonable costs and preparation of the documents associated with the Transfer if no Transfer Fee is assessed. The current administrative fee is $250.00, but may be increased by Franchisor in the future.

10.4. Prior to the Transfer of the Franchised Business or a customer contract, Franchisee will provide to Franchisor a copy of any written agreements relating to the proposed Transfer or any additional information which Franchisor may require in order to determine if Franchisor will grant consent to the proposed Transfer. It is agreed that consent for Transfer will be granted only when: (a) all obligations under the terms of this Agreement have been fulfilled, (b) all money owed by Franchisee to Franchisor and Franchisor's affiliates have been paid in full, (c) the purchaser of the franchise agrees to undergo and successfully completes the training required of a new Jani-King franchisee and (d) the purchaser of the franchise executes Franchisor's then current franchise agreement which may differ substantially from this Agreement. Franchisee agrees to continue providing service to all of the Franchisor's contracts to which Franchisee is providing service at the time of the proposed Transfer, until items (a) through (d) above are complete and such Transfer is consummated.

10.5. Upon Transfer of the Franchised Business or termination of the Franchise Agreement, Franchisee shall not solicit customers serviced by Franchisor's franchisees for twelve (12) months after the Transfer or termination. Upon Transfer of a customer contract, Franchisee shall not solicit the customer named in the transferred customer contract for twelve (12) months after the Transfer. As a condition of Franchisor's consent to a Transfer, Franchisee shall provide a personal covenant to the purchaser that, for twelve (12) months after the Transfer, Franchisee will not solicit customers serviced by Franchisor's franchisees or, if transferring a customer contract, will not solicit the customer named in the transferred customer contract. The transferor must also execute a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor, Franchisor's parent corporation and affiliated corporations, and the officers, directors, shareholders, and employees of Franchisor and each parent and affiliate corporation in their corporate and individual capacities including, without limitation, claims arising under this Agreement and federal, state, and local laws, rules, and ordinances.

10.6. This Agreement is fully assignable by Franchisor and will inure to the benefit of any assignee or other legal successor to the interest of Franchisor.

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

## SECTION 11

## RIGHT OF FIRST REFUSAL

11.1. In the event Franchisee receives a bona fide, arms-length offer to purchase Franchisee's interest in this Agreement (or in the business conducted hereunder) or a customer contract from any third party, or in the event Franchisee proposes to convert, assign, or otherwise transfer Franchisee's interest in this Agreement (or in the business conducted hereunder) or a customer contract, in whole or in part, to any third party, Franchisee hereby agrees to offer to Franchisor a first right to purchase or otherwise receive Franchisee's interest under the same terms and conditions offered to or accepted from the third party (the "***Right of First Refusal***"). Franchisee's failure to offer to Franchisor the Right of First Refusal will be an Event of Default of the terms of this Agreement. Notwithstanding anything contained herein to the contrary, Franchisee will not be obligated to offer Franchisor the Right of First Refusal if the Transfer is solely between Franchisee and either (a) a corporation whose original sole shareholders are individuals who comprise the original Franchisee and/or (b) the immediate family of Franchisee or the immediate family of the individuals described in (a) herein. For the purpose of this section, immediate family means the spouse, children, siblings, or parents of Franchisee only.

11.2. Franchisee will make available to Franchisor in a written statement verified by Franchisee the terms of the offer received or made by Franchisee, and Franchisor will have 30 days from the receipt of said statement to either accept or refuse such offer. Written notice of Franchisor's decision to accept or refuse said offer will be delivered to Franchisee. Acceptance by Franchisor will be at the same price and on the same terms set forth in the written statement submitted by Franchisee.

11.3. In the event Franchisor fails to accept the offer within the 30-day period, Franchisee will be free to effect the disposition described in the statement upon the exact terms set forth in the statement delivered to Franchisor, provided that nothing in this paragraph may be interpreted as limiting the requirements of Section 10 or Paragraph 4.29.

11.4. Furthermore, in the event Franchisee is insolvent, or upon the filing of any petition by or against Franchisee under any provisions of any bankruptcy law, Franchisor will have the first right to purchase the business conducted by Franchisee, for an amount and pursuant to terms established by an independent appraiser selected by Franchisor.

## SECTION 12

## GENERAL

12.1. Nothing in this Agreement may be construed to prevent Franchisee from freely setting Franchisee's own prices and discounts for services and products which Franchisee may render or sell provided such actions do not affect the business of Franchisor.

12.2.1. Should any part of this Agreement for any reason be declared invalid or unenforceable, such decision will not affect the validity of the remaining portion, which remaining portion will remain in full force and effect as if this Agreement had been executed with the invalid or unenforceable portion eliminated, and the parties to this Agreement agree that they would have executed the remaining portion of this Agreement without including any such part, parts, or portion which may, for any reason, hereafter be declared invalid or unenforceable.

12.2.2. If any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

termination of or refusal to renew this Agreement than is required hereunder, or the taking of some other action not required hereunder, or if under any applicable and binding law or rule of any jurisdiction, any provision of the Agreement or any requirement prescribed by Franchisor is invalid or unenforceable, the prior notice and/or other action required by such law or rule will be substituted for the comparable provisions hereof, and Franchisor will have the right to modify such invalid or unenforceable provision or requirement to the extent required to be valid and enforceable. Franchisee agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is comprehended within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof, or any requirement prescribed by Franchisor, any portion or portions which a court may hold to be unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order. Such modifications to this Agreement will be effective only in such jurisdiction, unless Franchisor elects to give them greater applicability, and will be enforced as originally made and entered into in all the jurisdictions.

12.3. This Agreement and the Attachments and Exhibits hereto constitute the entire Agreement between us and you concerning the subject matter hereof and supersede all prior agreements, negotiations, representations, and correspondence concerning the same subject matter; *provided, however*, that nothing in this Agreement or any related agreement is intended to disclaim the representations we made in the Franchise Disclosure Document that we furnished to you. All transactions between Franchisee and Franchisor regarding any operation of a Jani-King franchised business granted under any franchise agreement dated prior to this Agreement will be controlled by this Agreement and the most current publication of the Manual. Any amendment or modification to this Agreement is invalid unless made in writing and signed by all the parties.

12.4. Franchisee acknowledges that neither Franchisor nor anyone on Franchisor's behalf has made any representations, promises or agreements, orally or otherwise, respecting the subject matter of this Agreement which is not embodied herein. Franchisee specifically acknowledges that the only financial performance information Franchisor furnish is set forth in Item 19 of the franchise disclosure document; that no officer, director, employee, agent, representative or independent contractor of ours is authorized to furnish Franchisee or the Principals with any financial performance information; that, if they nevertheless do, neither Franchisee nor the Principals will rely on any such financial performance information provided by any such individual; and, that if any such individual attempts to or actually does give Franchisee or the Principals any such financial performance information in contravention of this provision, Franchisee will immediately communicate such activity to Franchisor. For the purpose of this Agreement, "financial performance information" means information given, whether orally, in writing or visually which states, suggests or infers a specific level or range of historic or prospective sales, expenses and/or profits of franchised or non-franchised units.

12.4.1. Franchisee acknowledges that Franchisee has carefully read this Agreement, that ample opportunity has been provided for Franchisee to obtain the services of an independent legal or financial advisor, and that Franchisee has had the opportunity to have this Agreement and all supporting disclosure documentation, as well as any other information gathered by the Franchisee, reviewed by an attorney and/or financial advisor of Franchisee's own choice.

12.4.2. Franchisee further acknowledges that Franchisor does not authorize any representative of Franchisor to make any oral, written, visual or other claim or representation that is not contained in the Franchise Disclosure Document provided to Franchisee by Franchisor and does not permit any promises, agreements, contracts, commitments, or representations to be made to Franchisee except those stated in this Agreement.

12.5. Franchisee acknowledges that the Franchised Business and all documents and information Franchisee receives from Franchisor relating to the operation of the Franchised Business, including the manuals and communication tools and the training will be presented to Franchisee in the English language. Franchisee is solely responsible for ensuring that a representative of Franchisee that is fluent in the English language is present during

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

any training provided by Jani-King and available for any translating necessary during the operation of the Franchised Business.

12.6. The Parties agree and understand that Franchisee will be at all times an independent contractor under this Agreement and will not, at any time, directly or indirectly, hold itself out as an agent, servant, or employee of Franchisor. Nothing in this Agreement may be construed to create a partnership, joint venture, agency, employment or fiduciary relationship of any kind. None of Franchisee's employees will be considered to be Franchisor's employees. Neither Franchisee nor any of Franchisee's employees whose compensation Franchisee pays may in any way, directly or indirectly, expressly or by implication, be construed to be Franchisor's employee for any purpose. Franchisee may not, without our prior written approval, have any power to obligate Franchisor for any expenses, liabilities or other obligations, other than as specifically provided in this Agreement.

12.7. No waiver by Franchisor of any default in performance on the part of Franchisee, time being of the essence, or like waiver by Franchisor of any breach or series of breaches, of any of the terms, covenants and conditions of this Agreement will constitute a waiver of any subsequent breach or waiver of said terms, conditions or covenants.

12.8. Any notice required or permitted under this Agreement must be in writing and delivered by personal delivery service, by deposit in the U.S. mail, certified, return receipt requested, or by a recognized express delivery service providing written receipt of delivery at the address listed for the Franchisee in the Franchise Summary or to Franchisor at the following address:

JANI-KING OF«Region», INC.
Address

A Party to this Agreement may change its notice information by providing written notice to the other Party pursuant to the notice requirements stated above, and such change will be effective as to each other Party on the 10th day after delivery to such other Party.

12.9. THE PARTIES AGREE AND INTEND THIS INSTRUMENT TO BE EXECUTED, INTERPRETED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REFERENCE TO CONFLICT OF LAWS PRINCIPLES. TEXAS LAW WILL APPLY TO ALL CLAIMS, DISPUTES, AND DISAGREEMENTS BETWEEN THE PARTIES, WHETHER ARISING FROM ALLEGED BREACHES OF THE CONTRACT OR AGREEMENT OR OTHER CLAIMS ARISING IN ANY WAY FROM THE PARTIES' DEALINGS. JURISDICTION AND VENUE IS DECLARED TO BE EXCLUSIVELY IN DALLAS COUNTY, IN THE STATE OF TEXAS.

12.10. The submission of this Agreement does not constitute an offer to license, and this Agreement becomes effective only upon execution thereof by Franchisor and Franchisee and the compliance with Section 12.13.

12.11. THE PARTIES AGREE THAT ANY DAMAGES SOUGHT BY OR AWARDED TO FRANCHISEE WILL BE LIMITED TO FRANCHISEE'S TOTAL INVESTMENT WITH FRANCHISOR, AND NO PUNITIVE OR EXEMPLARY DAMAGES WILL BE AWARDED TO FRANCHISEE.

12.12. This Agreement will not be binding on Franchisor unless and until it has been accepted and signed by an officer or director of Franchisor at Franchisor's home office in Addison, Dallas County, Texas.

12.13. The numbers and headings of paragraphs used herein are for convenience only and do not affect the substance of the paragraphs themselves.

12.14. Franchisee certifies and warrants that all owners and spouses of owners and all persons who are a shareholder, member, manager, officer or director of any corporation who holds the franchise: (1) are listed in the

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

attached SCHEDULE OF PRINCIPALS; and (2) that all such parties will execute all Guarantees or other documents required by Jani-King.

*[Signatures appear on the following page.]*

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

IN WITNESS WHEREOF, the parties hereto have set their hands this _____ day of _____, 201_____.

JANI-KING OF «Region», INC.                    FRANCHISEE:

BY:_____        _____
                                             (Signature of Owner, Partner or Authorized
                                             Officer)

TITLE:_____        _____ ___
                                             (Print Name)
                                             Social Security #_____

                                             _____
                                             (Title of Authorized Officer)

                                             Franchise Federal Tax ID#: _____

ACCEPTED by the Home Office of Franchisor on this _____ day of _____, _____.

BY:_____
        Authorized Representative

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

## SCHEDULE OF PRINCIPALS

ANY OTHER PERSON NOT LISTED IN THIS AGREEMENT WHO IS A SPOUSE, PARTNER, OR AN OFFICER, DIRECTOR, MANAGER, MEMBER OR SHAREHOLDER OF FRANCHISEE:

Name: _____

Relationship: _____

Taxpayer ID: _____

Address: _____

_____

Telephone: _____


Name: _____

Relationship: _____

Taxpayer ID: _____

Address: _____

_____

Telephone: _____


Name: _____

Relationship: _____

Taxpayer ID: _____

Address: _____

_____

Telephone: _____


Name: _____

Relationship: _____

Taxpayer ID: _____

Address: _____

_____

Telephone: _____

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

### SCHEDULE ONE
### "OFFICE SUPPLY AND ADVERTISING PACKAGE"

LIST OF MATERIALS PROVIDED TO FRANCHISEE
PURSUANT TO THE FRANCHISE AGREEMENT

| ITEM | AMOUNT |
|------|--------|
| Business Cards (imprinted logo) | 1,000 |
| JANI-KING Logo/Border Paper (matching envelopes) | 100 |
| Color Tri-Fold | 50 |
| JANI-KING Tunics | 3 |
| JANI-KING Golf Shirt | 1 |
| JANI-KING Polo Shirts | 4 |
| Inspection Pads | 5 |
| Memo Pads | 5 |
| Past Performance Pads | 5 |
| Account Bid Sheet Pad | 1 pad |
| Contact Evaluation Pad (replace as needed) | 1 pad |
| JANI-KING Logo Binders | 2 |
| JANI-KING Executive Pad Holder | 1 |
| JANI-KING Tri-fold Pad Holder | 1 |
| JANI-KING Training Videos | 1 set |
| JANI-KING Customer Relations Handbook | 1 |
| Account Follow-up Sheets (replace as needed) | 5 |
| New Account Start-Up (replace as needed) | 5 |
| Initial Clean Sign-Off Sheets (replace as needed) | 5 |
| Franchisee Request Cards (replace as needed) | 5 |
| Authorization for Extra Work Forms (replace as needed) | 5 |
| JANI-KING Business Card Order Forms | As Needed |

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

## "SUPPLY AND EQUIPMENT PACKAGE"

THE FOLLOWING SUPPLIES AND EQUIPMENT MUST BE PURCHASED
BY EACH FRANCHISEE PURSUANT TO THE FRANCHISE AGREEMENT AND
PRIOR TO FRANCHISOR OFFERING ANY OF THE INITIAL BUSINESS

The products listed may be purchased from Franchisor, subject to shipping restrictions, or any other source. Franchisor reserves the right, upon thirty days' notice to Franchisee, to require Franchisee to purchase all cleaning equipment and supplies for the operation of its Franchised Business from one or more of Franchisor's affiliates, or from a vendor approved by Franchisor. Prices currently charged by Franchisor may be changed or modified in the future.

| ITEM | AMOUNT |
|---|---|
| All Purpose Cleaner (Biodegradable for use on walls, formica, etc. | 1 - one gallon container (or equivalent) |
| Glass Cleaner | 1 - one gallon container (or equivalent) |
| Restroom Disinfectant | 1 - one gallon container (or equivalent) |
| Cream Cleanser | 2 - one quart containers (or equivalent) |
| Neutral Floor Cleaner | 1 - one gallon container (or equivalent) |
| Carpet Cleaning Concentrate (Bonnet Method) | 1 gallon |
| Carpet Spot Remover | 1 can (or equivalent) |
| Floor Finish Stripper | 1 gallon |
| High Gloss Floor Finish | 1 gallon |
| Stainless Steel Cleaner | 1 can |
| Dust Mop Treatment | 1 can |
| Small Trash Liners (10-12 gallon capacity) | 1 case |
| Large Trash Liners (40-45 gallon capacity) | 1 case |

| ITEM | AMOUNT |
|---|---|
| Mop Bucket (26 quart minimum with wet floor caution inlayed) | 2 |
| Mop Wringer; Down Press | 2 |
| Wet Mop Handle | 2 |
| Wet Mop Head (24 oz.) | 4 |
| Dust Mop Head (24 inch) | 1 |
| Dust Mop Frame (24 inch) | 1 |
| Swivel Dust Mop Handle | 1 |
| Metal-Tipped Handle for Doodle Bug | 1 |
| Doodle Bug Holder and Pads (3) | 1 |
| Plastic Angler Broom | 1 |
| Corner Brush | 1 |
| Toy Broom | 1 |
| Janitor Dust Pan | 1 |

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

## "SUPPLY AND EQUIPMENT PACKAGE" – Continued

| ITEM | AMOUNT |
|---|---|
| 17" Black Stripping Pad | 5 |
| 17" Red Buffing Pad | 5 |
| 17" Bonnet Pad | 1 |
| Window Squeegee Handle | 1 |
| 14" Window Stripwasher with Sleeve | 1 |
| 12" Squeegee Channel | 1 |
| Commercial Sponge with Scrubber | 1 |
| Commercial Sponge | 1 |
| Roll-around Trash Container (32 gallon) | 1 |
| Brute Container Caddy | 1 |
| Lambswool Duster (Telescoping) | 1 |

| ITEM | AMOUNT |
|---|---|
| Disposal Wipes | 1 package |
| Disposal Gloves | 1 box |
| Putty Knife | 1 |
| Sanitary Bowl Swab | 2 |
| Rubber Door Stop | 1 |
| Wet Floor Caution Sign | 4 |
| One Quart Spray Bottle | 6 |
| Trigger Sprayer | 6 |
| 8 oz. Measuring Cup | 1 |
| Cellular Phone (not Available through Franchisor) | 1 |

Franchisor may adjust the items included in the Supply and Equipment Package as industry standards change.

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND RELATED STATE EVIDENTIARY RULES**

### "ADDITIONAL ELECTRIC EQUIPMENT"

THE FOLLOWING EQUIPMENT MUST BE PURCHASED BY EACH
FRANCHISEE PURSUANT TO THE FRANCHISE AGREEMENT AND PRIOR
TO FRANCHISOR OFFERING ANY OF THE INITIAL BUSINESS

The products listed may be purchased from Franchisor or any other source.
Prices currently charged by Franchisor may be changed or modified in the future.

For Plans E-4 and Higher:

| QUANTITY | DESCRIPTION | UNIT PRICE |
|----------|------------|------------|
| 1 | 17" Heavy Duty Floor Machine with 1.5 HP electric motor, triple planetary gearing, includes pad driver, 175 rpm, with easy adjusting handle | $906.40 each |
| 1 | Wet/Dry vacuum with 14 gallon tank includes tool package | $586.72 each |
| 1 | Backpack Vacuum Cleaner, 10 qt. including tool package | $434.40 each |

In addition to the above equipment, any Franchisee purchasing Plans E-10 and higher must purchase the following equipment:

| QUANTITY | DESCRIPTION | UNIT PRICE |
|----------|------------|------------|
| 1 | 20" high speed Burnisher with dust control | $1,754.40 each |

In addition to all of the above equipment, any Franchisee purchasing Plans E-20 and higher must purchase the following equipment:

| QUANTITY | DESCRIPTION | UNIT PRICE |
|----------|------------|------------|
| 1 | Self-contained Extractor with 8 gallon solution tank | $2,415.36 each |